**No. 99-194C**
**(Judge Bruggink)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**MARKETING AND MANAGEMENT INFORMATION, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION *IN LIMINE*

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

SHERYL FLOYD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

OF COUNSEL:

THOMAS D. RATHGEB
ELLIOTT CLARK
Office of General Counsel
Defense Commissary Agency
Fort Lee, VA 23801-1800

MAY 21, 2004

## TABLE OF CONTENTS

DEFENDANT'S BRIEF .......... 2

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF FACTS .......... 3

SUMMARY OF ARGUMENT .......... 9

ARGUMENT .......... 11

I. The Court Should Grant The Government's Motion *In Limine* To Limit The Scope Of Trial .......... 11

II. MMI Assumed The Risk That It Would Not Be Able To Collect Damages Because The Parties Contemplated That The Government Would Not Expend Any Appropriated Funds On The Contract .......... 11

A. The Intention Of The Parties Can Be Gleaned From The Contract .......... 11

B. The Parties Did Not Intend For MMI To Recover Damages From Appropriated Fund Sources For Breach Of The Contract .......... 13

III. MMI Waived Its Right To Assert A Breach .......... 14

IV. Even If The Court Determines That Recovery Is Not Precluded As A Matter Of Law, No Breach Could Have Occurred Prior To The Time The Contracting Officer Issued The Notice Of Termination On June 12, 1998 .......... 16

V. Even If MMI Is Entitled To Recover Damages, It May Not Recover Damages For Any Period of Time After December 31, 1998 .......... 19

A. The Contract Performance Period Ends On December 31, 1998 .......... 20

B. The Contracting Officer Did Not Exercise Any Options On The Contract Which Would Have Extended The Performance Period Beyond December 31, 1998 .......... 22

VI. Even If MMI Is Entitled To Recover Damages, It Is Not Entitled To Collect Interest Because The CDA Does Not Apply To This Contract ............... 24

A. This Contract Is Not Governed By The Contract Disputes Act ............... 25

1. The Court Should Not Rewrite The Contract To Find Two Separate Contracts ........................................................... 26

2. If This Is Not A Procurement For The Purposes Of The Brooks Act And The FAR, It Is Not A Procurement For The Purposes Of The CDA ...................................................................... 27

B. MMI Is Not Entitled To Collect Interest Upon Its Claim Because It Is Not Covered By The CDA ........................................................... 28

VII. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND KUMHO TIRE ........ 29

A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Reliable And Relevant ............ 30

B. To Establish That Proposed Expert Testimony Is Reliable, The Party Proposing The Testifying Expert Must Establish That He Or She Is Qualified To Render The Opinions At Issue .......................................... 32

C. Mr. Metcalfe Is Not Qualified To Provide Expert Opinions Regarding Economic Matters ............................................................... 33

CONCLUSION ........................................................................................................... 37

## TABLE OF AUTHORITIES

### FEDERAL CASES

A.C. Nielsen Co., et al., v. Defense Commissary Agency,
1996-1 B.C.A. ¶ 28,253 G.S.B.C.A.
Nos. 13466-P, 13469-P, 13470-P
(A.C. Nielsen I), vacated,
Marketing and Management Information, Inc. v. Beale,
155 F.3d 567, 1998 WL 314626 (Fed. Cir.) .......... PASSIM

A.C. Nielsen Co., et al., v. Defense Commissary Agency,
1998-2 B.C.A. ¶ 29,938
(A.C. Nielsen III) .......... 8

A.C. Nielsen Company, et al., v. Defense Commissary Agency,
1996-2 B.C.A. ¶ 28,382
(A.C. Nielsen II) .......... PASSIM

Aerolease Long Beach v. United States,
31 Fed. Cl. 342,
aff'd, 39 F.3d 1198,
1994 WL 573795 (1994) .......... 15

Aero Mayflower Transit Co. v. United States,
162 Ct. Cl. 233 (1983) .......... 12

Alaska Airlines, Inc. v. Johnson,
8 F.3d 791 (Fed. Cir. 1993) .......... 28

Apostol v. United States,
838 F.2d 595 (1st Cir. 1988) .......... 32

Atlas Corp. v. United States,
895 F.2d 745 (Fed. Cir.),
cert. denied, 498 U.S. 811 (1990) .......... 9

Barnes v. United States,
138 Ct. C 150 F. Supp. 317 (1957) .......... 17

Berry v. City of Detroit,
25 F.3d 1342 (6th Cir. 1994),
cert. denied, 513 U.S. 1111 (1992) .......... 33,36

Beta Systems, Inc. v. United States,
838 F.2d 1179 (Fed. Cir. 1988) ........ 12

Bonneville Associates v. United States,
43 F.3d 649 (Fed. Cir. 1994) ........ 26

Bourjaily v. United States,
483 U.S. 171 (1987) ........ 31

Brookhard v. Janis,
384 U.S. 1 (1966) ........ 14

CACI, Inc. v. Stone,
990 F.2d 1233 (Fed. Cir. 1993) ........ 3,6

Carroll v. Otis Elevator Co.,
896 F.2d 210 (7th Cir. 1990) ........ 33,34

Coastal Corp. v. United States,
713 F.2d 728 (Fed. Cir. 1983) ........ 25

Commodity Futures Trade Commission v. Schor,
478 U.S. 833 (1986) ........ 14

Community Heating & Plumbing Co. v. Kelso,
987 F.2d 1575 (Fed. Cir. 1993) ........ 11

Continental Collection & Disposal, Inc. v. United States,
29 Fed. Cl. 644 (1993) ........ 12

Coplin v. United States,
6 Cl. Ct. 115 (1984) ........ 26

D.H. Overmyer v. Frick Co.,
405 U.S. 174 (1972) ........ 14

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) ........ 31,32

Dhillon v. Crown Controls, Inc.,
269 F.3d 865 (7th Cir. 2001) ........ 32

Do-Well Machine Shop, Inc. v. United States,
870 F.2d 637 (Fed. Cir. 1989) ........ 15

Dynamics Corp. of America v. United States,
182 Ct. Cl. 62,
389 F.2d 424 (1968) ..... 23,24

EDP Enterprises, Inc. v. United States,
56 Fed. Cl. 498 (2003) ..... 15

Eagleston v. Guido,
41 F.3d 865 (2nd Cir. 1994),
cert. denied, 516 U.S. 808 (1995) ..... 33

Fields v. United States,
53 Fed. Cl. 412 (2002) ..... 23

Firestone Tire & Rubber Co. v. United States,
195 Ct. Cl. 21,
444 F.2d 547 (1971) ..... 12

Florida Power & Light Co. v. United States,
307 F.3d 1364 (Fed. Cir. 2002) ..... 25,28

Forman v. United States,
767 F.2d 875 (Fed. Cir. 1985) ..... 26

Fortec Constructors v. United States,
760 F.2d 1288 (Fed. Cir. 1985) ..... 11,12

G.E Boggs & Associates, Inc. v. Roskens,
969 F.2d 1023 (Fed. Cir. 1992) ..... 25

Genty v. Resolution Trust Corp.,
937 F.2d 899 (3d Cir. 1991) ..... 32

G.L. Christian & Associates v. United States,
160 Ct. Cl. 1,
312 F.2d 418,
rehearing denied, 160 Ct. Cl. 58, 320 F.2d 345,
cert. denied, 375 U.S. 954 (1963) ..... 9

Government Systems Advisors, Inc. v. United States,
847 F.2d 811 (Fed. Cir. 1988) ..... 23,24

Green Management Corporation v. United States,
42 Fed. Cl. 411 (1998) ..... 22,23

Hardin v. Ski Venture, Inc.,
50 F.3d 1291 (4th Cir. 1995) .......... 33

Hi-Shear Technology Corp. v. United States,
356 F.3d 1372 (Fed. Cir. 2004) .......... 23

Hol-Gar Manufacturing Corp. v. United States,
169 Ct. Cl. 384,
351 F.2d 972 (1965) .......... PASSIM

Industrial Indemnity Co. v. United States,
14 Cl. Ct. 351 (1988) .......... 12

Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,
456 U.S. 694 (1982) .......... 28

ITT Arctic Services, Inc. v. United States,
207 Ct. Cl. 743,
524 F.2d 680 (1975) .......... 12

International Transducer Corp. v. United States,
30 Fed. Cl. 522 (1994) .......... 12

Interwest Construction v. Brown,
29 F.3d 611 (Fed. Cir. 1994) .......... 11

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993) .......... 31

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) .......... PASSIM

LaSalle Partners v. United States,
48 Fed. Cl. 797 (2001) .......... 23

Library of Congress v. Shaw,
478 U.S. 310 (1986) .......... 28

Lithuanian Commerce Corp. v. Sara Lee Hosiery,
179 F.R.D. 450 (D.N.J. 1998) .......... 31

Lockheed Martin IR Imaging Systems, Inc. v. West,
108 F.3d 319 (Fed. Cir. 1997) .......... 23

Marine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) .......... 25

Marketing and Management Information, Inc. v. Department of Defense,
1997 U.S. App. LEXIS 18150 (1997) .......... 16

