DEFENSE COMMISSARY AGENCY
HEADQUARTERS
1300 E AVENUE
FORT LEE, VIRGINIA 23801-1800

September 30, 1996

MARKETING & MANAGEMENT INFORMATION, INC.
Attn: Mr. Ed Downey
4800 Montgomery Lane, Suite 700
Bethesda, MD 20814

PROVIDED VIA FACSIMILE AND CERTIFIED MAIL

Dear Mr. Downey:

Reference: DeCA Solicitation No. DECA01-94-R-0068 for Category Management Services

As you are aware, the Defense Commissary Agency (DeCA) previously solicited proposals from prospective offerors to provide Analytical Support Services for Category Management, in accordance with the terms of the solicitation cited above.

That solicitation resulted in the award of contract # DECA01-96-S-0001, which was subsequently protested before the General Services Board of Contract Appeals (GSBCA). The resulting opinion from the Board ruled that the subject contract was void.

In the interim period between that ruling and now, DeCA has looked to validate its need for the particular types and term of services described within the original solicitation package. Based on the current and projected needs of the agency, it has been determined that the requirements set forth in the original solicitation package no longer adequately describe the needs of the agency. As such, you are hereby formally advised that the aforementioned solicitation is canceled in its entirety.

Should you have any questions, I may be reached at (804) 734-8521.

Sincerely,

Lawrence P. Hahn
Contracting Officer

EXHIBIT 9

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 | OF PAGES 1

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| 0002 | 9-30-96 | ANALYT00949214 | |

6. ISSUED BY CODE

[DE]FENSE COMMISSARY AGENCY
[AC]QUISITION BUSINESS UNIT
EQUIPMENT/SUPPLY DIVISION (OC/RAE)
1300 E AVENUE
FORT LEE, VA 23801-1800

7. ADMINISTERED BY *(If other than Item 6)* CODE

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

MARKETING AND MANAGEMENT INFORMATION, INC.
4800 MONTGOMERY LANE, SUITE 700
BETHESDA, MD 20814

CODE | FACILITY CODE

(✓) X 9A. AMENDMENT OF SOLICITATION NO. DECA01-94-R-0068

9B. DATED *(SEE ITEM 11)* 6-1-95

10A. MODIFICATION OF CONTRACT/ORDER NO.

10B. DATED *(SEE ITEM 13)*

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☒ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☒ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning ____________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

NO FUND CITATION

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER *(Specify type of modification and authority)*

E. IMPORTANT: Contractor ☐ is not, ☐ is required to sign this document and return ____________ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

A. Based on the current and projected needs of the agency, it has been determined that the requirements set forth in this solicitation no longer adequately describe the needs of the agency. This solicitation is hereby canceled in its entirety.

B. No acknowledgment of this amendment is required.

C. Questions concerning this action may be addressed to Mr. Larry Hahn at the office identified in block # 6 above.
Phone: (804) 734-8512 Fax: (804) 734-8139

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| *(Signature of person authorized to sign)* | | *(Signature of Contracting Officer)* | |

Marketing & Management

June 12, 1998

Via Facsimile: 804-734-8139

Mr. Lawrence P. Hahn
Contracting Officer
Acquisition Management Unit (OC/RA)
Defense Commissary Agency
1300 E Avenue
Ft. Lee, VA 23801-1800

Dear Mr. Hahn:

In our telephone conversation we requested a meeting with you and appropriate associates to discuss proceeding with the Analytical Support Services for Category Management contract awarded to MMI on October 26, 1995. We are ready to proceed and are eager to begin.

All impediments to DeCA proceeding have been removed by the Federal Circuit's recent decision (copy enclosed) vacating the GSBCA's decision regarding the contract as awarded. The decision explicitly states, "we [i.e. the Federal Circuit]...vacate the GSBCA decision." Since the GSBCA's decision always has been the only possible impediment to contract performance, and that decision has been vacated, it is now incumbent on DeCA to proceed with its contract obligations. Specifically, DeCA must stop disseminating scanner data to protesters ACNielsen, IRI and anyone else, immediately. DeCA is legally bound to adhere to all other obligations under the contract. Since we know it is a DeCA concern that the flow of information to DeCA suppliers not be disrupted, MMI is prepared to deliver reports based on DeCA scanner data to companies that had elected to receive reports from ACNielsen and IRI during the period the GSBCA ruling was under appeal.

