Certified Copy



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -

MARKETING AND MANAGEMENT INFORMATION, INC. :

vs. : Case No. 99-194C

THE UNITED STATES :

- - - - - - - - - - - - - - - -

November 30, 2001

Fort Lee, Virginia

The deposition of COL. WILLIAM E. SHERMAN, taken at the instance of the plaintiff, before Sherry W. Dudley, a Notary Public for the Commonwealth of Virginia at Large, beginning at 9:00 a.m., at the Defense Commissary Building, 1300 E. Avenue, Fort Lee, Virginia.

- 70 -

APPEARANCES:

Vincent J. Colatriano, Esq.
COOPER & KIRK
1500 K Street, N.W., Suite 200
Washington, D. C. 20005
(202) 220-9656
vcolatriano@cooperkirk.com
Counsel for the plaintiff

Sherry L. Floyd, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W., Room 12024
Washington, D.C. 20530
(202) 307-0290
sheryl.floyd@usdoj.gov
Counsel for the defendant

Thomas D. Rathgeb, Esq.
DEFENSE COMMISSARY AGENCY
1300 E Avenue
Fort Lee, Virginia 23801-1800
(804) 734-8029
rathgetd@hqlee.deca.mil
Counsel for the witness

INDEX TO WITNESSES

| | PAGE |
|---|---|
| COL. WILLIAM E. HERMAN | |
| By Mr. Colatriano | 4 |

the extension of the MMI or the '95 contract or the pre-'95 contract and the time period we were getting to that, there had to be some kind of extraordinary methods taken in order to insure that everyone had information and data out there.

And that proceeded along with Category Management and use of category captains for industry numbers and things like that, and that those procedures seemed to be working very, very well.

Q You referred a second ago to extraordinary methods. What were you referring to?

A Well, I think what I was getting at is there had to be -- what we had was a void with the '95 contract being protested. We did have a little bit of breathing room, because there was always a two-month delay in processing data, so the last data MMI got would have been the March '96 data, I believe, which would have been completed in May.

So from May forward, we were facing a point and that was the focus early on, what are we going to do come May when there isn't any more data available out there? Because our buyers need to have some concept of what's going on, and the industry needs to know how their products are moving so they have an idea of what kind of offers to make and that kind of

thing. So we were trying to figure out how we were going to work all of that.

And there were a number of different things that were looked at, including looking at shipping reports that companies would bring in for the products that they had been selling so we could try and compute in some manner what the movement of their products were during that time frame.

And at that point this whole concept of Category Management kind of, at least in my view as an observer, probably kind of speeded up a little bit in moving into the category captains and a lot of cooperation amongst the service industry members who had products in a particular category to try and define who the leaders were and what the sales were and that kind of thing of the various products in that category.

Q And when you refer to industry, you say industry partners or leaders, you are referring to the manufacturers of products?

A Yes. Or their representatives. Some of them are represented by brokers.

Q And you used the term "category captains" a couple of times. What does that mean?

A I'm probably the wrong person to ask and

I'm probably going to define it wrong. Because it is more of a technical term.

But as I understand it, the way Category Management traditionally works is that those manufacturers or those companies that are represented or have products that are represented in a particular category usually recognize that there is one leader within each of those categories.

And we have adopted what I understand is the civilian practice, then, of appointing that company to be what we call the category captain.

They kind of put together the marketing plan for that category. It is coordinated with all of the other members, industry members, that have products within that category.

And then finally we would review it and determine whether or not -- in conjunction with all of the industry members in that category, and determine whether or not it seemed to be an acceptable plan or not.

Q Do I take it that that process of using category captains was starting to get underway under that same general time frame?

A Yes. And, in fact, I think it probably got a little boost because of -- or because of the void

that was created in the process.

Q The void in getting refined data?

A The void in getting refined data, or in just having marketing information or product movement information, not only data but others.

Q Okay. During the time period that Gen. Beale was Director of DeCA, did you consider yourself a close advisor to Gen. Beale?

A Yes.

(Exhibit 1 for marked identification: Compilation of meetings.)

Q Mr. Sherman, if you could take a look at what's been marked as Exhibit 1 and let me know if you can identify this document for the record.

A I saw this for the first time on Monday.

Q Do you know what it is?

A I believe it is a compilation of meetings that was done in response to one of the interrogatories.

