COPY



IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

x- - - - - - - - - - - - - - - - - - - - -x

MARKETING AND MANAGEMENT INFORMATION, INC.,

Plaintiff,

vs.

THE UNITED STATES DEPARTMENT OF DEFENSE, William Perry, Secretary, Et al.,

Defendant.

x- - - - - - - - - - - - - - - - - - - - -x

CIVIL ACTION NO. 96-1309

Wednesday, October 2, 1996

Alexandria, Virginia

Transcript of motion for temporary restraining order in the above-captioned matter.

BEFORE:

The Honorable LEONIE M. BRINKEMA, Judge
United States District Court

APPEARANCES:

FOR THE PLAINTIFF:

JAMES S. DELSORDO, ESQ.
WAYNE HANSEN, ESQ.
Suite 300
1568 Spring Hill Road



APPEARANCES: (Continued)

FOR THE DEFENDANTS:

JAMES MACKLIN, ESQ.
UNITED STATES ATTORNEY'S OFFICE
2100 Jamieson Avenue
Alexandria, Virginia 22314-5794

WILLIAM GOODRICH, ESQ.
ARENT FOX KINTNER PLOTKIN & KAHN
1050 Connecticut Avenue, NW
Washington, DC 20036-5339

JOSEPH P. HORNYAK, ESQ.
WILLIAM F. BURTON
SONNENSCHEIN NATH & ROSENTHAL
1301 K Street, NW
Suite 600, East Tower
Washington, D.C. 20005

C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| (None) | | | | |

P-R-O-C-E-E-D-I-N-G-S

THE CLERK: Criminal Action No. 96-1309-A,

Marketing and Management Information, Inc., vs. The United States Department of Defense and others.

MR. DELSORDO: Good afternoon, Your Honor. My name is James DelSordo. I represent the plaintiff, Marketing and Management Information, Inc.

With me today is Brigadier General Wayne Hansen, U.S. Army, retired, who I will now move to admit pro hac vice in this matter.

THE COURT: All right. I assume Mr. Hansen is an attorney, right?

MR. DELSORDO: Yes, Your Honor. He is admitted to Bar of the State of Colorado.

THE COURT: That's fine. Nice to have you in court, sir.

MR. HANSEN: Thank you.

THE COURT: And for the defendants?

MR. MACKLIN: Your Honor, I'm James Macklin from the U. S. Attorney's Office for the defendant.

THE COURT: All right.

MR. GOODRICH: Your Honor, I'm William Goodrich, attorney for A.C. Nielsen Company, intervenor-defendant.

THE COURT: All right.

MR. BURTON: Good afternoon, Your Honor; William Burton on behalf of the interve1or-defendant, IRI.

With me this afternoon is Joseph Hornyak of my

office. Mr. Hornyak is licensed to practice in the District of Columbia and in Maryland. Pursuant to Local Rule 7(d), I move that he be allowed to appear before this Court and address the Court in this matter.

THE COURT: That's fine. That motion is also granted. Good afternoon.

MR. HORNYAK: Thank you, Your Honor.

THE COURT: All right, before the Court today is the plaintiff's application for a temporary restraining order. We have had a chance to review the briefs. I don't need to hear them repeated.

I guess what I want to hear the plaintiff address for me, first of all, though -- and I don't know who is going to be speaking -- Mr. Hansen, are you going to do the speaking?

MR. HANSEN: Yes.

THE COURT: Come up to the lectern, please.

Can you show me where in this record there is any evidence to support the proposition that the contract that is at issue right now involves an exclusive license?

MR. HANSEN: Your Honor, not within the terms of the contract. It's the operation of the license that made it an exclusive arrangement.

THE COURT: Because nothing -- as I reviewed the papers and the various -- the May 8 letter and the May 23

information and the way these spot-bid sales are arranged, I don't see anything in the language of any of these documents that would support the proposition that the Government is giving out exclusive arrangements with the people who purchase this data.

MR. HANSEN: Yes. That's correct. It was not an exclusive license ab initio.

What had happened in the views of the plaintiff is by the terms of the license, paragraph three, I think it is, in the application, which is also the license which was granted by DeCA, paragraph three is the operative paragraph.

What had happened is, under the Property Act and the Commissary Data Sales Act, they were permitted to sell this property; and they did it under a spot-sale arrangement, which meant that bids were placed, each of the bidders suggested a price at which the property would be sold. Our client had suggested $30,000. That then became the monthly fee for anyone to subscribe to this service.

