# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF PAGES 1

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. *(If applicable)* |
|---|---|---|---|
| P00012 | 14 DEC 1995 | | |

6. ISSUED BY CODE

DEFENSE COMMISSARY AGENCY
ACQUISITION BUSINESS UNIT OC/RAE
1300 E AVENUE
FORT LEE, VA 23801-1800

7. ADMINISTERED BY *(If other than Item 6)* CODE

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

MARKETING AND MANAGEMENT INFORMATION, INC.
4800 Montgomery Lane, Suite 700
Bethesda, MD 20814

CODE | FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

X 10A. MODIFICATION OF CONTRACT/ORDER NO. F41689-89-S-1001

10B. DATED *(SEE ITEM 13)* 03 October 1989

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

No Change

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER *(Specify type of modification and authority)* Additional Contract Clause # 8, entitled "Extension After Performance". |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

A. In accordance with the clause cited above, the Government hereby elects to extend the current performance period of this contract for a period of three months, on the same terms and conditions as applicable to the current performance period. The current period of performance under this contract is changed to read 01 Jan 1995 through 31 Mar 1996.

B. All other terms and conditions of this contract remain unchanged and in full force and effect.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)* | |
|---|---|---|---|
| | | LAWRENCE P. HAHN | |
| 15B. CONTRACTOR/OFFEROR ______ *(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY [signature] *(Signature of Contracting Officer)* | 16C. DATE SIGNED 14 Dec 95 |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105-02

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA

Marketing & Management
INFORMATION, INC.

August 8, 1995

Via Facsimile: 804/734-8271
and Federal Express

Mr. Lawrence P. Hahn
Chief, Contracting Division
Defense Commissary Agency
East Service Center
38th Street & E Avenue
Building P-11200
Fort Lee, Virginia 23801-6390

**Re: Request for Proposals No. DECA01-94-R-0068**
**Analytical Support Services for Category Management**

95 AUG -9

Dear Mr. Hahn:

We will be submitting a proposal on August 10, 1995, in response to Request for Proposals No. DECA01-94-R-0068, for Analytical Support Services for Category Management (the RFP). Notwithstanding that, we continue to have some concern about the legal basis for requiring supermarket scanner data comparisons under the RFP. To date, our concern has not been addressed. DeCA is our customer, and we always have been able to resolve any differences with DeCA amicably and productively between ourselves. For the record, we would appreciate it if you would consider our statement on this issue as an "agency protest." Our position is set forth on pages 2-7 of our letter of November 16, 1994, which is incorporated by reference. Needless to say, if MMI is selected for award, then our concern is moot, and you may consider this "protest" withdrawn.

It is our fervent hope that we will be selected for award, and our concern will have been for nothing. Our only desire is to continue to serve DeCA. Thank you.

Sincerely,

Loretta M. Downey

Loretta M. Downey
Chairman and C.E.O.

PROTEST!

4800 MONTGOMERY LANE • SUITE 710 • BETHESDA, MD 20814 • (301) 718-7600 • FAX (301) 718-7652

Marketing & Management
INFORMATION, INC.

November 16, 1994

**CONTAINS PRIVILEGED AND CONFIDENTIAL**
**TRADE SECRETS AND COMMERCIAL OR FINANCIAL INFORMATION -**
**NOT TO BE RELEASED UNDER FOIA**

Defense Commissary Agency
East Service Center
Contracting Division (ES-AM)
Attn: Mr. Larry Hahn
Bldg. P-11200, 38th Street & E Avenue
Fort Lee, VA 23801-6390

RE: **Draft Request for Proposals -**
**Analytical Support Services for Category Management**

Dear Mr. Hahn:

Thank you for sending a copy of the draft Request for Proposals for Analytical Support Services for Category Management based on Commissary Product Movement and Sales Data (DRFP) to Marketing and Management Information Inc., the incumbent contractor. We appreciate this opportunity to review and comment on the DRFP.

Before we begin our comments on the DRFP, we are obliged to note that we found it somewhat difficult to prepare comments, because of the omission from the DRFP of:

Section B - Supplies or Services and Prices/Costs
Section H - Special Contract Requirements
Section J - List of Attachments
Section L - Instructions, Conditions and Notices to Offerors,
and Section M - Evaluation Factors for Award.

We recognize that the DRFP required extensive effort on your part, and on the part of your staff. However, these omissions give the unfortunate impression that this important requirement is being treated as a "rush job."

