**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| MARKETING AND MANAGEMENT INFORMATION, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 99-194C (Judge Bruggink) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE***

Charles J. Cooper
COOPER & KIRK, PLLC
1500 K Street, NW
Suite 200
Washington, D.C. 20005
(202) 220-9600
*Counsel of Record for Plaintiff*

*Of Counsel*:
Vincent J. Colatriano
Derek Shaffer
Nikki Chtaini
COOPER & KIRK, PLLC
1500 K Street, NW
Suite 200
Washington, D.C. 20005
(202) 220-9600

July 8, 2004

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... ii

APPENDIX TABLE OF CONTENTS (FILED UNDER SEAL) ..... iv

COUNTER-STATEMENT OF THE ISSUES ..... 2

PROCEDURAL BACKGROUND ..... 3

ARGUMENT ..... 4

I. THE FACT THAT THE CONTRACT DID NOT CALL FOR THE 4 EXPENDITURE OF APPROPRIATED FUNDS DOES NOT FORECLOSE MMI'S RECOVERY OF MONEY DAMAGES. ..... 4

II. MMI HAS NOT WAIVED ITS RIGHT TO ASSERT BREACH. ..... 9

III. THE BREACH OCCURRED PRIOR TO THE CONTRACTING OFFICER'S NOTICE OF TERMINATION OF THE CONTRACT ON JUNE 12, 1998. ..... 11

IV. MMI IS ENTITLED TO RECOVER DAMAGES BEYOND DECEMBER 31, 1998. ..... 14

V. MMI IS ENTITLED TO RECOVER INTEREST UNDER THE CDA ..... 16

VI. KENNETH METCALFE IS QUALIFIED TO TESTIFY UNDER FEDERAL RULE OF EVIDENCE 702 AND THE STANDARDS SET FORTH IN *DAUBERT* AND *KUMHO* TIRE ..... 20

CONCLUSION ..... 26

# TABLE OF AUTHORITIES

**Cases** **Page**

*Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*, 249 F.3d 1341 (Fed. Cir. 2001)....................21

*Cedar Chem. Corp. v. United States*, 18 Cl. Ct. 25 (1989)....................18

*City of Burbank v. United States*, 47 Fed. Cl. 261 (2000), *rev'd on other grounds*,18 273 F.3d 1370 (Fed. Cir. 2001)....................18

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ....................20, 21

*Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350 (Fed. Cir. 1999) ....................5

*Florida Power & Light Co. v. United States*, 307 F.3d 1364 (Fed. Cir. 2002) ....................18

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002)....................6

*Furash & Co. v. United States*, 252 F.3d 1336 (Fed. Cir. 2001)....................6

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................20, 21

*Laka Tool & Stamping Co., Inc. v. United States*, 7 Cl. Ct. 213 (1984)....................5

*Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002) ....................22

*Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387 (Fed. Cir. 2003)....................21

*MMI v. United States*, 57 Fed. Cl. 665 (2003)....................4, 19

*MMI v. Beale*, Nos. 96-1271 & 97-1171, 1998 U.S. App. LEXIS 10199 (Fed. Cir. May 19, 1998) ....................19

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000)..........6

*New York v. Solvent Chemical Co., Inc.*, 225 F. Supp. 2d 270 (W.D.N.Y. 2002)....................22

*Pandrol USA, LP v. Airboss Railway Products, Inc.*, 320 F.3d 1354 (Fed. Cir. 2003)....................5

*Regal Cinemas, Inc. v. W&M Props.*, Nos. 02-3450 & 02-3514, 2004 U.S. App. LEXIS 1367 (6th Cir. Jan. 27, 2004)....................23

*Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002)....................25

*Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 (7th Cir. 2000).......22, 23

*TVA v. United States*, 13 Cl. Ct. 692 (1987)....................6

*United States v. Triple A Machine Shop, Inc.*, 857 F.2d 579 (9th Cir. 1988)................................18

*United States v. Winstar Corp.*, 518 U.S. 839 (1996)............................................................................8

*Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir. 1995) ....................................................8

**Statutes**

41 U.S.C. § 601.....................................................................................................................16

41 U.S.C. § 602(a) ...............................................................................................................17

**Other**

FRE 702 ...............................................................................................20, 21, 22, 23

RCFC 5.2(a)(1)(C).......................................................................................................................2

RCFC 5.2(a)(2) .............................................................................................................................2

RESTATEMENT (SECOND) CONTRACTS 2d § 346 ....................................................................6

**APPENDIX**
**TABLE OF CONTENTS**

**Page**

Affidavit Of Kenneth P. Metcalfe In Support Of Plaintiff Marketing And Management Information, Inc.'s Response to Defendant's Motion *In Limine* (July 8, 2004)....................802

Excerpts from Deposition of Kenneth P. Metcalfe (Feb. 19, 2004) ....................814

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| MARKETING AND MANAGEMENT INFORMATION, INC., Plaintiff, | ) | |
| v. | ) | No. 99-194C (Judge Bruggink) |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE***

What the Government has styled and submitted as its "motion *in limine*" is, in large part, no such thing. While correctly identifying the purpose of such a motion as " 'to prevent a party before trial from encumbering a record with . . . cumulative matters,' " Motion *in Limine* ("Gov't Motion") at 11 (quoting *Weeks Dredging & Contracting Inc. v. United States*, 11 Cl. Ct. 37, 45 (1986)), the Government blithely endeavors, on the eve of trial, effectively to *re*-litigate the issue of contractual liability notwithstanding this Court's grant of summary judgment in favor of Plaintiff Marketing and Management Information, Inc. ("MMI") on that very point. Thus, the Government uses its motion *in limine* to revisit the issue of the Defense Commissary Agency's ("DeCA") contractual liability, raising arguments that are every bit as untimely as they are implausible; and it even goes so far as to argue, as it should have *some five years ago*, when MMI filed its complaint in April 1999, that "the Court should dismiss MMI's complaint because MMI fails to state a claim upon which relief can be granted." Gov't Motion at 9, 14. This gambit can only detract from meaningful efforts to frame and crystallize the damages issues this Court will have to adjudicate at trial. As it stands now, the Government's contractual liability for its breach

of contract has been established as the law of the case, and the time for the Government to present contrary arguments has long since passed. With respect to the remaining arguments raised by the Government, they may be procedurally appropriate, but they are substantively without merit.[1]

## COUNTER-STATEMENT OF THE ISSUES

Pursuant to RCFC 5.2(a)(1)(C) and 5.2(a)(2), MMI notes that the Government's Motion raises the following issues:

(1)(a) Whether the Government has preserved any argument that the Court should dismiss MMI's complaint because the parties' contract did not call for the use of appropriated funds; and, if so (b) whether the fact that the contract did not call for the use of appropriated funds precludes MMI from recovering damages for the breach of that contract.