Marketing and Management Information, Inc. v. United States,
57 Fed. Cl. 665 (2003) .......... PASSIM

Marketing and Management Information, Inc. v. Beale,
155 F.3d 567, 1998 WL 314626 (Fed. Cir.) .......... PASSIM

Massengill v. Guardian Management Co.,
19 F.3d 196 (5th Cir. 1994) .......... 17

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) .......... 31,32

McAbee Construction, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) .......... 13

McNamara Construction v. United States,
206 Ct. Cl. 1,
509 F.2d 1166 (1975) .......... 14

Metaphor Computer Systems, Inc.,
1990-1 B.C.A. ¶ 22,542, 117, G.S.B.C.A. (Dec. 19, 1989),
modified on reconsideration, 1990-2 B.C.A. ¶ 22,674 (Jan. 29, 1990) .......... 3,4

North Carolina Division of Services for the Blind v. United States,
53 Fed. Cl. 147 (2002),
aff'd, 2003 WL 1870901 (Fed. Cir. 2003) .......... 15

Otis v. Doctor's Assocs., Inc.,
1998 WL 673595 (N.D. Ill. Sept. 14, 1998) .......... 31

Padilla v. United States,
58 Fed. Cl. 585 (2003) .......... 22

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986) .......... 11

Ralston v. Smith & Nephew Richards, Inc.,
275 F.3d 965 (10th Cir. 2001) .......... 31,32,36

Reliance Insurance Co. v. United States,
931 F.2d 863 (Fed. Cir. 1991) .......... 13

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997),
aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table) .......... 14

Robertson v. Norton Co.,
148 F.3d 905 (8th Cir. 1998) .......... 36

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) .......... 17

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1980) .......... 14,15

Surace v. Caterpillar, Inc.,
111 F.3d 1039 (3rd Cir. 1997) .......... 33

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) .......... 9

Ulmet v. United States,
19 Cl. Ct. 527 (1990) .......... 29

Weeks Dredging and Contracting Inc. v. United States,
11 Cl. Ct. 37 (1986),
aff'd, 861 F.2d 728 (Fed. Cir. 1988) .......... 11

White Mountain Apache Tribe v. United States,
5 Cl. Ct. 288 (1984) .......... 11

White Mountain Apache Tribe v. United States,
10 Cl. Ct. 115 (1986) .......... 11

Zummerling v. Marsh,
783 F.2d 1032 (Fed. Cir. 1986) .......... 29

## FEDERAL STATUTES and REGULATIONS

28 U.S.C. § 1498 .......... 29

28 U.S.C. § 2516(a) .......... 24,28

28 U.S.C. § 3411 .......... 29

31 U.S.C. § 1304 .......... 28

40 U.S.C. § 759 .......... 9

41 U.S.C. § 602 .......... 2

41 U.S.C. § 602(a) .......... 25,27

41 U.S.C. § 602(a)(3) .......... 26

41 U.S.C. § 611 (1982) .......... 29

41 U.S.C. § 612(c) .......... 28

Federal Information Resources Management Regulation,
41 C.F.R. ch. 201 (1993) .......... 4

48 C.F.R. § 52.233-3 (1989) .......... 22

Fed. R. Evid. 702 .......... 30,31,32

## MISCELLANEOUS

3 J. Weinstein & M. Berger,
Weinstein's Evidence ¶ 702[2] .......... 32

Advisory Committee Notes, 2000 Amendments,
Fed. R. Evid. 702 .......... 31

Learned Hand, "Historical and Practical Considerations Regarding Expert Testimony",
15 Harv. L. Rev. 40 (1901) .......... 34

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **MARKETING AND MANAGEMENT INFORMATION, INC.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 99-194C** |
| | ) | **(Judge Bruggink)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION *IN LIMINE***

Pursuant to Rule 16 of the Rules of the United States Court of Federal Claims (RCFC) and the Court's order issued on October 30, 2003, defendant respectfully requests this Court to issue an order limiting the issues for trial based upon its ruling that (1) Marketing and Management Information, Inc. (MMI), fails to state a claim upon which relief can be granted because, as Contract No. DECA01-96-S-0001 (the Contract) states, the parties contemplated that the Defense Commissary Agency would not pay MMI any money; (2) MMI waived any claim for breach damages by knowingly entering into contract with the Defense Commissary Agency (DeCA) which was at risk of being declared void *ab initio* and by not challenging the non-exclusive sale of the scanner data when it had the opportunity to do so; (3) no breach of the Contract could have possibly occurred prior to the time the United States Court of Appeals for the Federal Circuit issued its May 13, 1998 opinion vacating the decision issued by the General Services Administration Board of Contract Appeals (GSBCA) on February 26, 1996, which declared the Contract void *ab initio*; (4) even if MMI is entitled to recover under a breach of contract theory, it may not recover damages for any time after December 31, 1998, because the performance period under the Contract terminated as of that date and DeCA did not extend the

contract performance period; and (5) MMI is not entitled to recover interest on its claim because the Contract is not covered by the Contract Disputes Act, 41 U.S.C. § 602 (CDA). In addition, the Court should strike pages 3 through 11 of the rebuttal report prepared by MMI's expert, Kenneth P. Metcalfe, and it should preclude Mr. Metcalfe from testifying concerning economic matters because he is not qualified to render an expert opinion in the field of economics.

## DEFENDANT'S BRIEF

## STATEMENT OF THE ISSUES

(1) Whether the Court should dismiss MMI's complaint because the parties contemplated that DeCA would not expend any funds under the Contract.

(2) Whether the Court should dismiss MMI's complaint because MMI waived its right to collect any damages (1) by failing to timely protest the legality of the solicitation due to the fact that DeCA did not obtain the appropriate Delegation of Procurement Authority from the GSA, and (2) by not challenging DeCA's non-exclusive sale of the scanner data in April 1986.

(3) Whether DeCA could have breached the Contract prior to June 12, 1998, when the contracting officer proposed to terminate it for the Government's convenience, given that the GSBCA had declared the Contract void *ab initio* on February 26, 1996.

(4) Whether MMI is entitled to recover damages after December 31, 1998, the Contract completion date.

(5) Whether MMI is entitled to recover interest on its claim for damages given that the Contract is not covered by the CDA.

(6) Whether the Court should enter an order (a) striking portions the MMI expert report prepared by Mr. Metcalfe, and (b) precluding Mr. Metcalfe from testifying concerning

economic matters because he is not a qualified economist.

**STATEMENT OF FACTS**

In 1989, the Air Force issued a request for proposal (RFP) F41689-R-0018 for the sale of product movement data obtained from military commissaries in exchange for the distribution of reports of commissary products to vendors who sell their products to the Government itself. Metaphor Computer Systems, Inc., 1990-1 B.C.A. ¶ 22,542, at 113, 117, G.S.B.C.A. No. 10337-P (Dec. 19, 1989), modified on reconsideration, 1990-2 B.C.A. ¶ 22,674 (Jan. 29, 1990). The Air Force awarded Contract No. F41689-89-S-1001 (the Air Force contract) to Military Audits of Marketing Information, Inc. (MAMI), the predecessor to the plaintiff in this case, MMI. The unsuccessful bidder, Metaphor Computer Systems (Metaphor), filed a bid protest at the GSBCA. Metaphor established that the Air Force had failed to obtain the requisite Delegation of Procurement Authority (DPA) under the Brooks Act from the General Services Administration (GSA). Id. at 113,114. Nevertheless, the GSBCA held that the Air Force could cure the defect by obtaining a DPA after the fact from GSA in order to ratify the unauthorized commitment. Id.

In October 1991, DeCA assumed responsibility for the administration of the Air Force contract. Def. App. 1-2.[1] In 1993, subsequent to the GSBCA's decision, the United States Court of Appeals for the Federal Circuit issued a decision which held that, where an agency awards a contract in the absence of a DPA, the contract is a nullity and void and cannot be cured merely by obtaining a DPA after the fact. CACI, Inc. v. Stone, 990 F.2d 1233 (Fed. Cir. 1993).

---

[1] "Def. App. ___" is a citation to the appendix to this brief. There is a non-protected and protected appendix. The non-protected appendix is found at pages 1 through 97 and 262 through 309 and will be filed electronically with this brief. The protected appendix is found at pages 98 through 261 and will be filed under seal at the Court.

On October 24, 1994, DeCA solicited comments upon its draft Request for Proposals for Analytical Support Services for Category Management from various vendors, including MMI, ACNielsen, and IRI. DeCA sought to procure category management support services, training, computer access to its own product movement sales data from its commissaries, money, as well as reports, in exchange for the contractor's access to DeCA's product movement sales data. DeCA's RFP also required that the successful contractor "be able to compare commissary performance indices with those of commercial supermarkets within comparable geographical areas." Def. App. 6.