At various times, DeCA officials have suggested that some of the services that the contract requires MMI to provide are no longer be needed. If this is true, we request that you review the contract statement of work, and identify and list these requirements. When the list is finalized, MMI is prepared to address the issue of contract modification, including modifying the Payment Proposal should modifications result in cost savings that can be shared with DeCA.

It must be understood that MMI will not accept any attempt on DeCA's part to terminate the contract for convenience. As you well know, DeCA has no such right under the terms of the contract. Moreover, DeCA must not disseminate scanner data to Nielsen or IRI after this point, while your statement of work review is proceeding.

Everyone at MMI looks forward to working with you in accordance with the terms of the contract.

Sincerely,

Edward M. Downey
Chief Operating Officer

Enclosures

cc: Richard E. Beale, Jr., Director, DeCA (fax: 804-734-8244)

Loretta M. Downey, MMI, CEO

Thomas A. McDonald, MMI, President



4800 MONTGOMERY LANE • SUITE 700 • BETHESDA, MD 20814 • (301) 718-7600 • FAX (301) 718-7652

While this appeal was in the briefing stage, on September 30, 1996 DeCA issued Amendment 0002 to the solicitation, as follows:

Based on the current and projected needs of the agency, it has been determined that the requirements set forth in this solicitation no longer adequately describe the needs of the agency. This solicitation is hereby cancelled in its entirety.

DeCA and the Intervenors, who are the three successful protesters, then moved this court to dismiss MMI's appeal for mootness. The appeal, and these motions, are before [*3] us for decision.

In moving for dismissal, DeCA and the Intervenors argue that whether the award was initially proper under the Brooks Act is irrelevant, now that the solicitation has been withdrawn. n2 MMI opposes the dismissal, arguing that the question of DeCA's authority to award the contract requires resolution to protect MMI's rights, and that there remain unresolved issues arising from the consequences of DeCA's action in cancelling the solicitation, which MMI describes as a breach of contract. MMI expresses concern about preserving its rights and remedies.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 The Brooks Act was repealed in 1996, by enactment two weeks before the decision of this case by the GSBCA. See Pub. L. No. 104-106, 110 Stat. 680 (repeal effective 180 days after Feb. 10, 1996).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

DeCA responds that its intention is to terminate the contract for the convenience of the government, and that the Brooks Act issue is now irrelevant because in no event will DeCA grant the contract or continue its performance. DeCA states that its cancellation [*4] of the solicitation moots the question of whether the contract was initially properly solicited and awarded by DeCA. DeCA relies on this court's ruling, in PRC, Inc. v. Widnall, 64 F.3d 644, 645 (Fed. Cir. 1995), that the cancellation of a solicitation following the award of a procurement contract mooted the appeal of a GSBCA decision granting a protest regarding that award.

The mootness principle derives from the "case or controversy" requirement of Article III, @ 2 of the Constitution. Honig v. Doe, 484 U.S. 305, 317, 98 L. Ed. 2d 686, 108 S. Ct. 592 (1992). A case is deemed moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969). This precedent is on point, and is applicable on the facts of the DeCA/MMI contract.

We conclude that the withdrawal of the solicitation moots the question of the propriety of its original solicitation. Although MMI has raised cogent concerns as to its remedies, this issue is not before us on this appeal. During oral argument counsel for DeCA and the court engaged in the following discussion: [*5]

DeCA: As in PRC, because the solicitation was cancelled there is no contract, and there would be no reinstatement. We put forth the alternative argument

2ND CASE of Level 1 printed in FULL format.