Q Is it fair to say that this compilation of meetings has to do with either CMSS or the MMI contract or Category Management?

A It appears to. As I recall, general

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: January 7, 2002
Case Name: Marketing and Management Information, Inc. vs. The United States
Case Number:
Dep. Date: November 30, 2001
Deponent: William Sherman
Place: Fort Lee VA
Ref. No.: 3787-3

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 6 | 8 | "saga" | "same" | spelling |
| 8 | 13 | "that" | "and" | Accuracy |
| 8 | 25 | "they" | "there" | Accuracy |
| 9 | 11 | "is" | "as" | Accuracy |
| 9 | 15 | "and" | "in" | " " |
| 10 | 20 | "B." | "P." | " " |
| 12 | 8 | "provide it" | "serve" | " " |
| 15 | 2 | "foyer" | "FOIA" | " " |
| 20 | 22 | "and" | delete word | " " |
| 22 | 4 | "insure" | "ensure" | spelling |
| 22 | 8 | "numbers" | "members" | Accuracy |
| 27 | 11 | "E-sale" | "Resale" | " |
| 29 | 11 | "NWR" | "MWR" | " |
| 30 | 13 | "Marty" | "Murry" | " |

- 76 -

Signature of Deponent

1-21-02
Date of Signature

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x
MARKETING AND MANAGEMENT, :
INFORMATION, INC. :
Plaintiff, :
v. : Case No. 99-194-C
THE UNITED STATES, : (Judge Bruggink)
Defendant. :
\- - - - - - - - - - - - - - - - - x

Washington, D.C.
Friday, September 20, 2002

Deposition of WILLIAM E. SHERMAN, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by CARLA L. ANDREWS, a Notary Public in and for the District of Columbia, taken at the offices of Cooper & Kirk, PLLC, 1500 K Street, N.W., Washington, D.C. 20005 at 1:00 p.m., Friday, September 20, 2002, and the proceedings being taken down by Stenotype by CARLA L. ANDREWS and transcribed under her direction.

**Certified Copy**

APPEARANCES:

On behalf of the Plaintiff:

VINCENT J. COLATRIANO, ESQ.
Cooper & Kirk, PLLC
1500 K Street, N.W.
Suite 200
Washington, D.C. 20005
(202) 220-9600

On behalf of the Defendant:

SHERRY L. FLOYD, ESQ.
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, N.W.
Room 12024
Washington, D.C. 20530
(202) 307-0290

THOMAS D. RATHGEB, ESQ.
Department of Defense
Defense Commissary Agency
1300 E. Avenue
Fort Lee, Virginia 23801-1800
(804) 734-8135

DeCA, indicated that they believed that it applied, also.

Q And which office within DeCA would have been responsible for making that determination that the FAR applied to this contract?

A I don't think there was an office in DeCA that made that determination or had the ability to make that determination because the determination was made by the GSBCA. I mean, you know, I guess you can say that our office read the GSBCA decision and came to the conclusion that it said that the FAR applied. But I don't think -- you know, there wasn't anyone in DeCA who had the independent ability to overrule the GSBCA.

Q Okay. So earlier when you said that sometime between GSBCA and notice of termination, DeCA determined that the FAR applied, what you mean is DeCA took the GSBCA's decision that the FAR applied and just took that as a given?

A We accepted that that was the state of the law, yes.

Q Okay. We have touched upon this topic already, but I want to more directly face the topic of -- I would like you to describe identify and describe for me with as much detail as you can all of the factors that DeCA considered in deciding to terminate this

contract for convenience?

A The first factor is that following the GSBCA decision, which bound the contract to be void ab initio, that there was no contract at that time. So there was nothing to terminate for convenience or for any other reason. Following MMI's appeal of that decision to the Federal Circuit, we still realized that until and unless that decision were overturned, there was no contract and, therefore, nothing to terminate it.

When matters continued to drag on in the litigation and with the change in industry regarding category management, with the changing needs of DeCA regarding getting data out to the customers and the manner that had been developed to do it, DeCA no longer had a need for, regardless of what the decision would have been by the Federal Circuit, DeCA no longer had a requirement for those services. So even if the Federal Circuit had ruled at that point in time that we are going to reinstate the contract, DeCA no longer needed the services that it was trying to get back in 1995. So it withdrew the solicitation.