Now, had all of the parties paid their fees on a monthly basis as required by the license, it would not have been an exclusive license at all. But what happened was, our client, MMI, was the only one that complied with paragraph three, made the monthly payments as required; and under our view, the final language of that paragraph says if

you don't make your payments, this subscription, that is, the licensing subscription that was granted, shall be considered canceled.

THE COURT: But there's nothing in that language, that I see that prevents somebody from the next month reinstating the subscription, and in effect getting back issues if you want to use that terminology. There's nothing that I see that prevent that from happening.

MR. HANSEN: Well, it's our view that this was a one-time licensing application, and indeed the 23 May letter from DeCA to the parties had this one-time licensing arrangement. If you want to come in under this license agreement, this is what you have to do.

And after 25 May, no new subscribers could indeed come on line, and those subscribers who indicated an interest in the beginning who did not meet the requirements, then were not licensees under this agreement; and once having lost that ability to be a licensee, they could no longer become one during the terms of this particular arrangement.

You will recall that the purpose of this arrangement was an interim fix from the present time when DeCA wanted to still get this information out until the protest was finally settled under the contract, which MMI had originally won and was set aside under protest; and that

of course is on appeal.

THE COURT: That original contract was an exclusive?

MR. HANSEN: It would have been, yes, Your Honor, it would have been, because they had the exclusive right under the contract to receive that money. That was a competitive contract, incidentally, which our client won over the other individuals who are here today.

In fact, that was the third contract that our client had won. They had two prior five-year contracts in which they were the exclusive marketer of DeCA data. And this would have been the third one.

So, in essence, what was happening was an effort on the part of DeCA to bridge the gap until this question of the protest was finally settled -- and I don't think the language -- I think it's pretty clear what we have here is that if you don't make your payments by the 25th of June, is the way that it works out, then this application is canceled; that is, your license is canceled.

This was not to be an ongoing arrangement where anyone could come in at any time and buy the data.

I think it might be a little closer to, if you listened to the radio coming into work, the Washington Post has an offer. It says if you will buy 52 weeks of daily, we will give you a free weekend paper. However, this is only

FORM FED PENGAD • 1-800-631-6989

available under certain circumstances. You can't have canceled within 30 days or 60 days and the like.

So this is not an ongoing one that you just adhere to it at any time that you wish, drop out at any time you wish. It's a license in which you pay your dues, which is up until the 25th of June; and if you fail do that, you know longer hold a license.

Now, what had happened is both of the other contractors had failed to meet the terms.

The letter came out advising on the 23rd of May. Our client immediately got a copy of the application, sent it back, was aware of the terms. Both of the others failed to do that, made no effort to meet the terms of the contract until one in late July and one in mid-August, as I recall.

And having slept on their rights, having failed to qualify for the license, now they want this Court to relieve them of their failures.

A license -- this license is a lot like a driver's license. You get a license as soon as you have met certain criteria. And if you don't meet those criteria, taking the test, driving in the streets, if you don't meet those criteria, you get no license.

THE COURT: But that's a very bad analogy because, I think, you can go the very next day and take the test again and make the application again get it.

MR. HANSEN: But you still have to meet the requirements, and if you fail to meet the requirements, it doesn't matter how many times you apply, you are not going to get an opportunity to get that license.

THE COURT: Let me hear from Mr. Macklin. Mr. Macklin, on these issues, issue number one, specifically whether you agree on number two with the plaintiff's position in that the way this language operates, it prohibits anybody from jumping in at a later time and getting this arrangement.

MR. MACKLIN: Your Honor, certainly defendants would disagree with plaintiff's restrictive interpretation of the application of intent and the way that defendants had hoped that this would work out.

It's clear that the motivation here, yes, they had been exclusive contracts, but one thing was different with the notification by DeCA to put out this data through these spot-bid sales. And that is, from the start, their clear emphasis on this being nonexclusive, on this going out to all the parties, insuring that all the parties had equal access to the information.

There is nothing restrictive in these licenses and applications except for the reading that plaintiff would apply to them.

Turning to paragraph --

THE COURT: (Interposing) Is there something in one those letters that says these are nonexclusive?

MR. MACKLIN: Repeatedly, Your Honor. In paragraph 3 of the application -- and I'll note that it is an application for license for data -- it does say beginning June of '96. Beginning June of '96 certainly implies that the months following that, further subscription could be made each month.

You put in your order by the 25th of the month, and that was simply a requirement in terms of processing time, put in your money by the 25th of the month; and you will be able to get your information.

It said that if you did not, then your subscription would be considered canceled.