We regard Section C (the Statement of Work, which you did provide), Section B (pricing) and Section M (evaluation factors) as the most important parts of any solicitation. Our ability to provide meaningful comments is hamstrung by the absence from the DRFP of two of the three most important sections. We would very

4800 MONTGOMERY LANE • SUITE 710 • BETHESDA, MD 20814 • (301) 718-7600 • FAX (301) 718-7652

much like to give you meaningful comments on pricing and evaluation factors before these sections are "set in stone" in an RFP. Therefore, we recommend that you issue a DRFP containing at least Sections B and M, and preferably all the missing sections, before you issue an RFP.

With this caveat in mind, we welcome this chance to give you our thoughts on the DRFP. For the sake of clarity and organization, each of our comments is preceded by a background statement identifying the relevant portions of the DRFP. Initially, we address four major issues: supermarket data, report delivery, evaluation factors, and set-asides. After that, we go through the DRFP, making comments on sections roughly in the order in which they appear in the DRFP. We close with miscellaneous requests for information.

## I. MAJOR ISSUES

### A. Supermarket Data

**BACKGROUND:** Our number-one concern about the DRFP is that Section C of the DRFP requires the use of data other than the data that DeCA is supplying to the contractor. This changes the character of the contract from an exchange contract under 10 U.S.C. § 2487 into a contract for the procurement of supermarket scanner data. We question the legality of such a procurement, because (a) 10 U.S.C. § 2487 does not contemplate such an arrangement, and (b) to the best of our knowledge, the GSA has not given permission for such an arrangement, as required by the FIRMR, and (c) tying the collection and distribution of DeCA scanner data to obtaining and reporting on supermarket scanner data is unduly restrictive.

By way of background, the current version of 10 U.S.C. § 2487 provides as follows:

> **Commissary stores: limitations on release of sales information**
>
> **(a) Authority to limit release.** -- (1) The Secretary of Defense may limit the release to the public of any information described in paragraph (2) if the Secretary determines that it is in the best interest of the Department of Defense to limit the release of such information. If the Secretary determines to limit the release of such information, the Secretary may provide for limited release of such information in accordance with subsection (b).
>
> (2) Paragraph (1) applies to those portions of computer

**PRIVILEGED AND CONFIDENTIAL**

data generated by electronic scanners used in the military commissaries, and those portions of reports generated by such scanners, that contain the following information:

(1) The unit prices of items sold.
(2) The number of units of items sold.

**(b) Release under competitively awarded agreements.** -- The Secretary of Defense may enter into one or more agreements that provide for limited release of information described in subsection (a)(2). The Secretary shall use competitive procedures to enter into each such agreement. Each agreement shall require payment for such information and shall specify the amount of such payment.

**(c) Deposit of receipts.** -- Amounts received by the United States under an agreement described in subsection (b) with respect to a commissary shall be deposited in the Commissary Trust Revolving Fund of the military department under which the commissary is operated.

10 U.S.C. § 2487 (Supp. IV 1992). This statute clearly contemplates and requires an exchange agreement. Under an exchange agreement, DeCA provides "computer data generated by electronic scanners used in the military commissaries." In exchange, the contractor provides "payment" and, if DeCA so desires, "reports generated by <u>such scanners</u>." The payment goes not to DeCA, but to the Commissary Trust Revolving Fund.

This is the arrangement under the incumbent contract.[1] Under the incumbent contract, the contractor is required to furnish to DeCA only reports on data generated from <u>DeCA</u>'s scanners. There is no supermarket reporting requirement under the incumbent contract.

In contrast, Section C of the DRFP states (in part) as follows:

> 2.2 The contractor must be able to compare commissary performance indices with those of <u>commercial supermarkets</u> within a comparable geographic area. . . .

---

[1] The incumbent contract actually was awarded under 10 U.S.C. § 2487 (1988), not 10 U.S.C. § 2487 (Supp. IV 1992). Nevertheless, the incumbent contract complies with the mandatory requirements of 10 U.S.C. § 2487 (Supp. IV 1992).

4.2 Contractor analysis must effectively benchmark DeCA performance indices against those of the commercial supermarket industry in the United States.

Tech. Ex. 1 – Required Reports. The following reports shall be provided to DeCA[:] . . . (a) A quarterly comparative summary of sales by total military commissary market, by region, and by the most compatible geographic segment of the commercial supermarket industry . . . .