(2)(a) Whether the Government has preserved its argument that MMI has waived its right to recover damages for the Government's breach; and, if so (b) whether MMI waived its right to collect damages (i) by failing to file a pre-solicitation protest on grounds that DeCA rejected at the time and that have been rejected as meritless by this Court, or (ii) by failing to file multiple legal challenges to DeCA's non-exclusive sales of scanner data.

(3)(a) Whether the Government has preserved its argument, which it frames as a discussion of the appropriate breach date, that the Government as a matter of law could not have breached the contract at any time during what it contends was the contract's term; and, if so (b)

[1] Concurrently with the filing of this brief, MMI is filing, under seal, a short appendix of relevant materials. To maintain consistency with appendices previously filed by MMI, the pages in this appendix have been numbered beginning on page 802, and MMI will cite to this appendix as "Pl. App. ___." Citations to "Pl. App." with page numbers between 1 and 801 refer to the appendices filed by MMI in connection with its previous motion for partial summary judgment as to liability. Finally, citations herein to "Def. App." are to the Appendix to Defendant's Motion *In Limine*.

whether the Government can rely on a GSBCA decision that this Court has held was incorrect and that DeCA contended before the Federal Circuit was moot to argue that no breach could have possibly occurred before June 12, 1998.

(4) Whether MMI may recover damages for the period after December 31, 1998.

(5) Whether the parties' contract was one for the disposal of personal property within the meaning of the Contract Disputes Act, thus entitling MMI to recover interest on its claim.

(6) Whether the expert witness retained by MMI, Kenneth Metcalfe, who has substantial experience and expertise in preparing and analyzing economic damages claims and analyzing economic and financial issues, is disqualified from testifying as to economic issues pertinent to this case by virtue of the fact that he is not an economist.

**PROCEDURAL BACKGROUND**

The Government is fundamentally correct in its account of the prior proceedings in this case. "Pursuant to the Court's order dated June 5, 2002, the parties filed cross-motions on the issues of liability with the exception of two issues, (1) whether the contract in question was one for . . . ADPE[], and (2) the value of the ADPE." Gov't Motion at 8-9. The Government was in no way precluded from contesting liability during the summary judgment stage on the grounds it now raises, including (*i*) that "the parties did not intend for MMI to recover any appropriated funds in the form of damages from its non-performance of the Contract," *id*. at 13; (*ii*) that "MMI relinquished its right to claim breach of contract damages by voluntarily and knowingly entering into a contract with significant ADPE requirements without the agency's seeking approval of GSA," *id*. at 14; or (*iii*) that "DeCA could not and did not breach the Contract because the GSBCA ruled that the Contract never existed," *id*. at 19. The claimed import of each of these new arguments is now that DeCA *cannot be held liable to MMI* by this Court.

In moving for partial summary judgment more than 20 months ago, MMI argued that it was "entitled to judgment as a matter of law on the issue of *the Government's liability for breach of contract*." Plaintiff's Motion for Partial Summary Judgment at 2 (filed Oct. 18, 2002) (emphasis added). The Government contested that motion on various grounds and retained the right to argue -- in the event that this Court deemed the contract a "procurement" within the meaning of the Brooks Act -- the two specific ADPE questions expressly reserved by the Court's order. But the Government neither presented nor preserved its freshly-conjured arguments for getting DeCA off the liability hook. And in August of last year this Court expressly rejected the liability arguments that the Government did make, granting partial summary judgment to MMI on liability on its breach of contract claim. *See MMI v. United States*, 57 Fed. Cl. 665 (2003).

**ARGUMENT**

**I. THE FACT THAT THE CONTRACT DID NOT CALL FOR THE EXPENDITURE OF APPROPRIATED FUNDS DOES NOT FORECLOSE MMI'S RECOVERY OF MONEY DAMAGES.**

Frustrated in its effort to invoke the Federal Acquisition Regulations ("FAR") and the Brooks Act as bases for reneging on its contractual obligations to MMI, the Government now hopes to evade those obligations on the opposite ground: Observing, with reference to this Court's decision, "that the Contract did not involve the expenditure of any Government funds, appropriated or otherwise," the Government reasons that "the parties did not intend for MMI to recover any appropriated funds in the form of damages from its non-performance of the Contract." Gov't Motion at 13. As adverted to earlier and detailed below, this line of argument is procedurally foreclosed to DeCA. But it is also spurious in the extreme.

First, there can be no doubt that this argument was waived long ago. The import of the argument, according to the Government, is that "MMI has failed to state a claim for which relief

can be granted." Gov't Motion at 14. There is no valid, newfound basis for the Government to be raising this argument at this extraordinarily late stage, for it is, as the Government says, founded "upon the plain language of the Contract" (and language emphasized with all-capitals at that), Gov't Motion at 13, which was written, fixed, and readily available to both parties well in advance of this suit. Moreover, the argument is squarely foreclosed by the Court's summary judgment decision, which addressed competing arguments regarding DeCA's liability and decided them in favor of MMI. At this stage, DeCA's liability to MMI is the law of the case and, after having lost on summary judgment its legal arguments as to why it could not be held liable under the contract, DeCA is not entitled to advance, under the auspices of a motion *in limine*, yet another wave of arguments as to why it should not be held liable.[2] Accordingly, MMI respectfully submits that this argument has been waived by the Government. Indeed, it would be difficult to find a more clear-cut example of waiver. *See Pandrol USA, LP v. Airboss Railway Prods., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003) (Defendant's liability argument "was waived when it was not raised in response to the motion for summary judgment"); *Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1353 (Fed. Cir. 1999) (same).