MMI submitted recommendations to DeCA on the draft RFP. Among other things, MMI questioned whether DeCA's prospective RFP complied with the Federal Information Resources Management Regulation (FIRMR), 41 C.F.R. ch. 201 (1993). Citing Metaphor Computer Systems, Inc., GSBCA No. 10337-P, 1990-1 B.C.A. ¶ 22,542, MMI stated that commercial supermarket data was an automatic data processing resource. Def. App. 103. Therefore, MMI contended that, in order for DeCA to procure this data and reports based upon the data, DeCA was required to obtain a DPA from GSA to comply with the Brooks Act. Id. MMI also observed that DeCA's proposed exchange contract had the unfortunate appearance of an effort to avoid GSA's authority. Id. It further asserted that the GSA, not DeCA, had the authority to decide whether to acquire commercial data through the use of an exchange contract. Id.

DeCA issued RFP No. DECA01-94-R-0068 on June 1, 1995, which it amended on July 19, 1995 (the RFP). DeCA did not seek a DPA from GSA. Despite MMI's pre-award concern and warning, MMI did not file a pre-award bid protest with either the General Accounting Office or the GSBCA..

The draft RFP, the final RFP, and the Contract clearly contemplated that DeCA would not expend any funds, of any sort, on the Contract. Section B of the Contract, "Supplies or Services and Prices/Costs," contained the following statement, in capital letters immediately following the title of the section: "THIS CONTRACT DOES NOT INVOLVE THE EXPENDITURE OF ANY FUNDS APPROPRIATED BY THE U.S. CONGRESS." Def. App. 4.

On or about August 10, 1995, MMI, A.C. Nielsen Co. (ACNielsen), Information Resources, Inc. (IRI), and Management Sciences Associates, Inc. (MSA) submitted proposals in response to DeCA's solicitation. A.C. Nielsen Co., et al., v. Defense Commissary Agency, 1996-1 B.C.A. ¶ 28,253 (Feb. 23, 1996), G.S.B.C.A. Nos. 13466-P, 13469-P, 13470-P (A.C. Nielsen I), vacated, Marketing and Management Information, Inc. v. Beale, 155 F.3d 567, 1998 WL 314626 (Fed. Cir.) (MMI v. Beale). DeCA awarded the Contract to MMI on October 26, 1995. Marketing and Management Information, Inc. v. United States, 57 Fed. Cl. 665, 668 (2003). Commencement of work under the Contract was scheduled to begin on January 1, 1996, and to conclude on December 31, 1998. The Contract also contained two one-year options. Def. App. 4-5, 11 ¶ 8.1, 35 § F.2.

On November 6, 1995, ACNielsen filed a bid protest at the GSBCA challenging the award to MMI because, among other things, DeCA had not obtained a DPA. MMI intervened in the proceeding as an interested party. Marketing and Management, 57 Fed. Cl. at 668. On November 14, 1995, the contracting officer issued a stop work order, pursuant to Contract clause F.1, 52.212-13, Stop Work Order. Id. In order to ensure that DeCA product movement data remained available to industry while the protest was pending DeCA extended the Air Force

contract from December 31, 1995, through March 31, 1996. Id.

On February 26, 1996, the GSBCA declared the Contract void *ab initio*. A.C. Nielsen I, 1996-1 B.C.A. ¶ 28,253, at 141,067. The GSBCA noted that, in light of CACI, Inc. v. Stone, *supra*, the statute authorizing the board did not permit it to ratify a contract that an agency had no authority to create in the first place. Id. The GSBCA directed DeCA "to reassess this procurement and proceed in accordance with statute and regulation." Id. After the board's decision, on March 18, 1996, DeCA sent a letter to the interested parties suggesting two alternatives by which it could insure that its industry partners could continue to receive DeCA product movement data after the Air Force contract expired on March 31, 1996. A.C. Nielsen Company, et al., v. Defense Commissary Agency, 1996-2 B.C.A. ¶ 28,382, at 141,746 (A.C. Nielsen II). On March 21, 1996, MMI filed an appeal of the GSBCA's decision which had declared the Contract void. Id. Notwithstanding the appeal, DeCA had to continue to perform its mission and function. Thus, by letters dated May 8 and 9, 1996, DeCA notified the parties that it would establish an auction procedure by which it would make the monthly raw product movement data available to all those willing to pay for it until the litigation regarding the Contract was resolved. Id. DeCA held the auction on May 17, 1996. Id. Although MMI expressed disagreement with the action, it took no formal action to stop it.[2] As a result of the auction, the monthly price of the data was established at $30,000. Id.

On May 14, 1996, MMI filed a motion with the GSBCA requesting the board to stay its

---

[2] However, in September 1996, MMI did file a Request for a Temporary Restraining Order and Permanent Injunction in the United States District Court for the Eastern District of Virginia seeking to prevent DeCA from distributing its product movement data to vendors, specifically, IRI and ACNielsen, who had not initially signed a license agreement with DeCA. Def. App. 262-73.

February 26, 1996 decision pending the resolution of its appeal to the Federal Circuit. Id. at 141,744, 141,746. DeCA neither opposed, nor joined MMI in its motion for a stay, indicating that it was awaiting the outcome of the appeal to the Federal Circuit. Id. at 141,746. DeCA further stated that, although it "would like to have category management services as envisioned by [the Solicitation], . . . since [DeCA] has not previously had these services and does not presently have these services, . . . [it] would not be irreparably harmed by the operations of [the] Board's Order [nullifying the Contract] while an appeal [was] pending." Id. at 141,746-47.[3] The GSBCA denied MMI's motion for a stay pending its appeal. It rejected MMI's claim of irreparable harm noting that, under the auction contract, MMI could purchase DeCA's scanner data under the same terms as any other vendor. Id. Taking into consideration ACNielsen's, IRI's, and MSA's contention that, if the voided contract were allowed to go forward, only MMI would continue to receive DeCA's valuable data, the GSBCA concluded that public interest would not be served by allowing the voided contract to go forward. Id.

As of late summer of 1996, it became clear to DeCA that (1) there were changes in the industry concerning how category management was conducted, (2) DeCA was able to develop a method for getting its product movement data to its vendors without relying on the Contract, and (3) the Federal Circuit would not issue a decision on MMI's appeal anytime soon. Def. App. 80; see Def. App. 57-60. DeCA's category management needs had changed. Def. App. 62-66, 72-75, 80, 82-84. Moreover, DeCA's training needs had changed. Def. App. 60-62, 67-68, 83. As a result, DeCA's cancelled the RFP on September 30, 1996. Def. App. 48a-48b.

---

[3] In addition, DeCA was concerned that the award of a sole source contract to MMI would be the subject of another protest. Def. App. 68a-68b.

On October 15, 1996, the United States filed a motion to dismiss MMI's appeal of the GSBCA decision because DeCA's cancellation of the solicitation rendered the appeal of the GSBCA decision moot. On January 23, 1997, while the Government's motion was pending, MMI filed another motion with the GSBCA for relief from its decision. A.C. Nielsen Co., et al., v. Defense Commissary Agency, 1998-2 B.C.A. ¶ 29,938, at 148,134 (A.C. Nielsen III). The GSBCA deferred ruling on MMI's request while its appeal was pending before the Federal Circuit. Id. On May 19, 1998, the Federal Circuit granted the Government's motion to dismiss MMI's appeal and vacated the GSBCA's decision because the withdrawal of the solicitation mooted the question of the propriety of its original solicitation. MMI v. Beale, 1998 WL 314626, **2. Mr. Edward Downey, Chief Operating Officer of MMI, sent a letter to the contracting officer, Mr. Lawrence Hahn on June 12, 1998, in which he requested the DeCA "to proceed with its contract obligations" and stop disseminating the scanner data to ACNielsen and IRI. Def. App. 49-52. On June 12, 1998, the contracting office notified MMI that Contract No. DECA01-96-S-0001 was cancelled in its entirety for the convenience of the Government. Def. App. 53-54.

MMI filed its complaint in this case on April 2, 1999. It alleged that (1) DeCA breached its express contract with MMI by terminating it for the convenience of the Government; (2) DeCA breached an implied-in-fact contract with the Government by selling its data to parties other than MMI; and (3) DeCA breached its covenant of good faith and fair dealing by not complying with the GSBCA's recommendation to obtain a DPA from the GSA and, instead, cancelling the solicitation. Compl. ¶¶ 28-37.