MARKETING AND MANAGEMENT INFORMATION, INC. Appellant v. Maj. Gen. Richard E. Beale, Jr., Director, DEFENSE COMMISSARY AGENCY, Appellee, v. A. C. NIELSEN COMPANY, Intervenor, and INFORMATION RESOURCES, INC., Intervenor, and MANAGEMENT SCIENCE ASSOCIATES, INC., Intervenor.

96-1270, 97-1171

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

1998 U.S. App. LEXIS 10199

May 19, 1998, Decided

OTICE: [*1] RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS MAY LIMIT ITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES OURT OF APPEALS FOR THIS CIRCUIT.

RIOR HISTORY: General Services Board of Contract Appeals.

ISPOSITION: Motions of DeCA and the Intervenors granted, Appeal dismissed, and SBCA's decision vacated.

JDGES: Before NEWMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and RADER, ircuit Judge.

PINIONBY: NEWMAN

PINION:
EWMAN, Circuit Judge.

This appeal by Marketing and Management Information, Inc. (MMI) is from a ecision of the General Services Board of Contract Appeals (GSBCA) concerning he award by the Defense Commissary Agency (DeCA), an agency of the Department f Defense, of a contract to MMI. n1 Request for Proposal No. DECA01-94-R-0068, ated June 1, 1995 was entitled "Analytical Support Services for Category anagement." On October 26, 1995 DeCA awarded the contract to MMI. Three other idders filed protests with the GSBCA, arguing that the award was subject to the rooks Act, 40 U.S.C. @ 759, and that DeCA had exceeded its procurement uthority. MMI intervened on the side of DeCA, which did not defend its action. he GSBCA granted the protests, holding that [*2] the award was subject to he Brooks Act and therefore that the contract was void, citing CACI, Inc. v. tone, 990 F.2d 1233 (Fed. Cir. 1993). MMI appealed, arguing that the award was ot subject to the Brooks Act and that the GSBCA, whose review authority is imited to Brooks Act solicitations, is without jurisdiction in the matter.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 A.C. Nielsen Co. v. Defense Commissary Agency, 1996 GSBCA LEXIS 60, 96-1 CA (CCH) P28,253, GSBCA Nos. 13466-P, 13469-P, and 13470-P (Feb. 23, 1996).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

that if in fact there would be some kind of reinstatement, that would be the functional equivalent of "no contract" because there would be an immediate T for C [termination for convenience] with no damages whatsoever.

* * * *

Court: . . . When you say it would be T for C with no consequences, has that been litigated or decided or conceded or negotiated?

DeCA: No, your Honor. But it's just a matter of logic and a matter of fact.

Court: Why wouldn't there be bid costs?

DeCA: There would not be T for C costs, your Honor, because there was a Stop Work Order issued immediately after the protest which came 11 days after the award.

Court: There was conceivably significant cost in preparing the bid and moving to the point that they had in receiving the bid. Aren't those costs reimbursable?

DeCA: But that wouldn't matter. Whether that is true or not would not be affected by this Court's decision. That would be a function of the cancellation of the solicitation, and not a function of this court's decision, which again underlies [*6] the mootness of this court's decision.

Although we do not express an opinion on the correctness of DeCA's position, we must agree that the issue of MMI's recovery is not before us. Whether DeCA's action is viewed as a breach of contract, whether the contract was properly terminated for convenience, and the question of remedy to MMI, were not before the GSBCA. We believe that all concerned are best served by restoring the matter in the first instance to the parties for speedy and just settlement; and thereafter, should settlement fail, by resolution through the procedures of the Contract Disputes Act, 41 U.S.C. @ 601 et seq.

Conclusion

We grant the motions of DeCA and the Intervenors, dismiss the appeal, and vacate the GSBCA's decision. See PRC, 64 F.3d at 645 (vacating the GSBCA's decision when the underlying proposal was withdrawn during pendency of the appeal); accord United States v. Munsingwear, Inc., 340 U.S. 36, 39, 95 L. Ed. 36, 71 S. Ct. 104 (1950) (vacating underlying decision for mootness). This dismissal and vacatur are without prejudice to any further proceedings flowing from the award of, challenge to, and withdrawal of this contract. [*7]

No costs.