Following the decision of the Court of Appeals and with the correspondence and the other communications that came from MMI, through its counsel, from Congressman Bartlett, and that information that had

management. What did you mean to refer to?

MS. FLOYD: Are you talking about termination for convenience or are you talking about cancellation of the solicitation? What time frame are you talking about?

MR. COLATRIANO: I am referring back to Colonel Sherman's earlier testimony when I asked him if these were the factors that led to the termination for convenience. He listed these factors. These were some of them. So now I am following-up on that. So it is whatever time frame he had in mind when he gave that response. This is following-up. He talked about a change in industry regarding category management and changing needs of DeCA regarding its requirements for these services, all of which he said were factors that led to the termination for convenience. So that's what I am following-up on.

THE WITNESS: What was the question again?

BY MR. COLATRIANO:

Q First of all, you referred to two different things or maybe you meant they are the same thing. One was changes in industry regarding category management, and the second one was the changing needs of DeCA, which led to it no longer having a requirement for the services. And that's what I would like you to elaborate

on in as much detail as you can.

A From the time the solicitation for the contract was originally issued, I believe, in the latter part of '94 or early '95 until the time period that we found ourselves in around -- I think it was around '97 -- the retail industry in the United States, particularly in the grocery industry, could not stand still with regard to category management and the implementation of it, nor could DeCA.

One of the things we were attempting to get under the contract was category management training. That training had to occur through other sources when the contract was protested and the GSBCA decision ultimately was -- well, initially with the protest, they stopped work on the contract.

There was also a belief at the time that we entered into the -- or that we developed the solicitation for the contract back in late '94, early '95 that category management would probably be exported to industry through the development of a number of experts, academia, a group of consultants, that kind of thing. What, in fact, happened is that the grocery industry essentially took it on themselves and said this is something that's really within our bailiwick and we will do category management in-house.

And so as a result, we had a lot of training, both from companies that had developed that expertise as well as some people from academia. And that training was primarily provided through the American Logistics Association at their various conferences and that kind of thing where they would have people provide that training. As a result, by the time we moved on to the -- it got to the cancellation of solicitation, we were more in the phase of sustainment new development-type training if any type of training was needed. We didn't need the basic type of training that we were thinking of initially. And it was more of -- it was more of an update or almost like a continuing legal education to keep you up with whatever the new developments were going on, not the basic type of thing in trying to determine what the proper categories were and how you should manage them and what items you ought to put together and all of that kind of thing.

Coupled with that is that industry put together teams for various categories. And while I don't know that there was a formal process for it, it essentially designated one of their group as a category captain for the products that were in that category. They basically looked at sales data from the commissaries as well as they had access to outside data

as to the potential for a sales group and that kind of thing. And then based upon the amount of space available on a commissary shelf, determined or made a recommendation primarily as to how much space each product in that category ought to have on the shelf.

Our people then reviewed that data. And then based upon that review, they concurred with it. That was also reviewed by everyone -- all of the industry members in the group within that particular category. We reviewed it after that and made the decision whether or not to accept. That's essentially the industry change that occurred or the way the category management came up. In part, that affected the DeCA business requirement because we no longer had a need either for the detailed training like I had mentioned or for the analytical services.

Q Was there any other respect in which DeCA's requirements had changed, such that there was no longer a need for services that were going to be provided under the contract?

A Well, I don't know if it was a direct factor. But in the interim when we couldn't get data out to the companies because of the termination of the previous MMI contract, we subsequently developed the auction of data to get that data or to get the data out

so that industry would have if it and so that we would have something to be able to view, also.

Actually, we were viewing it from an analysis perspective at that time. It turned out that what was up to that point an interim measure turned out to be extremely successful and beneficial to DeCA from a couple of standpoints. One of them was its competition in the marketplace had provided a broader source and a more economical source, particularly for smaller companies to obtain data and, you know, basically work better all the way around.

Q When you say more competitive source for smaller companies to obtain data, what types of companies? Are you referring to manufacturers, the companies that sold their products?

A Yes. But, you see, you have them in several different categories. You have the bulk of the grocery industry is taken up by the big companies -- the Procter & Gambles, the Krafts, the Kelloggs, General Mills, those kinds of companies. But there are occasionally new products that will come along that are manufactured or developed by a smaller company. And when they are looking for product movement data, up until that time, there had been complaints that in order to get the MMI data that they were paying essentially the same kind of