To the extent that you had a continuous, unrestricted flow of the information once you submitted your application and you continued to have that money in by the 25th, you are going to continue to get the data. There is no need to put in a further application. There is no need to put in a further request for license. It's going to flow.

If, however, you don't get it in by the 25th, they have got to stop it.

I'll note at the bottom of the application, the same page, it says, Unless the subscriber desires a shorter

period, this subscription shall continue uninterrupted, clearly conveying that there are periods that you could select from as opposed to having to sign up by June 25th and continuing uninterrupted until you happened to miss a date, in which case you are completely barred from the data.

I think when you read the application along with the letters that were forwarded to all of the offerors to try and get out this information of what was happening here, the whole context is, let's get the data to whoever wants it with the $30,000, as long as they get it by the 25th, so that we can get this data out, because of the fact that the other contract had been held up by the bid protest and the appeal. They had this information. They had to get it out. They wanted to get it out to whoever they could.

It's clear from the letters that it was to be nonexclusive.

One thing to note, at the time all of this was created, there was no retroactive data. So as of the June 25th, you could not go in and claim further data. It was not thought at the time of putting the specifics in regarding the retroactivity; there simply wasn't any to be purchased yet.

As type went on and people came in still wanting the data, that's when DeCA said, sure, as we responded in the letter with a specific question, as long as the firm is

willing to meet the competitively established price for a month's worth of data, they can have a license to use that month's worth of data under the interpretation specified in the May 8 letter.

The May 8 letter, of course, simply setting out the parameters of the spot-bid sales and how the license would work.

Your Honor, it's the defendant's contention that there is nothing within the statute, within the context of the letters or the licenses that were issued in response to this spot-bid sale that prohibits or makes illegal the action that plaintiffs claim is illegal.

I think clearly the plaintiff has failed to show any irreparable injury sufficient to make the next ten days of vital importance. I would like to point out that it has been asserted to me by plaintiff's counsel that they intend within the next 16 days to have a hearing on a motion for summary judgment in this case, such that the whole issue may be resolved within a matter of 16 days.

Clearly the urgency required for a temporary restraining order, the extraordinary relief that goes with that, is just simply not called for under these facts and under these circumstances.

THE COURT: All right.

Do the intervenors want to be heard?

MR. GOODRICH: Good afternoon, again, Your Honor; William Goodrich for the intervenor A.C. Nielsen Company.

I don't know that we have much of substance to add to the discussion that Mr. Macklin has given to you on the merits.

I think I'll just make one comment on that, which is that this language that talks about cancellation of a subscription, it seems to me when it's read in context with all of the prior letters, it's simply the Government saying we have to be paid up front for this data. We aren't going to give you the data and then get paid later. That's all there is to it.

The key to it here is that, of course, a part of the terms and conditions of the spot-bid sale are question and answer 13, that you can buy it at any time.

I just want to make two brief comments on the issue of harm, if I may.

First the alleged harm to MMI, I would like to suggest for the Court's consideration that MMI is certainly no worse off if it gets the injunction later than now. It's probably better off, frankly, if that were to occur.

The reason being this, that the only way Nielsen or MMI or any other company can make a business of providing products based on this data is to have the data for all months in question. Otherwise, your data is statistically

not valid.

So if 16 days or 36 days or whatever period of time from now the Court is to rule either on the permanent relief or preliminary injunction that we have no right to this data, then we are out of business.

And it seems to me that MMI is in much better shape than they are now, because we will by then have some probably another $30,000 or $60,000 in this data. So there is no need for a temporary restraining order.

Let me also say that MMI has an enormous competitive advantage here. As General Hansen said, they have been the exclusive licensee for ten years. They have existing customers, and we find ourselves in the position as Nielsen of trying to get into this business as is IRI.

So if anyone has an advantage in this business, it's them.

Finally on the subject of harm to Nielsen, and this is my final point: We have already paid the Government not just $30,000 for the April data but $150,000 for April, May, June, July, and so that is a sunk cost. Also a sunk cost is the cost of processing this data; and may I emphasize that when DeCA used the term "raw data," they meant it. It is extremely raw. It needs to be processed, using very expensive processes to make it usable.

Your Honor, also, finally on the subject of

irreparable harm, I think the reason we are here is probably this coming Monday, the American Logistics Association has an annual meeting, where MMI hopes to sign up as many customers as possible. It would certainly like to be in a position to say that the Court has ruled in its favor on a temporary restraining order, even if the Court has not determined the merits. That would certainly put Nielsen and IRI at an enormous and unwarranted competitive disadvantage.