(d) A semi-annual report which shows each category's contribution to total dollar and package sales, and compares these total commissary market and regional indices with comparable supermarket industry geographic areas.

(e) An annual report which compares the frequency of the promotional activity for each category within the commissary total market and region to comparable supermarket industry geographic areas.

(f) An annual report which compares the frequency of promotional activity for each category within the commissary total market and region to comparable supermarket industry geographic areas.

(Emphasis added.)

Although the Statement of Work requires the contractor to provide reports on commercial supermarket industry sales, it does not require DeCA to provide any scanner data from commercial supermarket industry sales. Under paragraph 3.1, DeCA is to provide only "[d]ata collected by DeCA from the commissaries."

It appears to us that there are several legal problems with any DeCA scanner data contract that requires the contractor to report on data -- any data -- that is not provided by DeCA under the contract. First, and most obviously, the only "consideration" that 10 U.S.C. § 2487 (Supp. IV 1992) permits for DeCA scanner data is "payment" and "reports generated [from DeCA] scanners." The statute does not permit consideration in the form of reports on commercial supermarket industry sales. DeCA may have the authority to issue a separate contract for supermarket sales reports, but it appears to us that it cannot do so under the "agreement" that 10 U.S.C. § 2487(b) (Supp. IV 1992) provides for.

Secondly, supermarket sales reports are expensive, and the

only way that a contractor can afford to pay for such reports is to propose a smaller "payment" to the Commissary Trust Revolving Fund. In effect, DeCA is diverting funds away from the Commissary Trust Revolving Fund in order to avoid paying for supermarket sales reports. Obviously, it would be improper to require the contractor to provide pencils and paper clips to DeCA, at the expense of the Commissary Trust Revolving Fund. We submit that it is equally improper to require the contractor to provide reports on anything other than the DeCA scanner data distributed under the exchange agreement.

Third, GSA evidently has questioned whether DeCA is adhering to the Federal Information Resources Management Regulation (FIRMR), 41 C.F.R. ch. 201 (1993). Supermarket scanner data obviously is an automatic data processing (ADP) resource. See Metaphor Computer Systems, Inc., GSBCA No. 10337-P, 90-1 BCA ¶ 22,542. Therefore, for DeCA to procure supermarket scanner data (and reports based on such data) DeCA must obtain a delegation of procurement authority (DPA) from the GSA, and use it in a conventional ADP procurement. Obtaining supermarket scanner reports by tying it into the exchange contract for DeCA scanner data has the unfortunate appearance of an effort to evade GSA's authority.[2]

Finally, there are only two companies that collect supermarket sales reports -- Nielsen and IRI. Nielsen and IRI divide the commercial supermarket industry between them. Each has different store samples, different market definitions, and different approaches to reporting the commercial supermarket industry. Some supermarkets may provide data only to Nielsen, and others only to IRI. Therefore, if an RFP requires complete data from the commercial supermarket industry, only a teaming arrangement between Nielsen and IRI could satisfy such a requirement. In any case, only Nielsen and IRI have access to such data. A procurement restricted in such a manner would violate the requirement in 10 U.S.C. § 2487(b) (Supp. IV 1992) that "[t]he Secretary shall use competitive procedures to enter into such an agreement." (Emphasis

---

[2] Under FIRMR, the GSA has the responsibility to prioritize and coordinate U.S. Government acquisition of ADP resources. The GSA might decide that (a) supermarket scanner data is not worth the expense, (b) it can be obtained more efficiently by some means other than "bundling" it with the exchange agreement for DeCA scanner data, or (c) acquiring such data under the exchange agreement improperly diverts funds from the Commissary Trust Revolving Fund (as noted above). It appears to us that the authority to make each of these determinations lies with the GSA, not DeCA.

added.) It also would violate the competition requirements of the Armed Forces Procurement Act, 10 U.S.C. § 2301 et seq. (1988).