Even if this argument were timely raised, however, such that the Government could properly use its motion *in limine* as a *de facto* vehicle for seeking reconsideration of this Court's summary judgment decision, the argument would still fail on its own terms. To be clear, although the Government couches the argument in terms of "the absence of appropriated funds to fund the contract," Gov't Motion at 14, it does *not* argue that DeCA is a Non-Appropriated Fund Instrumentality ("NAFI") over which this Court lacks jurisdiction. Presumably, the Government

[2] *See Laka Tool & Stamping Co., Inc. v. United States*, 7 Cl. Ct. 213, 216 (1984) ("Under the 'law of the case' doctrine, legal issues previously determined by the same trial court or an

steers clear of that argument because Congress has very clearly authorized DeCA to use appropriated funds and to be sued for money damages in cases such as this.[3] And, indeed, DeCA has expressly conceded in its discovery responses that it is properly subjected to suit for, and authorized to pay, money damages. *See, e.g.*, Pl. App. 545 (admission that "DeCA is generally authorized, as an agency, to receive and utilize appropriated funds"); *see also* Pl. App. 541, 544, 548. Thus, the Government is obliged to characterize this argument as one relating to contractual intent, *i.e.*, "the *parties did not intend* for MMI to recovery any appropriated funds in the form of damages from its non-performance of the Contract." Gov't Motion at 13 (emphasis added).

That argument simply does not hold water. And it drowns in a sea of contrary authority. As noted in our motion *in limine*, it is axiomatic that the Government is generally bound by the same principles of contract law as is a private party. *See, e.g.*, Plaintiff's Motion *in Limine* ("MMI Motion") at 4 (filed May 21, 2004); *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002); *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607 (2000). It is likewise axiomatic that a plaintiff complaining of a breach of contract is entitled to seek relief in the form of money damages. This is true regardless whether the contract entails a monetary exchange or a bartered exchange of goods and services.[4] Whatever the mode or substance of the performance contemplated by a particular contract, the available and intended

---

appellate court in the same case are binding on the trial court or an administrative board throughout the case."); *TVA v. United States*, 13 Cl. Ct. 692, 695 (1987).

[3] "To establish jurisdiction, the plaintiff need not show that appropriated funds have actually been used for the agency's activities, but only that 'under the agency's authorizing legislation Congress could appropriate funds if necessary.' " *Furash & Co. v. United States*, 252 F.3d 1336, 1339 (Fed. Cir. 2001) (quoting *L'Enfant Plaza Props. v. United States*, 668 F.2d 1211, 1212 (Ct. Cl. 1982)). Congress has provided general authorization in 10 U.S.C. § 2484 for DeCA to receive and utilize appropriated funds.

[4] *See, e.g.*, RESTATEMENT (SECOND) CONTRACTS 2d § 346, cmt. a ("*Every* breach of contract gives the injured party a right to damages against the party in breach, unless the contract is not enforceable against that party . . . .") (emphasis added).

relief for any breach remains the same: a possible award of money damages, typically measured by the non-breaching party's expectancy.

When the Government reasons that, because the parties' contract noted that "THE CONTRACT DOES NOT INVOLVE THE EXPENDITURE OF ANY APPROPRIATED FUNDS," "the parties did not intend for MMI to recover any appropriated funds in the form of damages" in the event of a breach, Gov't Motion at 13, it indulges in a gross *non sequitur*. The contract at issue obviously contemplated *performance* by both parties of their respective obligations under the contract; and it is absolutely true that the parties did not intend DeCA to expend any appropriated funds pursuant to *that*. But the gravamen of this case is that DeCA *failed* to perform its obligations under the contract. Nowhere in the contract do the parties state their intentions with respect to non-performance -- which is to say, breach -- nor can any intention by MMI to deprive itself of the remedies ordinarily available at contract law, including money damages, reasonably be inferred. And we are aware of no authority standing for the proposition that the Government cannot be held liable for money damages on the basis of a sales, as opposed to procurement, contract. Instead, the Government appears to have just made up this argument as part of its multi-faceted, seemingly endless effort to evade and/or dispel DeCA's contractual liability in this case.

The absurdity of the Government's contractual intent argument is further underscored when one considers its implications. In arguing that the parties agreed that MMI would not be able to recover appropriated funds in the form of damages if DeCA failed to perform, the Government is necessarily contending that the parties agreed that the contract was enforceable only if MMI failed to perform its obligations, but not if DeCA failed to honor its obligations. Such a one-sided, unenforceable "contract" is no contract at all, but is instead an illusory promise. The Government can point to no evidence that demonstrates that the parties intended to leave DeCA

free to perform, or not to perform, its end of the deal on its own whim.[5]

Even more ill-conceived is the Government's bizarre notion that, "by acceding to the absence of a termination for convenience clause, MMI assumed the risk that it would not be paid any money for the premature termination of the Contract." Gov't Motion at 14. The Government has it completely backwards. It is when the parties "accede" to the *presence* of a termination for convenience clause, not to the *absence* of such a clause, that the private party "assume[s] the risk that it would not be paid any money for the premature termination of the" contract. The whole point of a termination for convenience clause, as the name suggests and the Government surely knows, is to permit the Government to terminate for its convenience, thereby sharply *limiting* the Government's liability for money damages. Given the "absence" of such a clause from the contract, MMI knew that DeCA would *not* be able to terminate for convenience, and, if it attempted to, would assume full liability for money damages. The Government's argument to the contrary is akin to arguing that, "by expressly and repeatedly invoking his right to an attorney, defendant knowingly and intelligently waived it"; or that, "by shouting at the intruder to depart immediately, the homeowner clearly consented to entry." In no way did MMI bargain for, or deserve to be, subjected to recurring arguments of this strain.