Pursuant to the Court's order dated June 5, 2002, the parties filed cross-motions on the

issues of liability with the exception of two issues, (1) whether the contract in question was one for Automatic Data Processing Equipment (ADPE), and (2) the value of the ADPE. The Court granted MMI's motion for summary judgment finding that the solicitation was not a procurement under the Brooks Act, 40 U.S.C. § 759, because no appropriated funds were used. Marketing and Management, 57 Fed. Cl. at 673-74. It also rejected the Government's argument that the Contract was covered by the Federal Acquisition Regulations (FAR) and thus contained a termination for convenience clause by operation of the Christian doctrine. Id. at 674-675, citing G.L. Christian & Associates v. United States, 160 Ct. Cl. 1, 312 F.2d 418, rehearing denied, 160 Ct. Cl. 58, 320 F.2d 345, cert. denied, 375 U.S. 954 (1963). The Court granted the Government's motion to dismiss Count III finding that the Government did not breach its duty of good faith and fair dealing. Marketing and Management, 57 Fed. Cl. at 675. The Court noted that it did not resolve the issue of when the breach of contract occurred. Id.[4]

**SUMMARY OF ARGUMENT**

The Court should grant the Government's motion *in limine*. Having found in that the Contract does not provide for the payment of money by the Government, Marketing and Management, 57 Fed. Cl. at 667, 673-74, the Court should dismiss MMI's complaint because MMI fails to state a claim upon which relief can be granted. In addition, MMI waived any claims

---

[4] Although the Court did not expressly rule on Count II, MMI's theory of recovery under an implied-in-fact contract is precluded by the general principle that, if there is an express contract, there can be no implied-in-fact contract which covers the same subject matter as the express contract. Trauma Service Group v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997), accord Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir.) ("The existence of an express contract precludes the existence of an implied contract dealing with the same subject[.]"), cert. denied, 498 U.S. 811 (1990).

for relief because it knowingly entered into the Contract with full knowledge that DeCA lacked the authority to award an automatic data processing equipment (ADPE) contract without obtaining the necessary DPA. It assumed the risk that the Contract would be declared void *ab initio*. In addition, MMI waived any claim it might have for damages from April 1996 through May 1998, because MMI did not challenge DeCA's authority to issue license agreements for the sale of scanner data upon a non-exclusive basis.

In any event, even if the Court determines that MMI is entitled to recover damages under a breach of contract theory, no breach could have occurred prior to the Federal Circuit's May 13, 1998 vacation of the GSBCA's decision finding the Court void *ab initio*. In the absence of a contract, there can be no breach.

Moreover, MMI may not recover damages for any time after December 31, 1998. The Contract expressly provided that the period of performance was from January 1, 1996, through December 31, 1998. The contracting officer never extended the period of performance under the Contract, nor did he exercise either of the two one-year options.

In addition, should the Court find that MMI is entitled to recover damages, it is not entitled to collect interest because the Contract does not provide for the payment of interest, and no statute providing for the payment of interest covers this Contract. Specifically, this is not a CDA contract because, as the Court found, it is an exchange contract, not a procurement, and it does not involve the disposal of personal property by the Government.

Finally, the Court should strike the rebuttal report (pages 3 through 11) of MMI's expert, Mr. Metcalfe, and it should preclude Mr. Metcalfe from testifying upon economic matters at trial because he lacks the expertise in the field of economics.

## ARGUMENT

### I. The Court Should Grant The Government's Motion *In Limine* To Limit The Scope Of Trial

This Court has acknowledged that "[a] motion in limine is a recognized method under [RCFC] 16 and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial." White Mountain Apache Tribe v. United States, 10 Cl. Ct. 115, 116 (1986). In that regard, the hallmark of Rule 16 is the call for a more active and extensive pretrial case management on the part of the Court. White Mountain Apache Tribe v. United States, 5 Cl. Ct. 288, 292 (1984).

The purpose of a motion *in limine* is:

> . . . to prevent a party before trial from encumbering a record with irrelevant, immaterial or cumulative matters. Such a motion enables a court to rule in advance on the admissibility of documentary or testimonial evidence and thus to expedite and render efficient a subsequent trial.

Weeks Dredging and Contracting Inc. v. United States, 11 Cl. Ct. 37, 45 (1986), aff'd, 861 F.2d 728 (Fed. Cir. 1988). A motion *in limine* is also useful to “resolve issues which would otherwise 'clutter up' the trial." Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986).

### II. MMI Assumed The Risk That It Would Not Be Able To Collect Damages Because The Parties Contemplated That The Government Would Not Expend Any Appropriated Funds On The Contract

#### A. The Intention Of The Parties Can Be Gleaned From The Contract

It is well settled that questions of contract interpretation are questions of law to be decided by the Court. Interwest Construction v. Brown, 29 F.3d 611, 614 (Fed. Cir. 1994); Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993); Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985); Hol-Gar Mfg. Corp. v.

United States, 169 Ct. Cl. 384, 386, 351 F.2d 972, 974 (1965). The interpretation of a contract provision is a question of law. Fortec, 760 F.2d at 1291.

"'[I]t has been a fundamental precept of common law that the intention of the parties to a contract control its interpretation.'" Beta Systems, Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988), quoting Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971); ITT Arctic Services, Inc. v. United States, 207 Ct. Cl. 743, 751, 524 F.2d 680, 684 (1975); International Transducer Corp. v. United States, 30 Fed. Cl. 522, 526 (1994); Industrial Indemnity Co. v. United States, 14 Cl. Ct. 351, 356 (1988). The intention of the parties should be gathered from the instrument as a whole. ITT Arctic Services, 207 Ct. Cl. at 751, 524 F.2d at 684; Hol-Gar Manufacturing Corp. v. United States, 169 Ct. Cl. 384, 388, 351 F.2d 972, 979 (1965); Continental Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 644, 649 (1993). "[T]he language of the contract must be given the meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." Hol-Gar Manufacturing, 169 Ct. Cl. at 388, 351 F.2d at 975; Firestone Tire & Rubber, 444 F.2d at 551; Continental Collection, 29 Fed. Cl. at 649. The contract language should be ascribed

> 'its ordinary and commonly accepted meaning,' Hol-Gar Manufacturing Corp. v. United States, 351 F.2d 972, 976, 169 Ct. Cl. 384, 390 (1965), without twisted or strained out of context analysis, Aero Mayflower Transit Co. v. United States, 162 Ct. Cl. 233 (1983), or without regard to the subjective unexpressed intent of one of the parties. (citations omitted)

ITT Arctic Services, 524 F.2d at 684.

In addition, the court should "interpret the contract in a manner that gives meaning to all

of its provisions and makes sense." McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). In reading the contract as a whole, the Court should interpret provisions to avoid conflicts with other provisions in the same document. Reliance Insurance Co. v. United States, 931 F.2d 863, 865 (Fed. Cir. 1991); Hol-Gar Manufacturing, 169 Ct. Cl. at 395, 351 F.2d at 979 (a "provision [should not] be construed as being in conflict with another unless no other reasonable interpretation is possible").

### B. The Parties Did Not Intend For MMI To Recover Damages From Appropriated Fund Sources For Breach Of The Contract

In reaching the conclusion that the Brooks Act and the FAR did not apply to this Contract, the Court relied upon the plain language of the Contract in which DeCA advised the bidders: "THIS CONTRACT DOES NOT INVOLVE THE EXPENDITURE OF ANY APPROPRIATED FUNDS BY THE U.S. CONGRESS." Marketing and Management, 57 Fed. Cl. at 667. From this statement, the Court concluded that "[t]he contractor was to bear the cost of acquiring the product movement data, which the contractor would then manipulate at its own expense to provide analytical support services for category management to [DeCA]." Id. The Court also observed that, by the intentional nature of the omission of the termination for convenience clause, "the contract cannot be construed as including the termination for convenience clause." Id. at 675.

It follows from the fact that the Contract did not involve the expenditure of any Government funds, appropriated or otherwise, and from the absence of a termination for convenience clause in the Contract that the parties did not intend for MMI to recover any appropriated funds in the form of damages from its non-performance of the Contract. Had DeCA

intended for MMI to recover any money from the premature termination of the Contract, it would have included the standard termination for convenience clause in the Contract which would have permitted MMI to recover money as a result of its non-performance of the Contract. MMI clearly recognized that it would not receive any appropriated funds under the Contract. Id. at 667. By acknowledging the absence of appropriated funds to fund the Contract and by acceding to the absence of a termination for convenience clause, MMI assumed the risk that it would not be paid any money for the premature termination of the Contract. Cf. McNamara Constr. v. United States, 206 Ct. Cl. 1, 8, 509 F.2d 1166, 1169 (1975) (contractor assumes the risk of unexpected costs in a fixed-price contract). In any event, the parties agreed that this would be an unfunded, no-cost contract. For this reason, MMI has failed to state a claim for which relief can be granted. Accordingly, the Court should dismiss its complaint.

## III. MMI Waived Its Right To Assert A Breach

Waiver requires only that the party waiving a right do so "voluntarily" and "knowingly" based on the facts of the case. Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1563 (Fed. Cir. 1980), citing Brookhard v. Janis, 384 U.S. 1, 4, 5 (1966); D.H. Overmyer v. Frick Co., 405 U.S. 174, 185-86 (1972). MMI relinquished its right to claim breach of contract damages by voluntarily and knowingly entering into a contract with significant ADPE requirements without the agency's seeking approval of GSA.