DEFENSE COMMISSARY AGENCY
HEADQUARTERS
1300 E AVENUE
FORT LEE, VIRGINIA 23801-1800

June 12, 1998

Marketing & Management Information, Inc.
Attn: Mr. Ed Downey
4800 Montgomery Lane, Suite 700
Bethesda, MD 20814

**NOTICE OF TERMINATION**

Dear Mr. Downey:

You are hereby formally notified that Contract Number DECA01-96-S-0001 (hereinafter referred to as "the contract") has been terminated in its entirety for the convenience of the Government.

As you are aware, the contract was awarded on October 26, 1995. In accordance with the terms of the contract, the period of performance under the contract was for a base period of three years for the term of 01 Jan 96 through 31 Dec 98, with the potential for two additional one-year option periods. On November 8, 1995, the award was protested to the General Services Board of Contract Appeals (GSBCA) by three interested parties, those being A.C. Nielsen, Information Resources, Inc., and Management Science Associates, Inc. The Administrative Judge who was assigned to the case issued a Suspension Order. I subsequently issued a Stop Work Order to your firm, which was effective on November 14, 1995.

The GSBCA issued the final decision relative to the three protests on February 23, 1996. Their decision determined that the original contract award was void ab initio. That finding was appealed by your firm to the U.S. Court of Appeals for the Federal Circuit. Pending the decision of the appeal, DeCA determined that it no longer had a need for the type and term of services described in the original award. That agency decision resulted in a formal cancellation of the solicitation, via Amendment 0002, effective September 30, 1996.

On May 19, 1998, the final decision from the U.S. Court of Appeals for the Federal Circuit was rendered. The decision dismissed your appeal because the solicitation had been canceled and also vacated the earlier decision of the GSBCA. That decision recognized that as a matter of law, the agency's cancellation of the solicitation in September of 1996 constituted a withdrawal of the contract. The effect of these actions was to terminate the contract for convenience. Therefore, in accordance with FAR 52.249-2, you may forward your claim for any costs incurred in performing the contract during the period October 26, 1995, the date the contract was awarded, until November 14, 1995, the date the suspension of performance was issued because of the protests before the GSBCA.

Although the above referenced clause was not included in the contract as awarded, as a matter of law it is included in the contract even though it is not physically present in the contract document, G.L. Christian & Associates v. United States, 160 Ct. Cl. 1, 312 F.2d 418, rehearing denied, 160 Ct. Cl., 58, 320 F.2d 345, cert. denied, 375 U.S. 954 (1963).

I look forward to hearing from you.

Sincerely,

Lawrence P. Hahn
Contracting Officer

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARKETING AND MANAGEMENT INFORMATION, INC., Plaintiff | |
| vs. | Case No. 99-194C |
| THE UNITED STATES, Defendants | |

November 29, 2001

Fort Lee, Virginia

The deposition of GEN. RICHARD E. BEALE, JR., taken at the instance of the plaintiff, before Sherry W. Dudley, a Notary Public for the Commonwealth of Virginia at Large, beginning at 10:00 a.m., at the EEO Building, Fort Lee, Virginia; said deposition taken pursuant to the Federal Rules of Civil Procedure.

APPEARANCES:

Vincent J. Colatriano, Esq.
COOPER & KIRK
1500 K Street, N.W., Ste. 200
Washington, D. C. 20005
(202) 220-9656
vcolatriano@cooperkirk.com
Counsel for the plaintiff

Sherry L. Floyd, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W., Room 12024
Washington, D. C. 20530
(202) 307-0290
sheryl.floyd@usdoj.gov
Counsel for the defendants

Thomas D. Rathgeb, Esq.
DEFENSE COMMISSARY AGENCY
1300 E Avenue
Fort Lee, Virginia 23801-1800
(804) 734-8029
rathgetd@hqlee.deca.mil
Counsel for the witness

ALSO PRESENT:

Edward Downey
Impower IT

A That we still needed it, to the extent that we thought we needed it at the time the statement of work was written.