That's all I have, Your Honor.

THE COURT: Thank you.

MR. HORNYAK: Good afternoon, Your Honor; I'm Joe Hornyak for IRI.

I would just like to make a couple of quick points on the merits. The question and answer that Mr. Macklin read to you, elsewhere in that letter, that was the May 15 letter, Question No. 2, the response there too, says in part that the letters of May 8, 9 and 15 May specify the terms and conditions applicable to this license agreement.

So the May 15 letter which contains the response Mr. Macklin read to you was the term of the sale.

The document that they are relying on was the license application. It wasn't dated. It was sent to bidders upon request.

My client didn't even receive that application

until July. So my client never even had, if their interpretation is correct, never even had the opportunity to satisfy the June 25 date; because by the time it got the application, it was too late.

As to the harm that my client will suffer, actually -- actually let me address the lack of harm to MMI. Assuming IRI is able to sign up any customers the next week's ALA convention, we would still not be -- this is set forth in our papers, Your Honor -- we would not be delivering any data to our customers until March of 1997.

So if this Court were to rule on the merits sometime before March of '97, which everything I have heard today suggests it will be able to, MMI will lose one sale to my client, because we would not be able to satisfy any contracts we are able to get next week, and the customers would simply go back to MMI.

I think clearly with respect to IRI, there is no irreparable harm to MMI here. Our papers set forth the harm that we would suffer next week. If this Court were to grant the TRO, I can assure you MMI would make that front-page news at the ALA convention beginning on Monday. It would seriously hurt our ability to sign up customers.

That convention is held once a year. That opportunity will be lost for another year. We would have no other opportunity to meet with all of the potential

customers at one time. So I ask that the motion be denied. Thank you.

THE COURT: Does the plaintiff, Mr. Goodrich, want a brief time to respond -- I'm sorry, Mr. Hansen?

MR. HANSEN: Yes, if I may. Mr. Macklin's analysis of this not starting out as an exclusive license is correct. The documents indicate that it was the opportunity for a number of bidders to come in. The fact of the matter is that only one bidder made the requirements of the license, and that is my client.

The others had the same opportunity. They received the 23 May letter just as we did. We were able to get the application and the granted license almost immediately.

They chose for whatever reason to delay their application and the securing of their purported license until July or August.

So if they failed to meet the time requirements, it is because of their own fault, nothing that MMI did.

I think it's important to understand that. So what we have is that a non -- that a nonexclusive license became by operation of law an exclusive license.

I think an error was made that the April and May data was available and indeed was ultimately purchased at the time of this contract, because we got it.

So I think maybe Mr. Macklin maybe misspoke himself.

Now, the question of the urgency is simply this: The day, seven days after the plaintiff filed its complaint and request for restraining order, Nielsen went to DeCA and asked for all of the prior months, May, June, July and August.

Those are to be delivered today. And that's why we are asking for a temporary restraining order; because, as counsel for IRI said, it is not the individual month that is critical, it is the cumulative number of months and expanded data.

And if Nielsen gets that data, you cannot unring the bell. Once they have it for analysis, it's out there; and our ability to trace the violation when we win will be very difficult. And some judge then will be sitting in your place trying to determine how it was that improper use of that data was made to our detriment.

The question and answer are simply not a part of the licensing agreement.

Now, in normal Government contracts, those statements, initial statements to prospective bidders and the like, are incorporated by a contract clause within the Government contract.

Under the Property Act, there is no such

incorporation. And indeed, DeCA chose to base it under the Property Disposal Act and the standard form upon which that base says oral representations grant no rights to the bidder under any circumstances. So this question and answer simply are not a part of the licensing agreement when that licensing agreement is issued pursuant to the Property Act.

It's Standard Form 114-C, paragraph 16, and it's contained in the briefs that any mods, any changes have to be in accordance with those regulations, not willy-nilly at the request of DeCA.

The point of the fact is that any use of that data will significantly harm our client. I think there is no doubt, for example, if you assume an exclusive agreement, which we believe ours is as an operation of law, and DeCA attempts to sell that information which rightfully belongs to us, no one would contend that that is not an immediate and irreparable damage to our client's interest; and that's exactly what we have here.

In that sense, it's a very simple case. It's a very simple case, because if you will give us a temporary restraining order, we will have a motion for summary judgment filed on Friday available for hearing on the motion day on the 18th of October.

Now, I'm not sure about Nielsen; but in its papers, IRI says they need -- it will be six months before

they are prepared to sell this data.