In addition to these numerous legal objections to the Statement of Work's supermarket sales data requirements, we also question the practical need for such information. Unlike DeCA, the civilian supermarket industry is splintered and localized. It relies heavily on private labels. Brokers are much less prominent. There is less coupon usage. Shopping is more frequent. Demographics are more heterogeneous. There is less buying in bulk. Many supermarkets offer pharmacies, florist sales, movie rentals, and other non-traditional products. There are substantial dissimilarities in how items are promoted. Companies who supply commissaries employ separate military sales and marketing managers, and use specialized military brokers and distributors. More generally, supermarkets exist for profit, and commissaries for savings. With such marked differences, the utility of supermarket data for DeCA category management is limited. In fact, if there weren't such differences, then DeCA wouldn't even need to collect scanner data; it could use supermarket data alone. Obviously, this is not so, and the differences are significant. Calculations based on commercial supermarket data would be miscalculations, and detailed comparisons to civilian supermarket data actually would be misleading.

Based on our experience as the incumbent contractor, the DRFP drastically overstates the amount of supermarket industry sales data that DeCA ever would need or use. We believe that DeCA's needs would be met, amply, by replacing the supermarket sales data requirements in the DRFP with the following statement: "The Contractor is required to provide annual civilian grocery category-level sales trend information as a basis for comparison to commissary sales trends." For the same reasons, the definition of the term "performance index" on page C-6 should be abbreviated to read "A measure which helps define the relative sales success of a category." The frequency of reports (a) and (d) in Technical Exhibit 1 should be changed to annual. This is sufficient to inform DeCA about civilian supermarket price levels, whether sales are up or down, whether assortments are increasing or decreasing, trends, etc. In other words, it is sufficient to meet every practical need.

Annual civilian grocery category-level sales trend information is available to companies other than Nielsen and IRI. There is no need for quarterly civilian supermarket data to judge seasonality, because seasonality is readily ascertainable from DeCA's own monthly sales data. Therefore, such a requirement would not be unduly restrictive, and would satisfy DeCA's actual minimum needs.

Based on these observations, we make the following comment:

> COMMENT: All requirements for the contractor to make reports based on commercial supermarket sales are inconsistent with 10 U.S.C. § 2487(b) (Supp. IV 1992) and the FIRMR, and are unduly restrictive. All such requirements either should be eliminated, or they should be replaced with the following single requirement: "The Contractor is required to provide annual civilian grocery category-level sales trend information as a basis for comparison to commissary sales trends."

On the same subject, we make this additional comment:

> COMMENT: Paragraph 2.1 of the Statement of Work states that "DeCA is required to mirror commercial supermarket industry practices and standards in the way they conduct business." We believe that this statement is inaccurate, and inconsistent with paragraph 4.2 ("The contractor's benchmarking technique must recognize the differing product mix characteristics between" DeCA and the commercial supermarket industry.) If DeCA retains any requirements for commercial supermarket sales in the RFP, please identify the differences between DeCA and the commercial supermarket industry.

In the course of addressing the issue of the supermarket sales requirements, we have touched on certain information that we would like DeCA to distribute to the offerors. We put these information requests in the form of comments:

> COMMENT: Please provide a copy of the determination of the Secretary of Defense required under 10 U.S.C. § 2487(a) (Supp. IV 1992).

> COMMENT: Please provide a copy of any DPA or other permission from the GSA to conduct this procurement in the manner set forth in the DRFP.

We regret the need to discuss this complicated issue at such length. We now continue with comments on other issues.

B. Report Delivery

BACKGROUND: One of the fundamental purposes of the scanner data contract is to provide reports to DeCA. Under the incumbent contract, the contractor furnishes such reports through a contractor-furnished computer system used exclusively for this

purpose. The DRFP actually bars the distribution of reports in this manner. Instead, it requires that the contractor provide the reports by telephone line to modems. From a technical perspective, the DRFP's method of report delivery is old-fashioned and inefficient in the extreme. From a contracting perspective, this method of delivery is unduly restrictive. If the RFP is going to address report delivery methods at all, it should specify performance requirements, not the technical solution (and a poor one, at that) for achieving such requirements. In other words, DeCA should describe the end result that it wants to achieve, not the means for achieving the result.

Under paragraph 2.2.3 of the Statement of Work in the incumbent contract, the contractor delivers reports "(via electronic means) into a contractor furnished computer system (work station)." Admittedly, this is only one of several ways by which reports can be delivered to DeCA.[3] However, this approach does have the virtues of: (a) working well in practice, as shown by experience, and (b) going through a complete procurement cycle without anyone claiming that it was unduly restrictive.