[5] *Cf. United States v. Winstar Corp.*, 518 U.S. 839, 921 (1996) (Scalia, J., concurring) ("If, as the dissent believes, the Government committed only 'to provide [certain] treatment unless and until there is subsequent action,' . . . then the Government in effect said 'we promise to regulate in this fashion for as long as we choose to regulate in this fashion' – which is an absolutely classic description of an illusory promise."); *Winstar Corp. v. United States*, 64 F.3d 1531, 1550 (Fed. Cir. 1995) (*en banc*) ("The contracts the agencies properly enter into are not binding only at the grace of the legislative branch.").

## II. MMI HAS NOT WAIVED ITS RIGHT TO ASSERT BREACH.

In addition to arguing that MMI's initial complaint was invalid, DeCA claims that MMI has waived its entitlement to money damages. According to the Government, MMI waived this argument on "November 15, 1994, when Ms. Downey notified the contracting officer that DeCA should obtain a [Delegation of Procurement Authority] from GSA." Gov't Motion at 15. Ironically, the Government first articulated this argument on May 21, 2004, more than five years into this litigation and ten years after the supposed "waiver" occurred. If there is such a thing as valid waiver, then surely the Government has committed it here. For the reasons stated with respect to the Government's first argument, this one, which goes to DeCA's liability to MMI, has been waived and is foreclosed by the existing law of the case.

Again, though, even assuming that this Court were to excuse the Government's waiver, and to treat the motion as seeking reconsideration of the grant of summary judgment in favor of MMI, the argument itself is preposterous. First, and most importantly, the waiver argument is no stronger, and in fact far weaker, than the Brooks Act argument this Court has already rejected on the basis of reasoning that the Government no longer contests. It is disingenuous to pretend, as the Government does, that "the solicitation . . . should not have proceeded," Gov't Motion at 15, merely because of a GSBCA decision that this Court has now held to be *erroneous*. What the Government endeavors to do is to make a "near miss" argument: it reasons, in essence, that although the Brooks Act did not in fact apply, it almost did, and because MMI suggested that the statute might be argued to apply, MMI should now be treated as if it really did apply. That is not the law of waiver, nor is it law of any kind; it is pure fancy on the Government's part. Suffice it to say that a party's suggestion of a possible argument against a contract's validity has not been thought to foreclose that party, once it enters the contract, from championing the contract's valid-

ity. Not surprisingly, the Government cites no authority to the contrary.

Second, after MMI alerted DeCA to a possible Brooks Act concern with respect to one fairly minor aspect of the draft Request for Proposals (the requirement that the contractor obtain commercial supermarket scanner data), DeCA continued to take the position that the Brooks Act did not apply to the contract. *See, e.g.*, Pl. App. 187 ("this is a non-federal information processing, FIP acquisition"). *See also* Pl. App. 244. The Government offers no reason as to why MMI could not have reasonably relied upon that assurance, especially in light of this Court's subsequent holding that the assurance was indeed correct and the Brooks Act truly did not apply. If MMI could ever be thought, on the basis of its expression of concern, to have waived a claim to money damages, then surely DeCA must be equally estopped, on the basis of its subsequent assurance, from citing MMI's initial expression of concern as having waived any monetary recovery under the contract. There is no more basis for locking MMI into its suggestion of a possible Brooks Act problem than there is for locking DeCA into its representation that there was no such problem; it would be utterly perverse if, now that MMI has relied upon DeCA's prior representation and *successfully* argued its merit to this Court, MMI were to be deprived of the position that DeCA earlier articulated in order to induce MMI into the contract on the ground that MMI had somehow waived it.

Third, the Government is at its most outrageous in contending that MMI "s[at] on its rights" with respect to "DeCA's sale of scanner data upon a non-exclusive basis" by failing to seek *multiple* injunctions against DeCA's sale of scanner data on a non-exclusive basis. Gov't Motion at 16. No doctrine obliges a victim of a breach to bring a suit apart from its breach of contract action in order to preserve and vindicate its legal rights. And, tellingly, the Government once again cites no authority in support of its self-invented proposition. Here, though, MMI *did*

specifically "file[] a lawsuit in the district court in the Eastern District of Virginia in September 1996," challenging "DeCA's authority to sell DeCA's April 1996 scanner data upon a retroactive basis to IRI and ACNielsen in July and August 1996," and thereafter appealed the adverse decision of the district court, as the Government is obliged to acknowledge. Gov't Motion at 16 & n.5. Evidently, that was not enough to satisfy the Government, which faults MMI for not immediately challenging DeCA's announcement of a spot bid auction in May 1996. The Government nowhere suggests why such an additional challenge was necessary to preserve MMI's rights. No doubt, if MMI had brought *yet another* unsuccessful challenge, the Government would *still* fault it for not having challenged spot bid sales each and every month thereafter. Suffice it to say that MMI could not have been expected to, nor was it obliged to, spare no expense and do everything under the sun in combating DeCA's breach of contract. MMI was more than diligent in attempting to enforce its contractual rights and cannot be deemed to have waived those rights simply because it did not bring an endless series of challenges to DeCA's non-exclusive sales.

## III. THE BREACH OCCURRED PRIOR TO THE CONTRACTING OFFICER'S NOTICE OF TERMINATION OF THE CONTRACT ON JUNE 12, 1998.

The Government's breach date argument has so little logic, or any kind of reasoning, to support it that the Government has trouble maintaining internal consistency with respect to its position on this important issue. In the introduction to its motion, the Government asks the Court to rule that no breach could have possibly occurred prior to May 13, 1998, the date of the Federal Circuit decision vacating the GSBCA ruling. Gov't Motion at 1.[6] On the very next page of its brief, the Government frames the issue as whether the breach could have taken place before June 12, 1998, the day DeCA purported to formally terminate the contract for convenience. *Id.* at 2.

[6] The date of the Federal Circuit's decision was actually May 19, 1998. *See* Gov't Motion at 8.

Then, in its Summary of Argument, the Government reverts back to the May 13, 1998 date. *Id.* at 10. But then, in the heading for its discussion of this issue in the Argument section of its brief, the Government re-reverts back to the June 12, 1998 breach date argument. *Id.* at 16. Ultimately, however, the Government reveals its true agenda when it argues that no breach could have occurred even as late as June 12, 1998 – or at any time thereafter. *Id.* at 18-19. In short, the Government's real argument is that it never breached the contract *at all*, and is thus another thinly veiled attempt to take issue with this Court's liability ruling.