Lacking an affirmative prohibition by Congress, it is well settled that a party may waive regulatory, statutory, and even constitutional rights or benefits. Reservation Ranch v. United States, 39 Fed. Cl. 696, 712 (1997), aff'd, 217 F.3d 850 (Fed. Cir. 1999) (table), citing Commodity Futures Trade Comm'n v. Schor, 478 U.S. 833, 848 (1986) (contractual waiver of

due process rights); Seaboard Lumber Co., 903 F.2d at 1563 (contractual waiver to jury trial); Do-Well Mach. Shop, Inc. v. United States, 870 F.2d 637, 641 (Fed. Cir. 1989) (contract provision limiting statutory right to present termination of convenience claim upheld on waiver grounds). This Court has applied this principle of waiver in the bid protest area to cases in which a protestor challenges the award of a contract even though the error complained of is on the face of the solicitation. EDP Enterprises, Inc. v. United States, 56 Fed. Cl. 498, 500 (2003); North Carolina Division of Services for the Blind v. United States , 53 Fed. Cl. 147, 165 (2002), aff'd, 2003 WL 1870901 (Fed. Cir. 2003); Aerolease Long Beach v. United States 31 Fed. Cl. 342, aff'd, 39 F.3d 1198, 1994 WL 573795 (1994). The Court has found that, where an objection is untimely, the offeror has waived its rights in that regard. Id.

The principle of waiver also applies here. As of November 15, 1994, when Ms. Downey notified the contracting officer that DeCA should obtain a DPA from GSA, MMI knew that DeCA could not proceed with the solicitation without obtaining authorization from the GSA. MMI should have filed a protest before bid submissions were due with either the GSBCA or the General Accounting Office. Instead, MMI did not file a protest. Thus, MMI reserved to itself the ability to file a bid protest if it were not the successful offeror.

After it was awarded the Contract, the disappointed bidders, ACNielsen, IRI, and MSA, filed a protest with the GSBCA and prevailed upon the protest on the same issues that MMI raised almost a year prior to contract award. Now that the Federal Circuit vacated the GSBCA's decision, MMI is attempting to recover lost profits and other damages resulting from a solicitation that should not have proceeded in the first place. MMI assumed the risk that the Contract would be declared void *ab initio*. It should not be permitted to recover damages

because it failed to file a bid protest to resolve the problems it identified in the solicitation prior to contract award.

Moreover, MMI waived its claim to collect damages for the Government's sale of scanner data upon a non-exclusive basis as of April 1996. Although MMI filed a lawsuit in the district court in the Eastern District of Virginia in September 1996, MMI's complaint only challenged DeCA's authority to sell DeCA's April 1996 scanner data upon a retroactive basis to IRI and ACNielsen in July and August 1996. Def. App. 266-67, ¶¶ 12-16.[5] MMI is now belatedly trying to collect damages for DeCA's sale of scanner data to IRI and ACNielsen, when, in fact, it had an opportunity to challenge DeCA's authority to sell its scanner data upon a non-exclusive basis when DeCA first announced the spot bid auction in May 1996. By sitting on its rights, MMI has waived its opportunity to recover damages for DeCA's sale of scanner data upon a non-exclusive basis.

## IV. Even If The Court Determines That Recovery Is Not Precluded As A Matter Of Law, No Breach Could Have Occurred Prior To The Time The Contracting Officer Issued The Notice Of Termination On June 12, 1998

MMI states, in response to the Government's interrogatories, that the breach of the Contract occurred on April 1, 1996, or, in the alternative, no later than September 30, 1996. Def. App. 90-91. In support of the April 1, 1996 breach date, MMI contends that the Government breached the Contract on that date "by failing to perform its obligations under the [C]ontract." Id. In support of the alternative September 30, 1996 breach date, MMI notes that the

[5] The district court denied MMI's motion for a temporary restraining order and permanent injunctions. Def. App. 274-97, 298-309. The latter decision was affirmed on appeal. Marketing and Management Information, Inc. v. Department of Defense, 1997 U.S. App. LEXIS 18150 (1997).

Government cancelled the solicitation on that date and that the Federal Circuit dismissed its appeal of the GSBCA's decision as moot because of the cancellation of the solicitation. Def. App. 90-92. No basis exists to conclude that the Government breached the Contract on either April 1, 1996, or September 30, 1996.

To recover for a breach of contract, a party must establish: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). Therefore, it follows that, where no contract has been formed, there can be no breach. See, e.g., Massengill v. Guardian Management Co., 19 F.3d 196, 205, n. 4 (5th Cir. 1994); Barnes v. United States, 138 Ct. Cl. 76, 80, 150 F. Supp. 317, 320 (1957).

MMI is unable to establish that DeCA breached the Contract on either April 1, 1996 or September 30, 1996, because, on February 23, 1996, the GSBCA declared the Contract void. A.C. Nielsen I, 1996-1 B.C.A. ¶ 28,253, at 141,067. According to the GSBCA's ruling, the Contract was never formed because, in the absence of a DPA, DeCA did not have the authority to enter into the Contract when it was executed. Id. Without a contract in existence, DeCA was not obligated to commence performance on April 1, 1996, and DeCA could not have breached the Contract when it cancelled the RFP on September 30, 1996.

The GSBCA's ruling that the Contract was void *ab initio* was undisturbed during the period of time that MMI claims DeCA breached the Contract. Although MMI filed a notice of appeal of the GSBCA's decision on March 21, 1996, that did not have the effect of staying the GSBCA's decision regarding the existence of the Contract. In fact, the GSBCA explicitly rejected MMI's request to stay the effect of its decision pending MMI's appeal. A.C. Nielsen II,

1996-2 B.C.A. ¶ 28,382. Contrary to MMI's contention, DeCA did not breach the Contract by not continuing with its performance during the pendency of MMI's appeal. Rather, DeCA was complying with the board's decision that it could not proceed with the Contract. In addition, DeCA could not have breached the Contract with MMI by cancelling the solicitation on September 30, 1996, because the Contract was a nullity. The Federal Circuit did not vacate the GSBCA's decision until May 19, 1998. MMI v. Beale, 1998 WL 314626, at **2. Even so, the Federal Circuit properly vacated the decision of the GSBCA because there cannot be a decision that a non-existent contract is void because DeCA had previously cancelled the solicitation while MMI's appeal was pending. Id. The Federal Circuit never ruled on the merits of MMI's appeal. Id.

Since the Contract was void and the Government took no action one way or another, there is no basis to conclude that the Government breached the Contract prior to June 12, 1998, when it terminated the Contract for the convenience of the Government. Moreover, although the Court's August 25, 2003 order states that the Government's June 12, 1998 attempt to terminate the Contract for its convenience constituted a breach because the Contract did not contain a termination for convenience clause, MMI has not explained how a breach could have occurred as of that date. The Federal Circuit's decision vacated the GSBCA's February 26, 1996 decision declaring the Contract void. The Federal Circuit based its ruling upon the cancellation of the solicitation on September 30, 1996. That cancellation precluded the Contract from existing at all.

No explanation has been given as to how the Contract could spring back to life as of May 19, 1998, when the Federal Circuit vacated the GSBCA's decision, given that the solicitation

which gave rise to the Contract had been cancelled almost one and one-half years earlier. DeCA could not and did not breach the Contract because the GSBCA ruled that the Contract never existed. DeCA could not act in defiance of that order. Certainly, DeCA's cancellation of the solicitation could not be deemed to be a breach of a non-existent contract. Moreover, DeCA's termination for convenience was not a breach because the Contract could not be reinstated after the solicitation had been cancelled.

## V. Even If MMI Is Entitled To Recover Damages, It May Not Recover Damages For Any Period of Time After December 31, 1998

MMI instructed its expert, Kenneth P. Metcalfe, to calculate damages under four alternate scenarios, with different starting dates, assuming that the contract period would run for three years and that the Government would exercise the two one-year options in the Contract. So, under the four scenarios MMI calculates its damages based upon the following breach and contract conclusion dates: (1) Scenario I - the breach occurred on April 1, 1996, and the contract concluded in March 2001; (2) Scenario II - the breach occurred on September 30, 1996, and the contract concluded in September 2001; (3) Scenario III - the breach occurred on January 1, 1996, and concluded at the end of 2000; (4) Scenario IV - the breach occurred on June 12, 1998, and concluded in June 2003.

Contrary to MMI's contention, damages should not be based upon a contract performance period of three years, regardless of when the breach allegedly occurred. The performance period is explicitly stated in the Contract as commencing on January 1, 1996, and concluding on December 31, 1998. Nor is MMI correct in assuming, for the purposes of damages, that the Government would have exercised its two one-year options. The Contract specifies that the

contracting officer must express in writing an intention to exercise an option within a specified period of time before the contract expiration date. The contracting officer never extended the contract performance period, nor did he exercise the Government's option to extend the Contract beyond three years. Therefore, this Court should, as a matter of law, preclude MMI from testifying regarding damages, if any, beyond December 31, 1998.

### A. **The Contract Performance Period Ends On December 31, 1998**

Paragraph F.2, "Period of Performance" of the contract states that the

> term of any contract awarded as a result of this solicitation will extend from 01 Jan 1996 through 31 Dec 1998 (three year term). The contract will also contain two (2) one-year options periods, which may be exercised by the Government to extend the term of the contrat, pursuant to the terms of this contract.