Q And you are saying it's possible that you might not have thought you needed it at the time the statement of work was written?

A You know, that's one of the biggest heartburns I have with government contracting, because it takes so long to get from statement of requirement to award that with technology, particularly in the automated information area changing as rapidly as it does, you get to a point where you no longer need exactly what you thought you needed, or what you need changed because technology changed.

And there was one overriding concern that you have to remember. At that point in time, I saw -- I had absolutely no expectation that we were going to be able to ever execute in my lifetime the award that we made to Ed Downey's organization.

Q At what point in time?

A By the mid-'96 time frame, I had no expectation of ever being able to award that contract. I thought we were going to be stuck with the spot bid forever.

Q What did that have to do with the

determination of whether you needed the requirements under that contract?

A It had everything to do with it, because it suggested to me that the environment had changed so dramatically we needed to move on and plan for the future, because we were never going to see the execution of that contract.

Q Well, that sounds almost -- and I don't mean to be argumentative, but that sounds almost circular to me. Because you decided you didn't need the contract because you decided that you weren't going to get the contract executed, is that what you are saying?

A I'm saying I had no reasonable expectation of seeing the results of that original contract award, therefore we had to move on. And in the process of moving on, we had to try and redefine what we really needed and where we wanted to go.

(Recess taken from 2:55 to 3:10 p.m.)

Q Gen. Beale, we were talking about Exhibit 7, which was the Notice of Cancellation of this solicitation.

A Yes.

Q And in the same paragraph that we were talking about, the next sentence of that paragraph says, "Based on the current and projected needs of the Agency, it has been determined that the requirements set forth in the original solicitation package no longer adequately describe the needs of the Agency."

Do you see that?

A Yes.

Q Can you describe as specifically as possible which requirements were determined to no longer adequately describe the needs of the Agency? And if you need to, I have the RFP which I can make an exhibit here.

A I can probably give you two or three examples off of the top of my head, and without beating a dead horse or belaboring the issue, I just still have to refer back to some of my previous testimony about this learning process that had taken place and just state, again, that, in my opinion, in my opinion, by mid-1996, I really had no expectation of ever seeing a resolution to that court case on the original contract.

Because, you know, I tried to tell the Congress the same thing; okay. "There is going to be some kind of a decision by the Court of Appeals, and

then that's going to be appealed. No matter what I do, we are in a box."

Okay, what changed? The training requirement.

Q How did the training requirement change?

A Over a period of time, we had started to get some of the brightest minds in the business to come in and train our category managers. I gave an example of that week-long course here at Fort Lee by the young lady in Chicago.

Q When did that occur?

A I don't recall specifically. And unfortunately, I don't have my calender. I mean, I didn't save any of that stuff, expecting that the Agency had it.

Q Do you know if it occurred between February and September of 1996?

A I don't know for certain. All I'm saying is that we had had numerous examples of training. I even went to ALA trade shows a day early where we had training on category management. A guy from Procter & Gamble came out and spent a whole Saturday with us.

My point is that by the middle of '96, we had recognized that we didn't need Mr. Downey's organization or any one of the other four bidders on

that contract to train us on Category Management, because there were plenty of other people out there who could do it.

Now, training was a requirement, okay. And training is a constant requirement, because you've always got new people rotating in, so I'm not suggesting that we didn't have a requirement for training, but we did not have a specific requirement in terms of a continued need under that contract for training, because there were so many other avenues available to us for training that we were previously unaware of.

Q So let me make sure I understand this. You are not saying that you no longer needed training; correct?

A Correct.

Q So you still had a need for training; correct?

A Correct.

Q So how is that a requirement that no longer adequately describes the needs of the Agency?

A We didn't -- I think -- and I didn't write the thing, okay, I'm not the author of the document and I don't use that as an excuse, I'm just saying that we didn't need training under that particular

solicitation, because there were other means -- we were getting training paid for by ALA that we weren't even having to pay for.

Q Now, this says, though, that those requirements no longer adequately describe the needs of the Agency. And just so I'm clear, you still needed training; correct?

A You always need training. It's a reinforcement.