Now, that's so, six months out, surely, surely 16 days is not too much to ask so that the Court can decide this issue once and for all and settle it. And in that sense, as I said, this is a very simple case and something that we think the Court ought to provide a temporary restraining order.

THE COURT: Well, we have spent time in Chambers. We have had the luxury, since this was not on a Friday, of really being able to look at the papers. As I said to you at the very beginning, Mr. Hansen, I wanted you to be able to show me at this point anyway where you find your basis for the argument that this is an exclusive lease at this point or -- I'm sorry, an exclusive license at this point for your client.

I just don't see it at this point. And under the Blackwelder four-part analysis, this Court has to, first of all, take into consideration the likelihood of success on the merits.

My evaluation of the paperwork and of the reading of the operative documents is I see nowhere any language that says that DeCA was entering into any kind of an exclusive license with either you or any other entity concerning these stop-gap or whatever they are called, contracts.

In fact, the paperwork that surrounds the environment out of which this all grew was explicitly clear that these would not be exclusive agreements, which means it's a wide open, competitive marketplace.

As I read these documents, any party that's willing to come in and pay the money can get access to this data, period. There may wind up being eight or ten companies doing it. I just don't see it as an exclusive environment; and, therefore, I don't find there's a high likelihood of success at all on the merits.

I doubt that there's much discovery, frankly, that has to be taken in this case other than just a more in-depth reading of the documents themselves, but that's my feeling about that.

In terms of harm to the plaintiff, I would agree that there going is going to be harm to the plaintiff. There's harm to any plaintiff in a competitive environment when the competition is increased. That's the nature of being in an open economic society as we have.

The harm to the defendant if the injunction were to be granted, of course, is significant because these are two defendants who are trying to break into this marketplace, and they would be deprived the opportunity of getting in there especially, apparently, this week where they will able to start lining up potential customers.

The last factor the Court has to consider is the whole public welfare issue. The public tends to be best served when there is free and open competition in our society; and the temporary restraining order, in effect, affects that open competition by in effect granting at this the point a monopoly or exclusive license to MMI.

Therefore, the only one of the four Blackwelder factors that tips in favor the plaintiff is the likelihood of harm to the plaintiff. It is essentially an economic harm. It is not irreparable. It is not something that could not be addressed with economic damages down the road were the plaintiff to ultimately succeed.

And, therefore, I'm going to find that the -- there is no -- I'm not going to grant the motion for the temporary restraining order, because I don't find that the plaintiff is able it meets burden under Blackwelder.

All right. And I still think that your idea, Mr. Hansen, about going forward and getting the whole case resolved definitively in a very short order makes sense; because I don't think there is much of any discovery that's really needed. There may be. That's up to you-all. But anyway, I'll issue an order reporting this.

Yes, sir?

MR. DELSORDO: Your Honor, we may -- we are going to -- it's only 3:30, if I can get downstairs, file a notice

of appeal. I would move at this time for an emergency stay of your order so that we can get this before the Fourth Circuit on an expedited process.

THE COURT: Well, I'm not going to anything that prohibits the Government from going forward.

Normally, I don't think I have to stay anything. I have denied your motion for a temporary restraining order. That means there is no restraint at this time on DeCA. I'm not going to grant the relief, because that in effect would be reversing the ruling I have just made.

What you will need to do is go to the Fourth Circuit, I think, and see if they are prepared to enter some sort of temporary relief, but I'm not going to do anything other than issue my order this afternoon.

MR. DELSORDO: Thank you, Your Honor.

THE COURT: Anything further from the defendants?

MR. MACKLIN: None, Your Honor.

THE COURT: Recess court until 8:30 tomorrow morning.

(Whereupon, at 3:30 p.m., the above-captioned matter was concluded, and court stood in recess.)

CERTIFICATE OF OFFICIAL REPORTER

COMMONWEALTH OF VIRGINIA )
) ss.
CITY OF ALEXANDRIA )

I, EDWARD DONOVAN McCOY, Registered Professional Reporter and Official Court Reporter for the United States District Court for the Eastern District of Virginia, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that I was authorized to report, and did so report in Stenotype, the foregoing proceedings;

THEREAFTER, my Stenotype notes were reduced to typewriting under my supervision; and I further certify that the pages herein numbered contain a true and correct transcription of my Stenotype notes taken herein.

DONE and signed, this____________ day of ____________, 19__, in the City of Alexandria, Commonwealth of Virginia.

EDWARD DONOVAN McCOY, RPR
Official Court Reporter

* * *