In contrast, the DRFP prevents the contractor from delivering reports by means of work stations, whether networked or not. Instead, the contractor is forced to use a time-sharing system:

> 1. The contractor will provide on-line access . . . .
>
> 2.4 The contractor will be required to . . . provide outputs through DeCA's existing information infrastructure. No contractor hardware will be utilized resident onsite at DeCA. . . .
>
> 2.8 Contractor will provide HQ DeCA and regions multiple user ID's for concurrent on-line access via the Internet TCP/IP network utilizing a Telnet session. The system must support a maximum of 64 concurrent users. . . .
>
> 3.1.1 The contractor will provide a connection to the Internet TCP/IP network. The contractor will transfer the data collected by DeCA utilizing the Standard File Transfer Protocol (FTP). Remote logon will

[3] For instance, the work station can be incorporated in DeCA's computer network, so that it can be accessed from each network terminal.

be facilitated using Telnet. . . .

> 5.1 Contractor will provide DeCA password control access to that portion of the contractor's database which contains DeCA information. DeCA will retrieve such information through the file protocols as defined in para 3.1.1 above.

With all due respect to DeCA, we consider this to be a bizarre, retrograde method of delivering scanner data reports. Using timesharing to delivery data by telephone has been in decline since 1978, sixteen years ago. Today, everyone from Fortune 500 companies to mom-and-pop convenience stores use PCs and work stations, networked where appropriate, to maintain and analyze large databases. Even ordinary PCs with CD-ROM capability can examine databases containing a map of every street in the country, every telephone listing in the contract, every contract awarded by the U.S. Government, abstracts of all U.S. patents, and the entire contents of the U.S. Code, to mention but a few examples. None of this requires timesharing. The days of timesharing to obtain access to mainframe computers are long gone, as IBM and DEC will tell you. Whoever has suggested that DeCA insist on such a primitive means of report delivery has done DeCA a great disservice.[4]

There are many serious problems with the method of report delivery that the DRFP requires. For instance:

- <u>Access time</u>. Today, when a DeCA buyer wants to examine a particular report on a work station, the report is formatted and delivered within seconds. The same thing would be true of any terminal networked to the work station, with the work station acting as a server. Instant access is possible because the "pipe" connecting the database to the screen, or to the networked terminal, has the capacity to transfer and display millions of bytes per minute. On the other hand, if a DeCA buyer had

---

[4] There are a few databases that actually are so large that they are currently available only through timesharing. Some examples are all SEC corporate filings (available on Internet), NASA's photographs of planetary objects (mostly available on Internet) and all state court legal decisions (the decisions of individual states are available on CD-ROM, however). In print form, these databases fill large rooms. Commissary scanner data simply is not so voluminous, and a skilled company can make it available at a work station.

DEFENSE COMMISSARY AGENCY
HEADQUARTERS
FORT LEE, VIRGINIA 23801-6300

October 10, 1995

MARKETING & MANAGEMENT INFORMATION, INC.
Attn: Loretta M. Downey
4800 Montgomery Lane, Suite 700
Bethesda, MD 20814

Dear Ms. Downey:

This agency is in receipt of your correspondence of August 8, 1995, within which you describe an issue concerning solicitation # DECA01-94-R-0068 for Analytical Support Services for Category Management, and further proclaim that said issue should be considered as an *agency* protest.

You are advised that, in accordance with the Federal Acquisition Regulation (FAR) Part 33, as well as provision # L.14 of the solicitation, this protest has been reviewed by this agency. The results of that review are identified below :

The specific issue raised by MAMI expresses concern about the "legal basis for requiring supermarket scanner data comparisons under the RFP". This issue was originally articulated by MAMI in its written response (dated November 16, 1994) to the draft request for proposal. At that time, DeCA conducted an analysis of the specific issue raised by your firm, and subsequently confirmed that specifications that do not exceed an agency's minimum needs are considered reasonable. DeCA has previously determined that supermarket scanner data comparisons are one of its' minimum needs under this solicitation in order to perform category management properly. DeCA has a need to know what is going on in the various categories of merchandise outside of the military installation, in order to ensure that it meets its patrons' needs. It has further been determined that it is the agency, not the offeror, that is responsible for determining the needs of the agency, and the best method of accommodating them.

As such, you are hereby formally advised that the agency protest submitted has been denied.