The Government's theory of the date of breach is predicated upon its peculiar conception that the contract was invalid and "non-existent" by virtue of the GSBCA's decision, and bolstered by its notion that, in its words, DeCA's subsequent cancellation "precluded the Contract from existing at all." Gov't Motion at 18-19. One must marvel at this sort of reasoning. The greater marvel, though, is that the Government would dare to offer it in the context of a motion *in limine*. For although the Government initially steers this argument toward specifying a breach date of June 12, 1998 (or perhaps May 19, 1998), it then giddily swerves into yet another direct collision with this Court's summary judgment ruling, concluding that "DeCA could not and did not breach the Contract because the GSBCA ruled that the Contract never existed." Gov't Motion at 19. One wonders what all that prior fuss over the Brooks Act and FAR was really about, establishing the valid and binding nature of the same contract the Government now terms "non-existent" and essentially non-breachable in any event. *Id*.

The argument that an erroneous decision by the GSBCA absolved DeCA of liability is risible, even by comparison to the company in which it travels. First, as we have explained in our own motion *in limine*, it is axiomatic that an erroneous decision by the GSBCA was incapable of altering the legal status and binding operation of the contract, as adjudicated by this

Court.[7] MMI Motion at 3-6. Second, were the Government now correct that, because of the GSBCA decision, no breach could have occurred until June 12, 1998,[8] its representation to the Federal Circuit that the controversy over that decision had fallen moot *prior* to that date would necessarily have been false; that is because a decision on the merits reversing the GSBCA would have actually stood to obligate DeCA to perform under the contract and/or to entitle MMI to damages for an additional period of time. For that reason, and many others, the Government should not be running this argument at this time. In reality, the contract was valid from its inception, and the GSBCA's contrary decision obviated DeCA's breach no more than would an erroneous district court decision that went on to be overturned by a Court of Appeals.

The Government's suggestion that DeCA's unilateral cancellation of the solicitation rendered the contract nonexistent is still worse. If there is any principle that could be said to underlie this argument, it is that the Government's contracting decisions must control ordinary rules of contract law, rather than vice versa. Thus, when DeCA cancelled the RFP on September 30, 1996, that should have been the end of this case, according to the Government, for "[t]hat cancellation precluded the Contract from existing at all." Gov't Motion at 18. The Government here abandons any reliance upon any decision by an adjudicatory body or provision of a contract. Instead, it posits that DeCA's *ipse dixit* by itself trumps any breach of contract action by MMI. What a breathtaking principle of Government contract law this would be: the Government could

[7] Thus, although the Government questions "how the Contract could spring back to life as of May 19, 1998, when the Federal Circuit vacated the GSBCA's decision," Gov't Motion at 18, the obvious answer is that the contract, as a matter of law, was never dead.

[8] The notion that the breach did not occur until June 12, 1998, the date on which DeCA sent a termination for convenience notice, is implausible for another reason as well: It would then follow that, had DeCA simply delayed its notice of termination for several more months, or flatly declined to issue any such notice, it would have left the contract in some netherworld of nonexistence and thereby avoided contractual liability altogether. *See* MMI Motion at 10-11.

dispel its contractual obligations -- and insulate itself against recovery -- merely by canceling them unilaterally. Again, any such principle, which goes to DeCA's liability writ large, should have been advanced much earlier in this litigation and was long ago waived. But assuming that it were properly presented here and now, it is inimical to law and to logic alike. A spurious cancellation by the Government should predictably mark the beginning, not the end, of a breach of contract action by an aggrieved contracting party; and this Court sits in evenhanded adjudication of the parties' respective rights and obligations under the contract to which they agreed, not in blind deference to the Government's *ipse dixit*.

## IV. MMI IS ENTITLED TO RECOVER DAMAGES BEYOND DECEMBER 31, 1998.

The Government is incorrect that the contractual period ended on December 31, 1998. The contract ran for a minimum of three years from its inception, and the evidence shows that it would have been extended for an additional two option years absent DeCA's breach.

As to the initial term of three years, the Government acknowledges that ¶ 8.1 of Section C, the Statement of Work, specified that "this contract will be written for a basic three year period." Def. App. 11. Although ¶¶ B and F.2 and of the contract contemplated, as a default, that the base period would commence on January 1, 1996, Def. App. 5, 35, they did not by any means foreclose postponement of that date in response to intervening circumstances. As we have explained in our motion *in limine,* the circumstances were such that the parties implicitly agreed to postpone the commencement of the initial three-year term by three months, until April 1, 1996; specifically, DeCA extended the incumbent contract with MMI by three months, with the necessary consequence that the new contract was postponed for a corresponding period. *See* MMI Motion at 6-7.

The Government nonetheless argues, based upon ¶ G.1 of the contract, Def. App. 36, that

this modification was foreclosed because there could be no " 'changes in, or deviation from, the scope of work . . . without a written modification to the contract executed by the Contracting Officer.' " Gov't Motion at 21 (quoting Def. App. 36). The problem with that argument is that ¶ G.1 supports the very opposite of the conclusion advanced by the Government. An implicit modification postponing the commencement of the three-year period by three months in no way "changed" or "deviated from" the scope of work – it simply preserved it intact. It is Section C, the "STATEMENT OF WORK" that defines the "scope of work" under the contract, and the Government agrees that ¶ 8.1 of that Section specifies a "basic three year period," without references to a specific contract commencement date. (In contrast, Sections B and F, upon which the Government now relies, speak respectively to "SUPPLIES OR SERVICES AND PRICES / COSTS" and to "DELIVERIES OR PERFORMANCE.") Once the incumbent contract was extended by three months, the new one was without operative effect for that same period; and because the new contract for category management was displaced until April 1, 1996, it necessarily followed from ¶ 8.1 of the Statement of Work that its "basic three year period" would run from that new commencement date – else the contractual period would have been shortened and the *scope of work* thereby changed without the requisite written modification that the Government says never occurred.