Def. App. 35, ¶ F.2. Section B of the contract which specifies the amount the Government will be paid under the Contract also specifies that, for Line Item 0001, the BASIC CONTRACT PERIOD is January 1, 1996, through December 31, 1998; for Line Item 0002, the FIRST OPTION PERIOD is January 1, 1999, through December 31, 1999; and, for Line Item 0003, the SECOND OPTION PERIOD is January 1, 2000, through December 31, 2000. Def. App. 4-5. The language in the text of Section B further supports this interpretation. It states:

> Acceptance for line item number 0001, for the base period of performance of 01 Jan 1996 through 31 Dec 1998. This award also reserves the right of the government to exercise the two full option periods, as well as any other option periods specified in this contract, in accordance with the terms of the contract.

Def. App. 5. Paragraph F.2 and section B clearly state that the contract performance period extends from January 1, 1996, through December 31, 1998, and they indicate that the first option year begins on January 1, and extends through December 31, 1999, and that the second option

year begins on January 1, and extends through December 31, 2000.

In his deposition, Mr. Metcalfe suggested that the initial performance period was three years, rather than the period from January 1, 1996, through December 31, 1998, based upon the language contained in ¶ 8.1 of Section C, the Statement of Work. Def. App. 214c-214e. Paragraph 8.1 states:

> Because of the initial start-up costs to be incurred by the contractor, this contract will be written for a basic three year period, with two (2) one-year option periods. The decision to exercise any and all options under this contract shall be a unilateral right of the Government, and shall be accomplished in accordance with the applicable clauses of this contract.

Def. App. 11. Although ¶ 8.1 does not specify when the three-year performance period begins and ends, section B and ¶ F.2 expressly state that the performance period begins on January 1, 1996, and terminates on December 31, 1998. The rules of contract interpretation prescribe that contract provisions should be read in harmony unless no other reasonable interpretation is possible. Hol-Gar Manufacturing, 169 Ct. Cl. at 395, 351 F.2d at 979. Accordingly, ¶ 8.1 should be read in harmony with section B and ¶ F.2, specifying that the Contract performance period began on January 1, 1996, and ended on December 31, 1998.

Even though the contracting officer had the authority to extend the contract performance period beyond December 31, 1998, either by executing a modification to the Contract performance period or by exercising an option, no evidence exists that he did so. Paragraph G.1 provides that "[n]o changes in, or deviation from, the scope of work shall be effected without a written modification to the contract executed by the Contracting Officer." Def. App. 36, ¶ G.1. Although the Contract contains the "Protest After Award" clause found at 48 C.F.R. § 52.233-3

(1989), which provides that, when a bid protest is resolved, the contracting officer should either cancel the stop-work order or terminate the work covered by that order, Def. App. 43, ¶ I.40, Mr. Lawrence Hahn, the contracting officer, did not cancel the stop work order. In addition, he issued no modifications to the Contract extending the contract performance period.

Although the Court has determined that a contract existed and was breached, no basis exists to conclude that the contract performance period extended beyond December 31, 1998. Padilla v. United States, 58 Fed. Cl. 585, 590 (2003) ("[t]he Contracting Officer never executed a modification extending the contract period to account for the moratorium"); Green Management Corporation v. United States, 42 Fed. Cl. 411, 441-42 (1998) (the contractor never requested a schedule adjustment and the agency obtained the services required under the contract from another contractor "during the period of [work] suspension [caused by the protest] through the use of another contractual vehicle (obviating the need for an extension)").

### B. The Contracting Officer Did Not Exercise Any Options On The Contract Which Would Have Extended The Performance Period Beyond December 31, 1998

We demonstrated above that the Contract contained two option years, the first from January 1, 1999, through December 31, 1999, and the second from January 1, 2000, through December 31, 2000. Def. App. 4-5; 35, ¶ F.2. The Contract specified that the decision to exercise the option clause was "the unilateral right of the Government," and the Government was required to exercise it in accordance with the Contract provisions. Def. App. 4-5; 11, ¶ C.8.1; 35, ¶ F.2. The Contract contained two additional provisions which specified the procedures and circumstances by which the Government could exercise its options. Pursuant to ¶ I.19, the Government could extend the term of the Contract (1) by providing preliminary written notice of

its intent at least 60 days before the expiration date, and (2) by notifying the contractor in writing of its decision to extend the performance period at least 15 days prior to the expiration date of the current contract period. Def. App. 41, ¶ I.19(a). "The preliminary written notice [did] not commit the Government to an extension." Id. Pursuant to ¶ I.18, the Government had another option to extend the performance period for up to six months "within the limits and at the rates specified in the [C]ontract," and it could exercise that option by providing written notice to the contracting officer in accordance with ¶ I.19. Def. App. 40, ¶ I.18.

The law is well-settled that damages are not recoverable for unexercised option years. Hi-Shear Technology Corp. v. United States, 356 F.3d 1372, 1380 (Fed. Cir. 2004); Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 813 (Fed. Cir. 1988). In this case, as in Gov't Sys., the Government had the sole discretion to decide whether to exercise the option. Gov't Sys., 847 F.2d at 813. The Contract explicitly provided that "[t]he decision to exercise to exercise any and all options under this contract shall be the unilateral right of the Government, and shall be accomplished in accordance with the applicable clauses of this contract." Contract, ¶ 8.1, pl. C-6; see Contract, § B, p. B-2, ¶ F.2, I.18, I.19; see also, Hi-Shear, 356 F.3d at 1380; Dynamics Corp. of America v. United States, 182 Ct. Cl. 62, 74, 389 F.2d 424, 431 (1968); LaSalle Partners v. United States, 48 Fed. Cl. 797, 806 (2001); Fields v. United States, 53 Fed. Cl. 412, 419 (2002).

Moreover, the Government must comply with all of the option provisions contained in the contract in order to exercise an option. Lockheed Martin IR Imaging Systems, Inc. v. West, 108 F.3d 319, 323 (Fed. Cir. 1997); Dynamics, 182 Ct. Cl. at 74-78, 389 F.2d at 431-33. The Contract requires that the Government notify MMI of its intention to exercise the option in

writing. Def. App. 40, ¶ I.18; 41, ¶ I.19. As in Gov't Sys. and Dynamics, the Government was also required to provide timely notice of its intent to exercise its option. Def. App. 41, ¶ I.19; Gov't Sys., 847 F.2d at 813; Dynamics, 182 Ct. Cl. at 74-78, 389 F.2d at 431-33. No evidence exists that the Government in this case intended to exercise its option to extend the Contract. The contracting officer did not notify MMI in writing of the Government's intention to or its exercise of its option to continue the Contract. Rather, the contracting officer cancelled the solicitation on September 30, 1996, and notified MMI that the Government was terminating the Contract for the convenience of the Government on June 12, 1998.

Accordingly, no basis exists to award MMI breach damages, if any, beyond December 31, 1998. The Court should preclude MMI from testifying at trial concerning any damages beyond that date.

## VI. Even If MMI Is Entitled To Recover Damages, It Is Not Entitled To Collect Interest Because The CDA Does Not Apply To This Contract

MMI's claim includes a claim for prejudgment interest. In the calculation of its claim, MMI assumes, without any argument, that it is entitled to interest. In accordance with 28 U.S.C. § 2516(a), in the absence of a contract provision or an Act of Congress providing for the payment of interest, a contractor is not allowed to recover interest on a claim against the Government. It follows from the Court's conclusion that, since this Contract did not contemplate the use of appropriated funds, it is not governed by the CDA. Since the Contract did not provide for the payment of interest upon an MMI claim and no other statute provides for the payment of interest under these circumstances, MMI is not entitled to collect interest upon its claim for damages.

## A. This Contract Is Not Governed By The Contract Disputes Act

The Contract Disputes Act (CDA) applies to contracts entered into by an executive agency for:

> (1) the procurement of property, other than real property in being;
>
> (2) the procurement of services;
>
> (3) the procurement of construction, alteration, repair or maintenance of real property; or
>
> (4) the disposal of personal property.

41 U.S.C. § 602(a). "Congress created the [CDA] to promote economy, efficiency and effectiveness in the Government's procurement of goods. Accordingly, the associated regulations emphasize the buyer-seller relationship." G.E Boggs & Assocs., Inc. v. Roskens, 969 F.2d 1023, 1027 (Fed. Cir. 1992). The CDA "does not cover all Government contracts." Coastal Corp. v. United States, 713 F.2d 728, 730 (Fed. Cir. 1983). For example, "the CDA does not apply to the provisions of services by the government, but only the procurement of such services." Florida Power & Light Co. v. United States, 307 F.3d 1364, 1371 (Fed. Cir. 2002); Marine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000).

By its terms, the CDA does not apply to this Contract. The Court described the RFP as

> a sales contract pursuant to which [DeCA] would release product movement sales data from its commissaries to the contractor in exchange for a share in the revenue generated by sale of that information and for "Analytical Support Services for Category Management."

Marketing and Management, 57 Fed. Cl. at 667. The primary purpose of the Contract was to sell commissary scanner data to a company that would process the data, provide it to DeCA's

suppliers for a fee, as well as to DeCA, and to provide DeCA with analytical support services.