Q Did the contract require Category Management training?

A I believe it did.

Q And was that the type of training that you got from ALA, Category Management training?

A Yeah, sure, taking, for example -- taking the data printouts of sales and understanding how those kinds of data should influence decisions on stock assortment or promotions.

Q What other requirements set forth in the original solicitation packets no longer adequately describe the needs of the Agency?

A We did not need an outside company, certainly beyond the bridge period. We did not have a long-standing requirement for analysis because we were learning how to do it.

Q Did you know how to do it in 1996?
A We had the fundamental beginnings. I mean, you start somewhere. We were probably in the third grade, where you would like to get up to the high school education.
Q At what point did the Agency, to use your analogy, achieve the high school education in analysis?
A I will tell you that by the 1998, '99 time frame, we were getting constant positive comments from all of the industry folks that I came in contact with and even people outside of the military resale support community, who would review our category management plans and say that they were some of the best that they had seen in the industry.
Q What time frame was that, '98, you say?
A By '98, '99, we had just about -- In fact, when I left the agency in '99, we were on our second, as I recall, our second iteration of Category Management plans that I think we started cranking out in the '97 time frame.
Q What other requirements set forth in the original solicitation package no longer adequately describe the needs of the Agency by mid-1996?
A I don't know that I'd be able to address

that unless I saw a copy of the solicitation so I could go down point by point.

Q I do have the RFP.

A Okay.

MR. COLATRIANO: So why don't we mark that as Exhibit 8.

(Exhibit 8 marked for identification: RFP issued on June 1, 1995.)

Q Exhibit 8 is the RFP that was issued on June 1, 1995; correct?

A I'm sorry?

Q I just want to make sure for the record that Exhibit Number 8 is the RFP that was issued by DeCA on June 1, 1995.

A I believe it is.

Q And what I would suggest, and although you should feel free to look anywhere else, is in the statement of work on page C-1 under paragraph 1, there is a summary?

A I'm sorry, page C?

Q C-1.

A I'm there.

Q Under paragraph 1, there's a summary that

says, near the end of that paragraph, "In exchange for the product movement data from DeCA, the contractor will provide monitary payment, analytical services, training, periodic product movement/sales data reports and online access."

Do you see that?

A Yes.

Q And although you should feel free to look at anything else, I view that as a good summary of the services that were required under the contract, so if that helps you answer the question --

A Okay, I think by -- certainly by the 30th of September of '96, I believe we were well on our way to understanding the analytical services that theretofore Mr. Downey's organization had provided to.

Us. In fact, I went to a briefing, the only time I think I visited MMI. And I'd be hard pressed to tell you the date, although it was fairly early on in my tenure, I believe, probably '93, '94 time frame.

I got a very comprehensive briefing of the type of analysis that they provided to our buyers. Now, understand that from the time of -- from basically March of '96 on, even though Mr. Downey continued to offer that service to us, we were not in

a position officially to accept that service because we no longer had a contract.

So we learned quite effectively to do the analysis with our industry trading partners. In fact, that's how we built the Category Management plans, which is very similar to what the leading grocery chains do.

Q And when you say you did that in conjunction with your industry trading partners -- Is that what you said?

A Sure, the suppliers.

Q -- does that mean the manufacturers or --

A Yeah, suppliers, manufacturers, or the brokers.

Q Do you know whether IRI is currently providing any analytical services to DeCA?

A I do not know that. I have no idea generally what's in that contract, because -- The planning for the contract occurred on my watch. The execution of the contract, in fact, occurred after I was gone.

Q And from your recollection of the planning process, what were you planning to have that contract cover, what types of services?

A I don't recall. The main thing that I

and the software, or whether they are happy just to provide the raw data to a Nielsen, an IRI, or a MAMI and let them do it.

Q I think we had been talking about the sentence on page C-1 in the Purpose section of the statement of work, the one that I read earlier.

"The exchange for the product movement data from DeCA, the contractor will provide monitary payment, analytical services, training, periodic product movement/sales data reports, and online access."