Sincerely,

Lawrence P. Hahn
Contracting Officer

**PROVIDED VIA FACSIMILE & CERTIFIED MAIL**

# APPLICATION

Marketing and Management Information, Inc., (hereafter referred to as subscriber), hereby subscribes for a license to use the Defense Commissary Agency (DeCA) raw product movement data (hereinafter referred to as Data) generated by the front end cash register systems used in the commissaries operated by DeCA in the United States. The rate of payment for this subscription shall be $30,000 per month.

The license granted pursuant to this Application is subject to the following terms and conditions:

1. The DeCA retains all ownership, right, and title to the data itself.

2. Data subject to this license consists of a listing by individual commissary stores of the Universal Product Codes (UPC), unit price at the time of data download at the commissary, and number of units sold, by month of sale.

3. Payment by money order, company check, certified check (if other than a company check is issued) or cashier's check made payable to "DFAS-CO" must be received at (by) the Defense Commissary Agency, Acquisition Business Unit, Equipment/Supply Division (RAE), 1300 E Avenue, Fort Lee, VA 23801-1800 before Data will be provided. Beginning June 1996, if payment is not received by the 25th day of the month (or the next business day) following the month for which the data is to be provided, the subscription shall be considered canceled.

4. Firms receiving the Data from DeCA shall not release or sell that Data to any other person, entity or association.

5. Firms receiving Data shall not release or sell reports based on the Data which reflects units sold by individual stores to any person, entity or association other than interested manufacturers and suppliers of resale products.

6. Data will be provided in the medium requested below (8 mm tape; 1/4" cassette tape; or 9-track tape; all are available in either ASCII or EBCDIC) by the last day of the month following the month to which the Data pertains. DeCA's preferred transfer method is using UNIX cpio, tar or dd utilities.

7. Any misuse of the Data in violation of this license will constitute grounds for the immediate revocation of the license and cancellation of this subscription.

Unless the subscriber desires a shorter period, this subscription shall continue uninterrupted from April 1996 through the close of the month following the month of the resolution of the appeal of GSBCA 13466-P, 13469-P, and 13470-P.

Signature by an authorized official of the firm completing this subscription shall constitute the agreement by the firm to by bound by the terms and conditions specified in this Application.

Dated this 23rd day of May, 1996.

Patrick L. Flannery
President
[signature]
(Signature and Title of Authorized Official)

We desire the data in the See cover letter medium.



** TOTAL PAGE.02 **

Nielsen

Ted C. Fichuk
V.P., Marketing Director
Information Services

150 North Martingale Road, Schaumburg, IL 60173-2076
847-605-5110 Fax 847-605-2522

August 15, 1996

Mr. Larry Hahn
Chief, OC/RAE
Defense Commissary Agency
1300 E. Avenue
Fort Lee, VA 23801-1800

Dear Mr. Hahn:

Enclosed please find a completed Application for License Agreement for access to DeCa's product movement information. This application replaces the one we sent you earlier (letter and application dated August 7, 1996), that you rejected. This application is in the original form you requested.

All other conditions conveyed in our August 7, 1996 letter remain the same.

Upon receipt of this letter could you please inform me as to when we might expect delivery so we can prepare our systems.

Sincerely:

Ted C. Fichuk

Enclosure
cc: Lori Buss
Ed Riehl
Craig Meadors

# APPLICATION

The A.C. Nielsen Company, (hereafter referred to as subscriber), hereby subscribes for a license to use the Defense Commissary Agency (DeCA) raw product movement data (hereinafter referred to as Data) generated by the front end cash register systems used in the commissaries operated by DeCA in the United States. The rate of payment for this subscription shall be $30,000 per month.

The license granted pursuant to this Application is subject to the following terms and conditions:

1. The DeCA retains all ownership, right and title to the data itself.

2. Data subject to this license consists of a listing by individual commissary stores of the Universal Product Codes (UPC), unit price at the time of the download at the commissary, and number of units sold, by month of sale.

3. Payment by money order, company check, certified check (if other than a company check is issued) or cashier's check made payable to "DFAS-CO" must be received at (by) the Defense Commissary Agency, Acquisition Business Unit, Equipment/Supply Division (RAE), 1300 E. Avenue, Fort Lee, VA 23801-1800 before Data will be provided. Beginning June 1996, if payment is not received by the 25th day of the month (or the next business day) following the month for which the data is to be provided, the subscription shall be considered canceled.

4. Firms receiving the Data from DeCA shall not release or sell that raw Data to any other person, entity or association.

5. Firms receiving the Data shall not release or sell reports based on the Data which reflects units sold by individual stores to any person, entity or association other than interested manufacturers and suppliers or resale products.