The Government's position is that the contract was effectively modified to run for at most a period of six months,[9] rather than a period of three years, notwithstanding the absence of any such written statement by the Contracting Officer. That obviously does far more violence to the three-year period consistently specified throughout the contract, and is less in harmony with the

---

[9] If ever it were to accept liability, the Government would apparently attempt to limit MMI's damages to the period between June 12, 1998 and December 31, 1998, little more than six months.

"scope of work" expressly referred to in ¶ G.1, than MMI's position that the commencement was implicitly postponed in order to preserve the specified three-year term.[10]

Nor does the Government provide a convincing explanation as to why the two option years should not be counted for purposes of calculating damages. MMI's argument is not that DeCA was legally obligated to exercise the options. We have acknowledged that the contract and governing law will not permit such a theory. *See* MMI Motion at 11-12. Rather, MMI's position is that the available evidence (including DeCA's repeated decisions to exercise prior options with MMI and expression of continuing needs for category management services) shows that DeCA would *in fact* have exercised each of the two option years but for its precipitous breach; accordingly, consequential damages should take account of those two option years. *Id.* At the very least, MMI should be permitted at trial to present proof that DeCA would have exercised the two option years had it not breached the contract in 1996. *Id.*

## V. MMI IS ENTITLED TO RECOVER INTEREST UNDER THE CDA.

The Government's next attempt to limit MMI's recovery for the Government's breach of contract centers around the Government's argument that MMI is not entitled to recover interest on its damages claim. Gov't Motion at 24-29. According to the Government, because interest on a claim against the Government is not available unless a statute or contract expressly so provides, and because the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* ("CDA"), the only statute which could arguably provide for the payment of interest by the Government in a breach-of-contract action such as this one, does not apply to the contract between MMI and DeCA, the

---

[10] Of course, the Government's rigid adherence to the dates specified in Sections B and F is squarely at odds with its fast-and-loose efforts to define DeCA's breach as not having occurred until June 1998. If the period of performance was indeed fixed as the Government now contends, then breach by definition occurred as soon as DeCA failed to provide MMI with exclusive access to the requisite commissary data, which was in April 1996.

Government is not liable for interest on MMI's damages claim. The Government's argument ignores the plain language of the CDA, which makes clear that that statue *does* apply to the contract at issue in this case.

By its terms, the CDA applies "to any express or implied contract . . . entered into by an executive agency" for:

(1) the procurement of property, other than real property in being;
(2) the procurement of services;
(3) the procurement of construction, alteration, repair or maintenance of real property; or,
(4) the disposal of personal property.

41 U.S.C. § 602(a). The Government's argument focuses exclusively on the first three subsections of section 602(a). The Government argues that because this Court has already held that the parties' contract was not a "procurement" contract within the meaning of the Brooks Act or the FAR, it necessarily follows that the contract was not a "procurement" contract within the meaning of sections 602(a)(1)-(3) of the CDA. Gov't Motion at 27-28.

But, whatever its merit on its own terms, the Government's argument ignores that the CDA does *not* apply only to "procurement" contracts. As section 602(a)(4) makes clear, the CDA *also* applies to contracts for "the disposal of personal property." 41 U.S.C. § 602(a)(4). It is this provision (all but ignored by the Government[11]), rather than the provisions dealing with procurement contracts, that is relevant to MMI's entitlement to interest on its claim.

The scope of section 602(a)(4) is fairly expansive. A contract is for the disposal of personal property when it provides for the disposal of personal property owned by the Government,

[11] While the Government makes the unsupported assertion, in the Summary of Argument section of its motion, that the contract here "does not involve the disposal of personal property by the Government," Gov't Motion at 10, the Argument section of the motion focuses solely on whether this contract is a "procurement" within the meaning of the CDA. *Id.* at 24-29.

as opposed to personal property belonging to a third party. *See Cedar Chem. Corp. v. United States*, 18 Cl. Ct. 25, 32 (1989); *City of Burbank v. United States*, 47 Fed. Cl. 261, 269 (2000), *rev'd on other grounds*, 273 F.3d 1370 (Fed. Cir. 2001). *See also Florida Power & Light Co. v. United States*, 307 F.3d 1364, 1373 (Fed. Cir. 2002) ("It seems clear that if the government purchased natural uranium directly from a third party, enriched the uranium, and sold it to the customer utilities, the contract would be for the disposal of personal property and would be covered by the CDA."). Moreover, the "definition of 'property' owned by the government," including personal property, "is broad." *City of Burbank*, 47 Fed. Cl. at 269 (citation omitted). " 'Personal property' is defined as 'any movable or intangible thing that is subject to ownership and not classified as real property. . . .' " *Id.* (citing BLACK'S LAW DICTIONARY 1233 (1999)). Thus, intangible as well as tangible property can qualify as personal property. *Id.* ("As electric power is property owned by the government, and is not an estate in real property, it is properly characterized as personal property" subject to the CDA).[12]

There can be no doubt that the central subject matter of the contract was the disposal of intangible property owned by the Government – DeCA scanner data. The "Purpose" paragraph of the contract's Statement of Work provided that "[i]n exchange for the product movement data from DeCA, the contractor will provide monetary payments, analytical services, training, periodic product movement/sales data reports and on-line access." Def. App. 6. Indeed, the Government does not dispute this point, as it concedes that "the *sine qua non* of the Contract is the Government's supplying of commissary scanner data to MMI. . . . In essence, the Government was to supply commissary product movement data to MMI in exchange for MMI to pay DeCA

---

[12] *See also United States v. Triple A Mach. Shop, Inc.*, 857 F.2d 579, 584 (9th Cir. 1988) ("the government concedes [that] a leasehold interest in real property can be considered an item of personal property.").

for this data." Gov't Motion at 27.[13] *See also MMI*, 57 Fed. Cl. at 668 (noting that DeCA characterized contract as a "sale exchange contract"); *id.* at 667 (describing DeCA's authority to dispose of scanner data).