**1. The Court Should Not Rewrite The Contract To Find Two Separate Contracts**

In order to obtain CDA coverage, MMI must argue that the Contract is really two contracts with separate purposes. We suggested this approach in our previous filings, when we contended that this Contract was covered by the FAR. The Court rejected our arguments, citing Coplin v. United States, 6 Cl. Ct. 115, 127 (1984) ("the court may not simply rewrite the contract to achieve an end"). Since the Court did not accept our argument to view the Contract as two separate contracts in order to find coverage under the Brooks Act or the FAR, then MMI cannot argue that the Contract should be viewed as two separate contracts in order for the CDA to apply.

In Florida Power & Light, plaintiff contended that the energy enrichment contracts at issue were really a transaction with four separate components, three of which plaintiff contended involve the procurement and the disposal of property by the Government. Florida Power & Light, 307 F.3d at 1372. However, the court rejected that approach and characterized the contract as the Government's providing enrichment services for a price. Id. at 1373. In doing so, the court distinguished two cases, Bonneville Associates v. United States, 43 F.3d 649 (Fed. Cir. 1994), and Forman v. United States, 767 F.2d 875 (Fed. Cir. 1985), in which the Federal Circuit had concluded that contracts that fell squarely within § 602(a)(3) of the CDA (contracts for "the procurement of construction, alteration, repair or maintenance of real property") that subsumed lesser agreements arguably outside the CDA's scope. Bonneville Assocs., 43 F.3d at 655 ("The agreement to convey the building to the Government was part of a larger agreement in which [plaintiff] promised to repair and alter the building."); Forman, 767 F.2d at 879 ("[T]he lease was

part of a larger agreement over which the Board plainly does not have jurisdiction.").

### 2. If This Is Not A Procurement For The Purposes Of The Brooks Act And The FAR, It Is Not A Procurement For The Purposes Of The CDA

Section B of the Contract defines the compensation under the Contract solely in terms MMI's payment of $6,659,401, for the base period, January 1, 1996, through December 31, 1999. In addition, as we demonstrated above, the Court determined in this case that, "THIS CONTRACT DOES NOT INVOLVE THE EXPENDITURE OF FUNDS APPROPRIATED BY THE U.S. CONGRESS." Marketing and Management, 57 Fed. Cl. at 667; Def. App. 4. Although Section C of the Contract, Statement of Work in the Contract, focuses on the Category Management Services to be provided under the Contract, the *sine qua non* of the Contract is the Government's supplying of commissary scanner data to MMI. Without the Government's agreement to supply the scanner data, the Government cannot obtain any category management services. In essence, the Government was to supply commissary product movement data to MMI in exchange for MMI to pay DeCA for this data.

In our earlier motion for summary judgment, we argued that this solicitation was a procurement, under the Brooks Act, as well as the FAR, even though it was essentially a barter arrangement. See Marketing and Management, 57 Fed. Cl. at 671-74. The Court rejected the Government's arguments and concluded that "[t]he contract before us did not utilize appropriated funds, and therefore does not meet the FAR's definition of acquisition. The Brooks Act was thus not applicable * * * [N]o acquisition has taken place." Id. at 674. Just as the Brooks Act relies upon "procurement" to determine its scope, so does the CDA. Section 602(a) provides that the CDA applies to contracts for the "procurement" of services and property by the Government.

MMI has not explained how this Contract cannot be a procurement for the purposes of the FAR or the Brooks Act and yet be a "procurement" for the purposes of the CDA.

In addition, § 612(c) of the CDA provides for the payment of monetary awards in favor of a contractor out of the Judgment Fund, pursuant to 31 U.S.C. § 1304, which, in turn, provides for the reimbursement to the fund "by the agency whose appropriations were used for the contract." 41 U.S.C. § 612(c). As we demonstrated in Section II, since, as the Court found, no appropriated funds were to be used for this Contract and since the CDA contemplates that the judgment will be paid out of appropriated funds, no basis exists to conclude that the CDA covers the disposition of this contract dispute.[6]

**B. MMI Is Not Entitled To Collect Interest Upon Its Claim Because It Is Not Covered By The CDA**

Section 2516(a) of Title 28 of the United States Code provides:

> (a) Interest on a claim against the United States shall be allowed in a judgment of the United States Claims Court only under a contract or Act of Congress expressly providing for payment thereof.

28 U.S.C. § 2516(a). Consistent with this, the Supreme Court has stated that "[i]n the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." Library of Congress v. Shaw, 478 U.S. 310, 314 (1986). Interest may not be recovered against the Government in the absence of an explicit waiver of sovereign immunity explicitly for that purpose. Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 798 (Fed. Cir. 1993). "'Express consent to the payment of interest

---

[6] Even if the Contract had stated that it was governed by the CDA, no action of the parties can confer jurisdiction by a Federal court. Florida Power & Light, 307 F.3d at 1370-71, citing Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701-02 (1982).

must be found in either a special statute or an express contractual provision. The intent by Congress to permit the recover of interest cannot be implied ' and must be strictly construed." Zummerling v. Marsh, 783 F.2d 1032, 1034 (Fed. Cir. 1986).

Congress has provided for interest on claims against the United States from judgments in the Court of Federal Claims on judgments entered in contract claims pursuant to 41 U.S.C. § 611 (1982), which are subject to the CDA. Ulmet v. United States, 19 Cl. Ct. 527, 537 (1990). However, as we have demonstrated above, MMI's claim in this case is not covered by the CDA. While interest is permitted on judgments entered (1) in suits for refunds of federal taxes pursuant to 28 U.S.C. § 3411, (2) in connection with compensation on patent infringement and copyright claims pursuant to 28 U.S.C. § 1498, and (3) in connection with Fifth Amendment takings claims, none of these is implicated in this case. Moreover, the Contract does not provide for the recovery of interest on any claims MMI might file.

Accordingly, since there has been no waiver for sovereign immunity for the recovery of interest on MMI's claims, this Court should preclude MMI's witnesses from testifying at trial concerning the amount of interest MMI may be permitted to recover.

## VII. A MOTION *IN LIMINE* IS APPROPRIATE IF A PROPOSED TESTIFYING EXPERT WITNESS LACKS THE QUALIFICATIONS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE*

MMI has proffered Mr. Kenneth P. Metcalfe, President of The Kenrich Group, LLC, to testify concerning the damages MMI claims to have suffered as a consequence of the Government's breach. Mr. Metcalfe, a Certified Public Accountant, received his Bachelor of Science in Business Administration, with a major in Accounting. Def. App. 131. As an

accountant, Mr. Metcalfe has provided expert opinions regarding accounting matters within the litigation context and provided consulting and accounting services in the general business context. Def. App. 131-37. Nevertheless, in his rebuttal report, Mr. Metcalfe proffers opinions concerning economic matters dealing with the elasticity of demand and industry revenue projections, which are critical of an economic analysis prepared by the Government's expert, Dr. Gustavo Bamberger, an economist with the consulting group Lexecon. Mr. Metcalfe is unqualified to offer opinions upon economic matters. Therefore, the sections of Mr. Metcalfe's rebuttal report in which he criticizes Dr. Bamberger's elasticity of demand analysis (Metcalfe Rebuttal Report, pp. 3-11) should be stricken, and he should be precluded from opining upon economic matters at trial.[7]

### A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Reliable And Relevant

Federal Rule of Evidence ("FRE") 702, as amended in 2000, provides that expert witness testimony is admissible only if the proposed expert witness is qualified as an expert "by knowledge, skill, experience, training, or education" and, further, if the testimony of the proposed expert satisfies the other requirements of the rule:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the

[7] By filing this motion, we do not waive any other objection we may have to the testimony of MMI's expert, Mr. Metcalfe. We expressly reserve our right to object or seek to have the testimony of MMI's expert stricken if MMI fails to establish his qualifications or otherwise lay an adequate foundation for his opinions pursuant to the Federal Rules of Evidence.

principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

FRE 702 imposes on the Court a special "gatekeeping obligation" to prevent the introduction of certain expert testimony that is irrelevant or unreliable. See, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993); see also 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful"). Specifically, the Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, 526 U.S. 137 (1999), require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under Federal Rule of Evidence 702 is both relevant and reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). Further, the party proposing to introduce expert opinion "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)); see Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001) (citing cases); see Lithuanian Commerce Corp. v. Sara Lee Hosiery, 179 F.R.D. 450, 457 (D.N.J. 1998); Otis v. Doctor's Assocs., Inc., 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998).

Further, the Supreme Court has rejected the familiar refrain that it has sufficient safeguards against irrelevant or unreliable expert testimony in the opponent's ability to present its own expert testimony or to cross-examine each other's experts at trial. Daubert, 509 U.S. at 596; see Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993) (rejecting "'let

it all in' philosophy" of expert testimony). Federal courts must exercise great care to prevent the admission of unreliable or irrelevant expert opinion because "Federal Rules of Evidence 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" Kumho Tire, 526 U.S. at 138 (quoting Daubert, 509 U.S. at 592).