And I've been asking you which of those stated requirements no longer adequately describes the needs of the Agency in mid-1996, and you -- I think you started to go through that when we started talking about the data issue, and I want to make sure that you've completed your answer on that.

A Okay. The answer is, to the best of my knowledge, analysis was a requirement, whether it was done by us or someone else. There had to be analysis of the data. You just don't produce it for the sake of producing it.

Prior to this contract, we had, in my judgment, very little to no analytical capability, because we just didn't understand the name of the

game.

So we needed to be able to analyze data or interpret or understand data that someone else analyzed for us.

It mattered not who did the analysis, unless you wanted to use government employees or contractor employees, and then you had to weigh the -- We needed training. Training is a constant requirement.

Did we need the level of training that we anticipated in the 1995 solicitation on a continuing basis? Not under the terms of that contract, because there were other avenues available to obtain the training.

We needed training. We didn't specifically need it under a CMSS type contract to the extent that had originally been specified, which was all of it.

Q What do you mean, "all of it"?

A All of the training. In other words, my understanding of the contract is that MMI would have been the sole provider of training for the duration of the contract.

We had no reason to go outside, but since we had no contract, we had to look elsewhere for training opportunities.

Q Okay, but as we described earlier, you still needed the training; correct?

A Yeah, but, you know, this gets back to the very heart of the issue. The major difference is that Mr. Downey, yourself, and the lawyers believed, and still believe, that DeCA had the opportunity to award that contract to MMI.

I could not see that on the horizon. The farther we got into this court deliberation, as far out as I could see, we, as an Agency, had to move forward. Regardless of how we felt personally about that other contract, it was void. It did not exist.

And that was the basis which every decision that my Agency and I made after that point, it did not exist, and I was not about to put the Agency through another excruciating resolicitation of a contract that I never believed from that point on would come to fruition. Now, that's the basis for the decision.

Q The basis for what decision?

A Every decision that we made.

Q Including the decision to cancel the solicitation?

A Absolutely. I mean, we were just waiting in limbo, recognizing that Ed had certain expectations of us -- Heck, if I had been in his position, I would

68 a

have had the same expectations, but I couldn't get there from here because the Court put me on the opposite side of the fence.

I had no expectation that we could ever execute that contract or any other similar contract, and I said to my guys and gals "Figure out another way to get the data moving. We'll take it one step at a time."

Q Are there any other requirements stated in the solicitation that you determined in 1996 no longer fit your needs?

MS. FLOYD: You are not confining him to the paragraph 1 here, C-1, as you were earlier; is that correct?

MR. COLATRIANO: I've never confined him to it. I told him that that was a summary of it. If he feels the need to look elsewhere, he can.

A You know, I'll give you an example between the Chevrolet and the Cadillac, this first paragraph that you referred to, and recommendations to develop an improved category management and merchandizing strategies. Now --

Q I'm sorry, where do you see that?

A Middle of the first paragraph. All of that stuff would have been nice to have, but by the middle

69 b

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: January 7, 2002
Case Name: Marketing and Management Information, Inc. vs. The United States
Case Number:
Dep. Date: November 29, 2001
Deponent: Richard Beale, Jr.
Place: Fort Lee VA
Ref. No.: 3787-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 124 | 19 | khaki | CACI | accuracy |
| 125 | 6 | firmer | FIMR | accuracy |
| 125 | 10 | ABP | ADP | accuracy |
| 126 | 20 | was | were | grammar |
| 128 | 18 | do-little. | do-little mode. | clarification |
| 128 | 25 | to be | to me | accuracy |
| 132 | 14 | ANC | A and T | clarify |
| 136 | 14 | were | was | grammar |
| 137 | 13 | supported -- little | supported little | dash not needed |
| 139 | 8 | kate's | Cate's | spelling |
| 162 | 18 | messaging | massaging | spelling |
| 173 | 3 | monitary | monetary | spelling |
| 173 | 15 | to. | to | no period |
| 174 | 16 | Us. | us. | no capital |

Richard E Beale
Signature of Deponent

31 Jan 02
Date of Signature