6. Data will be provided in the medium requested below (8 mm tape; 1/4" cassette tape; or 9-track tape; all are available in either ASCII or EBCDIC) by the last day of the month following the month to which the Data pertains. DeCA's preferred transfer method is using UNIX epio, tar or dd utilities.

7. Any misuse of the Data in violation of this license will constitute grounds for immediate revocation of the license and cancellation of this subscription.

Unless the subscriber desires a shorter period, this subscription shall continue uninterrupted from April 1996 through the close of the month following the month of the resolution of the appeal GSBCA 13466-P, 13469-P, and 13470-P.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Signature by an authorized official of the firm completing this subscription shall constitute the agreement by the firm to be bound by the terms and conditions specified in this Application.

We desire the data on an 8-mm tape in the EPCDIC format.

Ted C. Fichuk
Vice President, Marketing IS

Dated this 15th day of August, 1996.

Information Resources, Inc.
8[illegible] [illegible]g Pike, Ste. 600
[illegible], VA 22182

J[illegible], 1996

Mr. Lawrence Hahn
Chief, OC/FAE
Defense Commissary Agency
3[illegible]d E Avenue
[illegible] 23801-6300

D[illegible]hn,

Attached is IRI's completed Application for a license to use the Defense Commissary Agency raw product movement data. Please note that before we finalize our choice of [illegible] we would like to have your technical representative discuss DeCA's transfer [illegible] Gerry Stroobosscher.

[illegible] uest is for the Agency's April, 1996 data. Assuming the data is acceptable [illegible] Development Group, we will quickly follow with a request for ensuing [illegible]

I [illegible]ing today that a $30,000 check to DFAS-CO be expedited to your attention.

[illegible] urs,

[illegible] nd
[illegible], Military Sales & Retail Services

# APPLICATION

_Formation Resources, Inc._, (hereafter referred to as subscriber), hereby subscribes for a license t[illegible] t[illegible] Defense Commissary Agency (DeCA) raw product movement data (hereinafter referred to as Data) ge[illegible] te[illegible] the front end cash register systems used in the commissaries operated by DeCA in the United States. T[illegible] payment for this subscription shall be $30,000 per month.

[illegible] granted pursuant to this Application is subject to the following terms and conditions:

1. The DeCA retains all ownership, right, and title to the data itself.

2. [illegible] subject to this license consists of a listing by individual commissary stores of the Universal Product C[illegible] (UPC), unit price at the time of data download at the commissary, and number of units sold, by month c[illegible].

[illegible] by money order, company check, certified check (if other than a company check is issued) or cashi[illegible] payable to "DFAS-CO" must be received at (by) the Defense Commissary Agency, Acquisi[illegible] Unit, Equipment/Supply Division (RAE), 1300 E Avenue, Fort Lee, VA 23801-1800 before D[illegible] provided. Beginning June 1996, if payment is not received by the 25th day of the month (or the next [illegible]) following the month for which the data is to be provided, the subscription shall be conside[illegible]d.

[illegible] ceiving the Data from DeCA shall not release or sell that Data to any other person, entity or associat[illegible]

[illegible] receiving Data shall not release or sell reports based on the Data which reflects units sold by individ[illegible] any person, entity or association other than interested manufacturers and suppliers of resale prod[illegible]

[illegible] be provided in the medium requested below (8 mm tape; 1/4" cassette tape; or 9-track tape; all ar[illegible] [illegible]ther ASCII or EBCDIC) by the last day of the month following the month to which the Data pertai[illegible] [illegible] referred transfer method is using UNIX cpio, tar or dd utilities.

[illegible] use of the Data in violation of this license will constitute grounds for the immediate revoca[illegible] [illegible]cense and cancellation of this subscription.

[illegible] subscriber desires a shorter period, this subscription shall continue uninterrupted from April 19[illegible] [illegible]se of the month following the month of the resolution of the appeal of GSBCA 13466-P, 13[illegible] -P.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

[illegible] an authorized official of the firm completing this subscription shall constitute the agreement by the f[illegible] [illegible]und by the terms and conditions specified in this Application.

We des[illegible] in the _8 mm tape or 9-track tape_ medium.

_[signature]_ _VP Trade Services_ Dated this _16_ day of _July_, 1996.
[illegible] Title of Authorized Official)



TOTAL P.03