Because it is readily apparent that the parties' contract was for the disposal of the personal property of an executive agency, the conclusion is inescapable that the CDA applies to the contract.[14] Despite the Government's contrary suggestion, this conclusion does not at all depend on an argument "that the Contract is really two contracts with separate purposes." Gov't Motion at 26. Moreover, the Government is simply incorrect to the extent it suggests that the CDA only applies to contracts that provide for the use of appropriated funds. *Id.* at 28. Since the CDA applies, without qualification, to contracts for the disposal of the Government's personal property, and since such contracts, almost by definition, call for the contracting federal agency to *receive* funds rather than to spend funds (appropriated or otherwise), there can be no question that contracts falling under section 602(a)(4) of the CDA are governed by the CDA regardless of whether those contracts call for the expenditure of appropriated funds.

In short, because the CDA does apply to the contract between DeCA and MMI, MMI is entitled to recover interest on its damages claim as provided by that statute.

---

[13] *See also* Gov't Motion at 25-26 ("The primary purpose of the Contract was to sell commissary scanner data to a company that would process the data, provide it to DeCA's suppliers for a fee, as well as to DeCA, and to provide DeCA with analytical support services.").

[14] It is worth noting in this regard that in dismissing as moot MMI's appeal of the GSBCA decision, the Federal Circuit directed that, should the parties be unable to reach a settlement of their dispute, that dispute should be resolved "through the procedures of the Contract Disputes Act." *MMI v. Beale*, Nos. 96-1271 & 97-1171, 1998 U.S. App. LEXIS 10199, at *6 (Fed. Cir. May 19, 1998) (Pl. App. 279). DeCA has never, until now, suggested that the Federal Circuit's direction was wrong.

## VI. KENNETH METCALFE IS QUALIFIED TO TESTIFY UNDER FEDERAL RULE OF EVIDENCE 702 AND THE STANDARDS SET FORTH IN *DAUBERT* AND *KUMHO* TIRE.

Finally, the Government argues that certain opinions expressed by MMI's damages expert, Kenneth Metcalfe, should be stricken, and that Mr. Metcalfe should be precluded from testifying at trial "upon any economic matters." Gov't Motion at 36. According to the Government, Mr. Metcalfe lacks sufficient "expertise" to offer relevant and reliable opinion testimony with respect to such "economic" matters. *Id.* at 34-36. The Government's arguments mischaracterize both the law and the facts relating to Mr. Metcalfe's relevant expertise. Because Mr. Metcalfe is qualified as an expert with respect to the matters on which he is prepared to testify, and because his specialized knowledge will assist the Court in the trial of the damages issues in this case, the Government's effort to limit Mr. Metcalfe's testimony (and to thereby leave a portion of the Government's own expert testimony essentially unrebutted by any expert) must be rejected.

The standard set forth in Federal Rule of Evidence ("FRE") 702 is straightforward:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FRE 702. Under the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), trial courts must ensure that expert opinion testimony is both reliable (*i.e.*, that it is based upon " 'scientific, technical, or other specialized knowledge' ") and relevant (*i.e.*, that it will "assist the trier of fact to understand the evidence or to determine a fact in issue"). *Daubert*, 509 U.S. at 590-91 (quoting FRE 702). *See also Kumho Tire*, 526 U.S. at 147.

In performing this "gatekeeping" role, trial courts must keep in mind that the Supreme Court has "emphasize[d]" that the FRE 702 inquiry is "a flexible one." *Daubert*, 509 U.S. at 594. Trial courts have considerable latitude in determining whether proffered expert testimony is sufficiently relevant and reliable to warrant admission. *See, e.g.*, *Kumho Tire*, 526 U.S. at 142 ("[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.") (emphasis in original); *id.* at 152-53. *See also Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003). Perhaps most important, while a trial court of course must take its gatekeeper role seriously, " 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.' " *Micro Chemical*, 317 F.3d at 1392 (quoting Advisory Committee Note to FRE 702). As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, [and] presentation of contrary evidence," rather than preclusion of testimony under FRE 702, are "the traditional and appropriate means" of testing expert testimony and evidence. *Daubert*, 509 U.S. at 596. The "flexible" test for admissibility under FRE 702 should not be used by litigants as a way to short-circuit their obligation to try their case. *See, e.g., Micro Chemical*, 317 F.3d at 1392 (holding that where defendants "had ample opportunity to rebut [plaintiff's experts] damages theory during cross-examination," and to present "their competing theory through the testimony of their own expert witness," the trial court did not abuse its discretion in allowing plaintiff's expert to present damages testimony based upon plaintiff's version of the contested facts).[15]

In keeping with the "flexible" nature of the inquiry under FRE 702 and *Daubert*, there are

---

[15] *Cf. Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) ("When competing views of qualified experts satisfy [relevance and reliability] criteria, the trier of fact may consider them in reaching its decision. Indeed, it would contravene fundamental principles of due and fair process to withhold evidence of disparate sci-

no rigid requirements governing an expert's qualifications. In particular, contrary to the apparent but unstated premise of the Government's argument, there is no requirement that an expert hold particular academic credentials or professional certifications. The plain language of FRE 702 permits a witness to be qualified as an expert "by knowledge, skill, experience, training, *or* education." FRE 702 (emphasis added). As the Seventh Circuit recently noted:

> The notion that *Daubert* . . . requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be "scientific" (natural scientific or social scientific) in character. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.

*Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (citations omitted).[16]

As assessed against a backdrop of the legal and evidentiary principles discussed above, the Government's efforts to strike portions of Mr. Metcalfe's rebuttal report and to preclude Mr. Metcalfe from testifying as to certain issues at trial fall far short. The Government asserts that Mr. Metcalfe is not qualified to testify with respect to economic issues. Gov't Motion at 33-36. The Government's primary argument is that Mr. Metcalfe does not have sufficient academic training in the field of economics. *Id.* at 34-35. In this regard, the Government attempts to contrast Mr. Metcalfe's credentials with the credentials of one of the Government's experts, Dr. Gustavo Bamberger. *Id.* at 35. But the Government is setting up a strawman with this argument.

---

entific opinion relevant to the findings . . . required of the jury."); *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) ("The *Daubert* analysis should not supplant trial on the merits.").

[16] "Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications. 'Accordingly, assuming that the proffered expert has the requisite minimal education and experience in a relevant field, courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit.' " *New York v. Solvent Chemical Co., Inc.*, 225 F. Supp. 2d 270, 284 (W.D.N.Y. 2002) (citations omitted).