**B. To Establish That Proposed Expert Testimony Is Reliable, The Party Proposing The Testifying Expert Must Establish That He Or She Is Qualified To Render The Opinions At Issue**

As the first step in analyzing whether proposed expert testimony is reliable, the Court must determine whether the expert rendering the opinion is "qualified" in the relevant field to do so, by reason of his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; see Masters, 291 F.3d at 991 ("[t]o gauge reliability, the district judge must determine whether the expert is qualified in the relevant field . . . ."); Ralston, 275 F.3d at 969 (expert must be qualified by knowledge, skill, experience, training, or education). The party proffering the witness as a expert has the burden of laying a foundation that establishes that the witness is qualified. See, e.g., Genty v. Resolution Trust Corp., 937 F.2d 899, 917 (3d Cir. 1991); Apostol v. United States, 838 F.2d 595, 599 (1st Cir. 1988). The Court's special "gatekeeping obligation" demands that the Court require the plaintiff to meet this burden before qualifying the expert, "only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls, Inc., 269 F.3d 865, 869 (7th Cir. 2001).

Further, the mere fact that an expert may be qualified in one area does not necessarily mean he is qualified to testify in other technical or specialized areas. Qualification to testify as an expert requires that the area of the witness' competence matches the subject matter of the

witness' testimony. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990); see Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994) ("issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question"), cert. denied, 513 U.S. 1111 (1992). Courts have frequently precluded a witness from testifying as an expert where the witness has specialized knowledge on one subject, but seeks to opine on a different subject. See, e.g., Surace v. Caterpillar, Inc., 111 F.3d 1039, 1055-1056 (3rd Cir. 1997) (although expert qualified as an electromechanical engineer, his opinion was not admissible because he had no education, training, or experience with the technical issue upon which his opinion was offered); Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1296 (4th Cir. 1995) (expert in recreational safety was not qualified to render expert opinion on snowmaking); Eagleston v. Guido, 41 F.3d 865, 873-74 (2nd Cir. 1994) (witness who held doctorate in sociology not qualified to render expert opinion on domestic violence or proper police training procedures), cert. denied, 516 U.S. 808 (1995).

### C. Mr. Metcalfe Is Not Qualified To Provide Expert Opinions Regarding Economic Matters

"Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" Kumho Tire, 526 U.S. at 148 (quoting Hand, "Historical and Practical Considerations Regarding Expert Testimony," 15 Harv. L. Rev. 40, 54 (1901)). It is the function of the trial judge to insure that the

specialized testimony is reliable and relevant. Id. at 149.

The starting point for determining whether a witness has "specialized knowledge" that qualifies him to testify about a particular matter is to define the area of expertise necessary for the opinions at issue. See Carroll, 896 F.2d at 212. MMI hired Mr. Metcalfe to develop MMI's claim. Def. App. 143. Mr. Metcalfe is an accountant, having received his Bachelor of Science degree in Business Administration with a major in Accounting. Def. App. 131. In his resume, Mr. Metcalfe describes his experience as providing expert analysis, consulting and testimony services, including damages calculations in various industries, including regulated industries, the commercial business area, construction, telecommunications, intellectual property, financial institutions, and Government contracts. Def. App. 131. His specialized knowledge is the field of accounting, as applied to damages claims.

Although Mr. Metcalfe testified that he considered himself to be an expert in the "economic impact on damages," that is not the same sort of specialized knowledge possessed by an economist. Def. App. 207. Mr. Metcalfe does not have expertise in the field of economics. When questioned during his deposition about his training in the field of economics, Mr. Metcalfe testified that he took four economics courses in college,[8] with no post-graduate courses in economics. Def. App. 203. In discussing, during his deposition, his area of practice and testimony, he made no mention of performing any work in the field of economics or economic theory. Def. App. 150-90. In his resume, he states that he has conducted various damages analyses in the area of lost profits, breach of contract issues, construction projects, utility

[8] Mr. Metcalfe stated that he had "at least" four economics courses. Def. App. 203. However, he did not represent that he took enough courses even for a minor in economics.

operations and fuel costs, and prudence reviews, as well as fraud investigations. Def. App. 131.[9] In short, Mr. Metcalfe is not an economist by training or experience. The four courses he took in economics while an undergraduate student do not qualify Mr. Metcalfe to render an opinion upon economic matters.

Mr. Metcalfe opined upon a number of matters during his deposition and in his rebuttal report based upon what he called "common sense economics." See, e.g., Def. App. 201-07, 208-09, 210-14. In addition, in his rebuttal report he criticized the economic analyses prepared by the Government's economics expert, Dr. Gustavo Bamberger, an economist with Lexecon who holds a doctorate in economics from the University of Chicago and has practiced as an economist for 17 years. Def. App. 240-48. The Court should strike portions of Mr. Metcalfe's rebuttal report (pages 3-11) and preclude him testifying based upon "common sense economics" because of his lack of expertise as an economist.

The "common sense economics" upon which Mr. Metcalfe bases his some of his conclusions is not the specialized sort of knowledge that is the product of reliable principles and methods. See, e.g., Def. App. 206-07, 208-09, 212-14, 222,[10] 223.[11] Mr. Metcalfe conducted no

[9] Other than a passing mention of an analysis of an "economic damages" analysis relating to a patent and trade secret infringement action, Mr. Metcalfe makes does not mention any economic analyses he has conducted. Def. App. 136. Even then, there is no reason to believe that the type of analysis Mr. Metcalfe conducted was of the sort practiced by professional economists.

[10] Mr. Metcalfe states that it is "readily apparent" that the factors influencing elasticity of demand in the actual world are different from those in the but-for world different, but he does not explain why this is the case. Def. App. 222.

[11] Mr. Metcalfe uses such language as "logically" and "it can be reasonably assumed" without explanation or supporting documentation. Def. App. 223.

economic analysis to support these conclusions. In comparable circumstances, one court has said that "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." Ralston, 275 F.3d at 970; see Robertson v. Norton Co., 148 F.3d 905, 907 (8th Cir. 1998) ("while Dr. Firestone was undoubtedly qualified to testify about a manufacturing defect in an exploding ceramic grinding wheel, that did not qualify him as an expert on grinding wheel warnings"). Mr. Metcalfe's "common sense economic" opinions reflected in his deposition testimony do not represent specialized testimony that can assist the Court in drawing any conclusions in this case.

In addition, based upon Mr. Metcalfe's lack of expertise in the field of economics, the Court should strike pages 3 through 11 of his rebuttal expert report in which he attempts to demonstrate that Dr. Bamberger's elasticity of demand analysis is incorrect. As Dr. Bamberger explains in his reply report, Mr. Metcalfe's analysis is fundamentally flawed because he misunderstands certain important economic principles. Def. App. 250, 251-56. It is not simply that Mr. Metcalfe is wrong; rather, as we demonstrated above, Mr. Metcalfe lacks the expertise to testify as an economist.

Accordingly, the Court should exercise its "gatekeeping obligation" and preclude Mr. Metcalfe from testifying at trial upon any economic matters, and to strike the sections of his rebuttal report in which he criticizes Dr. Bamberger's report upon economics grounds (Metcalfe Rebuttal Report, pp. 3-11). See Berry, 25 F.3d at 1348-50, 1352 (reversing court's decision to admit expert testimony on "police policies and practices," comparing it to experts on the law: "It is like declaring an attorney an expert on the 'law.' A divorce lawyer is no more qualified to opine on patent law questions than anyone else, and it is a mistake for a trial judge to declare

anyone to be generically an expert.").

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court dismiss MMI's claim for damages because (1) the Contract provided that there would be no expenditure of funds by the Government, and (2) in any event, MMI waived any right it had to recover damages by failing to protest the solicitation prior to bid solicitations were due because of DeCA's failure to obtain a DPA from the GSA, and by failing to protest DeCA's right to sell its scanner data upon a non-exclusive basis. In the alternative, we respectfully request the Court to rule, as a matter of law, that (1) the breach of the contract occurred no earlier than June 12, 1998, and (2) MMI is not entitled to collect (a) damages after December 31, 1998 because the contract performance period ended on that date, (b) interest upon its damages claim because the Contract is not governed by the CDA. In addition, we respectfully request that the Court issue an order (1) precluding MMI's expert, Mr. Metcalfe, from testifying at trial upon any economic matters, and (2) striking pages 3

through 11 of the Metcalfe Rebuttal Report because Mr. Metcalfe is not qualified to testify as an economist.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s/ David M. Cohen by James M. Kinsella
DAVID M. COHEN
Director

/s/ Sheryl Floyd
SHERYL FLOYD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0282
Facsimile: (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

THOMAS D. RATHGEB
ELLIOTT CLARK
Office of General Counsel
Defense Commissary Agency
Fort Lee, VA 23801-1800

MAY 21, 2004

**CERTIFICATE OF FILING**

I hereby certify that on 21st day of MAY, 2004, a copy of the "DEFENDANT'S MOTION *IN LIMINE*" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Sheryl L. Floyd