As discussed above, there is no requirement, under FRE 702 or *Daubert,* that an expert hold certain academic or professional credentials in order to be qualified to testify with respect to a particular subject matter; the suggestion that such credentials are required is "radically unsound." *Tuf Racing*, 223 F.3d at 591.[17] In short, the fact that Mr. Metcalfe, who has had economics training, does not hold a degree in economics does not render his rebuttal report inadmissible, let alone preclude him from testifying at all as to economic matters. Moreover, the Government ignores that, in addition to being a Certified Public Accountant, Mr. Metcalfe is also a Certified Valuation Analyst, and as such is qualified to opine regarding economic matters relevant to valuation issues. *See* Affidavit of Kenneth P. Metcalfe ("Metcalfe Aff.") ¶ 6, 12 (Pl. App. 803, 806).

No doubt aware that its focus upon academic credentials is legally suspect, the Government in its motion does pay lip service to the fact that an expert witness may be qualified by virtue of experience as well as by education. Gov't Motion at 35. But in another straw man argument, the Government attempts to side-step this inquiry by mischaracterizing Mr. Metcalfe's relevant experience.[18] The Government seeks to define that experience narrowly, claiming that Mr. Metcalfe's experience is in the "field of accounting, as applied to damages claims." Gov't

---

[17] *See also Regal Cinemas, Inc. v. W&M Props.*, Nos. 02-3450 & 02-3514, 2004 U.S. App. LEXIS 1367, at *24 (6th Cir. Jan. 27, 2004) (Proffered expert's "mere lack of previous experience with the movie exhibition industry [does not] render his financial analysis [in case involving movie theater's lost profits] inadmissible under Rule 702").

[18] In making this argument, the Government relies in part on Mr. Metcalfe's deposition testimony. In assessing the Government's discussion of this deposition testimony, it is worth noting that Mr. Metcalfe's deposition was taken before the Government submitted the expert report of Dr. Bamberger, and therefore before Mr. Metcalfe prepared his rebuttal report criticizing Dr. Bamberger's analysis. Perhaps for this reason, the Government's deposition inquiries regarding Mr. Metcalfe's experience pertaining to issues relevant to the opinions expressed in his rebuttal report were somewhat unfocused. After Mr. Metcalfe prepared his rebuttal report, coun-

Motion at 34. But even a cursory review of Mr. Metcalfe's resume makes clear that Mr. Metcalfe has substantial experience in providing "expert analysis, consulting and testimony services regarding claims for *economic* damages, including lost profits and increased costs, in a variety of business disputes in numerous industries, as well as . . . general business consulting." Def. App. 131 (emphasis added).[19] That resume also lists numerous examples of Mr. Metcalfe's experience conducting "economic, operational and damage analysis and general business consulting." *Id.* at 132. *See also id.* at 133 ("Proffered various analyses, which have involved developing economic damage models"). *See also* Metcalfe Aff. ¶ 4, 11-16 (Pl. App. 802-03, 805-10).

Mr. Metcalfe has performed economic damages analyses in the field of intellectual property, including damages studies related to infringement of patent, trade secrets, or proprietary agreement rights, Def. App. 135 -- areas which, like this case, involve analyses of economic principles relating to damages in industries in which one party enjoys an exclusive or near-exclusive position in the relevant market. Metcalfe Aff. ¶ 14 (Pl. App. 807-09). In particular, Mr. Metcalfe has had substantial experience in analyzing lost profits, price erosion, and loss of market share related to abrogation of intellectual property rights in the pharmaceutical industry. Metcalfe Aff. ¶ 14 (Pl. App. 807-09). Furthermore, as the affidavit of Mr. Metcalfe describes in detail, Mr. Metcalfe's experience includes work on numerous other matters involving economic issues, such as buyer and supplier dynamics pertaining to electric utilities, which have historically been relatively exclusive providers of electricity to their customers. Metcalfe Aff. ¶ 13-16 (Pl. App. 806-10).

---

sel for MMI offered to make Mr. Metcalfe available for another deposition, but the Government never sought to conduct such a deposition.

[19] *See also id.* ("Performed a broad range of accounting, financial and economic analyses on commercial, regulated industry, construction, telecommunications, intellectual property, financial institution and government contract matters.").

In short, by virtue of Mr. Metcalfe's extensive experience analyzing and developing economic damages models, including lost profits models in regulated industries and in other industries involving exclusive suppliers, there can be little doubt that Mr. Metcalfe possesses sufficient qualifications to present the quite limited economic testimony presented in Mr. Metcalfe's rebuttal report; indeed, Mr. Metcalfe seeks merely to identify and describe flaws, given the facts and circumstances of this case, in Dr. Bamberger's relatively simplistic analysis of economic and price elasticity issues in his expert report. *See* Def. App. 218-29; Metcalfe Aff. ¶ 8-9, 17-20 (Pl. App. 804-05, 810-12). At bottom, the Government's argument that Mr. Metcalfe is not qualified to criticize the Government's own expert's analysis constitutes a transparent attempt to micromanage the presentation of evidence in this case so that the flawed opinions of its own proffered economics expert may be presented without rebuttal from any expert retained by MMI. The proper exercise of this Court's gatekeeping function under *Daubert* and FRE 702 requires the Court to deny the Government's Motion *in Limine* with respect to Mr. Metcalfe's rebuttal report and testimony.[20]

[20] *Cf. Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1301-02 (Fed. Cir. 2002) (affirming decision allowing expert to testify).

## CONCLUSION

For the foregoing reasons, MMI respectfully submits that the Government's Motion should be denied.

July 8, 2004

Respectfully submitted,

/s/Charles J. Cooper___________

CHARLES J. COOPER
Cooper & Kirk, PLLC
1500 K Street, NW, Suite 200
Washington, D.C. 20005
(202) 220-9600
*Counsel of Record for Plaintiff*

*Of Counsel*:
Vincent J. Colatriano
Derek Shaffer
Nikki Chtaini
Cooper & Kirk, PLLC
1500 K Street, NW, Suite 200
Washington, D.C. 20005
(202) 220-9600